**CHAPMAN LAW FIRM, LPA, Plaintiff,**

v.

**UNITED STATES, Defendant.**

**No. 09–891C**

United States Court of Federal Claims.

Filed: November 25, 2013

---

James S. DelSordo, Argus Legal, LLC, Manassas, Va., for plaintiff.

Lauren S. Moore, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant. With her were Gregg M. Schwind, Senior Trial Counsel, Patricia M. McCarthy, Assistant Director, Bryant G. Snee, Acting Director, Commercial Litigation Branch, Stuart F. Delery, Assistant Attorney General, Civil Division, Washington, D.C., and Patricia McGarvey Knebels, of counsel, United States Department of Housing and Urban Development, Philadelphia, Pa.

## OPINION

HORN, J.

Plaintiff, Chapman Law Firm, LPA, asserts three claims [1] against defendant arising from plaintiff's contract with the Department of Housing and Urban Development (HUD) to provide management and marketing services for single-family homes in Ohio and Michigan. Plaintiff seeks compensation for: (1) costs that plaintiff incurred during two stop work order periods issued in response to bid protests filed at the United States Government Accountability Office (GAO), (2) costs that plaintiff incurred as a result of constructive changes to the parties' contract, and (3) what appear to be lost profits resulting from defendant's alleged bad faith failure to exercise the first option year to the parties' contract. In response, defendant asserts a counterclaim under the False Claims Act, 31 U.S.C. § 3729 (2006), as well as a number of affirmative defenses. Defendant maintains that plaintiff violated the False Claims Act by submitting thirteen invoices [2] to the HUD contracting officer, as well as a certified claim, impliedly representing that plaintiff had used licensed inspectors to conduct wood-destroying organisms (WDO) inspections of homes in HUD's inventory, although plaintiff had inspected homes with unlicensed inspectors, and that plaintiff had conducted WDO and routine inspections of homes in the inventory, although the inspections allegedly never occurred.[3] Defendant

---

1. Although plaintiff's Third Amended Complaint asserts four claims against defendant, on July 31, 2013 plaintiff withdrew Count III of its Third Amended Complaint, which relates to the alleged theft of plaintiff's trade secrets.

2. Defendant's Amended Answer to plaintiff's Third Amended Complaint alleges that plaintiff submitted "at least seven invoices to HUD containing false claims." Defendant subsequently identified thirteen invoices, as well as an April 8, 2009 certified claim to a HUD contracting officer, for a total of fourteen alleged false claims as the basis for plaintiff's liability under the False Claims Act in its post-trial briefs.

3. Defendant's Amended Answer to plaintiff's Third Amended Complaint asserted, for the first time, that plaintiff was required to conduct routine inspections in addition to WDO inspections, and that "CLF [Chapman Law Firm, LPA] failed to conduct routine inspections." Defendant's Amended Answer does not include specific allegations concerning plaintiff's failure to conduct routine inspections, instead focusing on plaintiff's failure to conduct WDO inspections and otherwise comingling the two forms of inspections. Defendant more specifically described

plaintiff's failure to conduct routine inspections in its post-trial briefs. Rule 15(b)(2) of the Rules of the United States Court of Federal Claims (RCFC) (2013) states:

> When an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings. A party may move—at any time, even after judgment—to amend the pleadings to conform them to the evidence and to raise an unpleaded issue. But failure to amend does not affect the result of the trial of that issue.

RCFC 15(b)(2). Defendant has not, as of November 25, 2013, moved to amend the pleadings to include specific claims of plaintiff's failure to conduct routine inspections. To the extent that defendant did not raise specific allegations regarding plaintiff's failure to conduct routine inspections in its Amended Answer to plaintiff's Third Amended Complaint, the court treats the additional allegations defendant raised in its post-trial briefs "as if raised in the pleadings" because plaintiff impliedly consented to defendant's presentation of evidence on plaintiff's failure to conduct routine inspections and because

also argues that plaintiff's claims should be barred, in whole or in part, under the doctrines of material breach of contract, unclean hands, offset, and failure to mitigate damages, as well as under the Special Plea in Fraud statute, 28 U.S.C. § 2514 (2006).[4] Plaintiff asserts that defendant's counterclaim is barred by defendant's "own breach of contract," estoppel, accord and satisfaction, and "own lack of reliance on any statement made by CLF."[5] Trial was held in two phases, as a result of plaintiff's belated and rolling production of documents, which is described below.

## FINDINGS OF FACT

### Stop Work Order Periods

On September 30, 2005, HUD awarded Contract No. C–PHI–00958 (the contract) to plaintiff for the management and marketing of single family homes in Ohio and Michigan. Following a bid protest to the contract award, *see Greenleaf Constr. Co.*, B293105.18, B–293105.19, 06 CPD ¶ 19, 2006 WL 249626 (Comp. Gen. Jan. 17, 2006),[6] the original contract was replaced in its entirety by Modification 0003,[7] which was issued on December 19, 2006, and became effective on January 1, 2007.[8] The contract, as amended, was an indefinite quantity, fixed-unit-rate contract with a total estimated value of $34,745,000.00 for the base period of the contract. Plaintiff was compensated under the contract for each service that it provided to HUD with respect to properties that HUD transferred to plaintiff's inventory.[9] Under the contract, as amended, plaintiff was to provide management and marketing services for the HUD Homeownership Center "Philadelphia B," which corresponded geographically to the states of Ohio and Michigan.

The base period of the contract, as amended, was from January 1, 2007 to December 31, 2007. The contract provided for a transition period, which included a "Start Up" phase, in which plaintiff was to prepare to perform the contract by establishing infrastructure and hiring personnel, as well as a "Ramp Up" phase, in which plaintiff was to receive properties in its inventory until the date on which plaintiff was responsible for fully performing the contract. The contract also included four option years with the potential to extend the contract to December 31, 2011. If defendant intended to extend

---

plaintiff responded, albeit briefly, to defendant's allegations regarding routine inspections in plaintiff's post-trial briefs. *See E.L. Hamm & Assocs. v. England*, 26 Fed.Appx. 936, 937 (Fed. Cir.2002) (citing *Erickson v. United States*, 159 Ct.Cl. 202, 210, 309 F.2d 760, 764 (1962)); *Laningham v. United States*, 5 Cl.Ct. 146, 156 (1984); *see also Kirkland v. District of Columbia*, 70 F.3d 629, 633 (D.C.Cir.1995) (noting that the equivalent Rule 15(b)(2) of the Federal Rules of Civil Procedure "does not require that the parties realize that the issue was not in the pleadings, just that it was presented at trial" (citations omitted)); *cf. Belizan v. Hershon*, 434 F.3d 579, 584 (D.C.Cir.2006) ("[T]he heightened pleading standard of Rule 9(b), which requires a plaintiff to plead any allegation of fraud with specificity, does not alter the operation of Rule 15(a)." (citation omitted)).

4. Defendant has not alleged that rescission of the parties' contract and disgorgement of payments made to plaintiff is warranted. In addition, defendant has not alleged that plaintiff is liable under the Contract Disputes Act for an inability to "support any part of [its] claim[s]." *See* 41 U.S.C. § 604 (2006).

5. The court does not address plaintiff's arguments below as plaintiff did not address them at trial. Nor did plaintiff raise a government knowledge defense. *See Ulysses, Inc. v. United States*, 110 Fed.Cl. 618, 642 (2013).

6. Prior to the protest at the GAO to the award of the contract to plaintiff, plaintiff had protested the contract's award to Green Leaf Construction Company, Inc. and Greenleaf Construction Company, Inc. had filed a protest before the Court of Federal Claims. *See Chapman Law Firm Co., LPA*, B–296847, 2005 CPD ¶ 175, 2005 WL 2430585 (Comp.Gen. Sept. 28, 2005) (citing *Greenleaf Constr. Co. v. United States*, 67 Fed.Cl. 350, 361 (2005)).

7. The original contract was cancelled by Modification 0001.

8. The contract was amended a total of twelve times after award.

9. Under the terms of the original contract and the amended contract, plaintiff was entitled to the following forms of compensation: (1) a property management fee, (2) a vacant lot management fee, (3) a marketing fee, (4) a held off market fee, (5) a custodial fee, (6) a management incentive fee, (7) a marketing incentive fee, and (8) reimbursement for any allowable pass-through expenses.

the contract, defendant was required to give plaintiff a preliminary notice at least sixty days before the contract's expiration, followed by a formal notice at least thirty days before the contract's expiration. *See* FAR 52.217–9 (2000). The contract, as amended, explicitly stated, however, that "[t]he preliminary notice does not commit the Government to an extension."

Although plaintiff was to begin performance of the original contract on October 1, 2005, a bid protest was filed at the GAO to contest the award of the contract to plaintiff. As a result, the contracting officer stayed plaintiff's performance of the original contract on October 7, 2005. On January 17, 2006, the GAO issued a decision on the bid protest, finding that plaintiff had made material changes to its proposal during the course of the procurement, that a potential conflict of interest was created by Frank Chapman's ownership of plaintiff, his status as plaintiff's Chief Executive Officer, and receipt of a portion of the profits derived from Lakeside Title, which was HUD's closing agent for the state of Ohio, and which Frank Chapman had owned prior to the award of the contract to plaintiff. *See Greenleaf Constr. Co.*, B–293105.18, B–293105.19, 06 CPD ¶ 19. On April 19, 2006, the contracting officer terminated the original contract pursuant to Modification 0001. Although HUD reissued the solicitation,[10] plaintiff filed a bid protest at the Court of Federal Claims, *see Chapman Law Firm Co. v. United States*, 71 Fed.Cl. 124, and the contract with plaintiff was reinstated on June 12, 2006, pursuant to Modification 0002, prior to the completion of the new procurement. Plaintiff submitted a revised proposal on July 13, 2006, which stated that plaintiff did not require the "transition time of up to six months," which was provided in the solicitation, because plaintiff did

not "require" a transition period and was "prepared to start immediately." Plaintiff submitted a second, revised proposal on November 7, 2006, once again indicating that plaintiff remained "ready, willing and able to immediately commence performance of these services as set forth in the prior and current Requests for Proposals."[11]

The contracting officer issued Modification 0003 on December 19, 2006, which replaced the original contract in its entirety, effectively resolving the new solicitation in plaintiff's favor. Under Modification 0003, plaintiff's performance of the contract was to begin on January 1, 2007. A second bid protest, however, was filed with the GAO on December 29, 2006 by Greenleaf Construction Company, Inc. *See Greenleaf Constr. Co.*, B–293105.21, B–293105.22, B–293105.23, 07 CPD ¶ 84, 2007 WL 1364623 (Comp. Gen. Apr. 4, 2007). As a result, the contracting officer once again stayed plaintiff's performance of the contract on January 3, 2007.

On January 3, 2007, while the second bid protest was pending, plaintiff sent the contracting officer a request for an equitable adjustment relating to the first stop work order period in the amount of $1,884,097.65. Plaintiff asserted entitlement to $385,455.48 in rent for the first stop work order period, which included a third of the cost of utilities for the building in which plaintiff's offices were located. Although not noted in plaintiff's request for equitable adjustment, the building in which plaintiff's offices were located was owned by 925 Keynote Circle Corporation, a separate company owned by Frank Chapman, plaintiff's Chief Executive Officer. Plaintiff also asserted entitlement to $245,632.79 for wages paid to its employees. Plaintiff separately asserted entitlement to

---

10. The parties did not provide the court with complete documentation of HUD's reissuance of the solicitation. The parties' relationship following the termination of the parties' contract has been described in a previous decision issued in the United States Court of Federal Claims. *See Chapman Law Firm Co. v. United States*, 71 Fed. Cl. 124, 126 (2006), *aff'd in part, rev'd in part*, 490 F.3d 934 (Fed.Cir.2007).

11. The parties dispute the length of the first stop work order period. Plaintiff maintains that the

first stop work order extended from October 7, 2005 to December 31, 2006. Although initially arguing that the first stop work order may have only extended from October 7, 2005 to January 17, 2006, the date on which the GAO issued its decision on the first bid protest, defendant asserted during closing argument that the first stop work order period extended only from October 7, 2005 to April 19, 2006, the date on which the HUD contracting officer temporarily terminated the parties' contract for convenience.

compensation for "wages which were simply not paid and where the parties agreed to take less money and seek later reimbursement from HUD," including $119,604.97 for the services of Derek Gasiorowski, who was plaintiff's Quality Control Supervisor and Inspections Supervisor during plaintiff's performance of the contract at issue in this case, $80,000.00 for the services of Justin Smith[12] during plaintiff's performance of the contract, $50,000.00 for the services of John Goss, plaintiff's Vice President of Operations and Contract Compliance during plaintiff's performance of the contract, as well as a technology specialist for plaintiff, and $437,500.00 for the services of Frank Chapman. In addition, plaintiff asserted entitlement to compensation for its "reoccurring expenses," such as payments made for telephone lines and office supplies. Plaintiff separately asserted entitlement to compensation for payments made through Frank Chapman's credit card and a checking account in the amount of $320,152.54, which included costs related to maintaining cellular phones and the purchase of gas and supplies by plaintiff's employees. Plaintiff also sought fifteen percent of what it viewed to be recoverable expenses relating to the stop work order period, which plaintiff characterized as "[p]rofit[s]."

In support of its a request for equitable adjustment relating to the first stop work order period, plaintiff submitted four charts delineating expenses that plaintiff allegedly incurred during the first stop work order period, including rent payments, payroll, payments made via check and electronic transfer, and payments made through Frank Chapman's credit card. Plaintiff's supporting documentation also included modified versions of the two charts relating to the payments made via check and electronic transfer and payments made on Frank Chapman's credit card, which highlighted the expenses that plaintiff believed were related to the first stop work order period. Plaintiff asserted entitlement to reimbursement for lease payments related to two luxury vehicles, lease payments for a number of other vehicles, and train tickets. Plaintiff also asserted entitlement to the cost of maintaining legal liability insurance for plaintiff, the cost of maintaining a permanent seat license for the Cleveland Browns sports team, and costs associated with "Career Builder." In addition, plaintiff asserted entitlement to reimbursement for the services of an accountant who helped plaintiff prepare its request for equitable adjustment relating to the first stop work order period.

The supporting documentation for plaintiff's request for equitable adjustment relating to the first stop work order period also included a copy of the lease between plaintiff and 925 Keynote Circle Corporation, which Frank Chapman signed as President of 925 Keynote Circle Corporation, and Dzenana Kajtezovic signed as "Secretary" of plaintiff. Moreover, the supporting documentation included account statements from plaintiff's utility providers, payroll documentation maintained by a third party, with canceled checks to demonstrate payment, as well as billing statements and other documentation, including electronic receipts of payment relating to the cost of maintaining insurance, with only partial evidence of payment, workers' compensation, and telecommunication services. In addition, plaintiff included an account statement for charges made on Frank Chapman's credit card. One of the documents included in plaintiff's supporting documentation indicates that plaintiff appears to have requested reimbursement for the cost of terminating telecommunication services provided to "CLF Real Estate Services," which appears to be a separate company from plaintiff, Chapman Law Firm, LPA.

---

**12.** Mr. Smith testified at trial that he was the "vice president of marketing" of Chapman Law Firm, LPA. The August 6, 2012 joint witness list, however, indicated that "Mr. Smith was Vice President of Operations for CLF." The parties' subsequent January 4, 2013 joint identification of witnesses' titles stated that Mr. Smith was the "Executive Vice President, Vice President of Marketing (as stated in Proposal)," as well as "the Chief Legal counsel, Executive and Marketing VP, Contract TEAMS Support Leader and Alternate Contract Manager (during Contract Performance)." Furthermore, the January 2, 2008 report issued by the Ohio Department of Agriculture referred to Mr. Smith as "Chief Legal Counsel and Executive and Marketing Vice President."

On January 18, 2007, the HUD contracting officer, Maureen Musilli, responded to plaintiff's request for equitable adjustment relating to the first stop work order period. The contracting officer explained that, to be recoverable under the Federal Acquisition Regulation (FAR), claimed costs must be both allocable to the parties' contract and reasonable. The contracting officer indicated that, because "Chapman Law Firm existed prior to the award of C–PHI–00958 (the contract) and has other business interests besides this HUD contract," HUD would only reimburse plaintiff a portion of the cost of its rent and utilities, as well as a portion of plaintiff's payroll expenses. The contracting officer indicated that HUD only would pay a portion of salaries actually paid, rather than the reduction in the salaries of plaintiff's employees with the promise of later reimbursement, and noted that Frank Chapman's salary of $350,000.00 per year was "quite excessive and unreasonable." The contracting officer informed plaintiff that it had not submitted evidence that the other expenses to which plaintiff asserted entitlement for reimbursement were allocable to the HUD contract, and that travel expenses were not necessary during a stop work order period. Although the contracting officer did not challenge plaintiff's assertion that it was entitled to a percentage of its expenses as profits, she indicated that plaintiff needed "to reduce the profit percentage drastically."

On April 19, 2007, plaintiff's current attorney of record, in his role as outside counsel for plaintiff, responded to the contracting officer's January 18, 2007 letter. Plaintiff's counsel maintained that all of plaintiff's costs were allocable to the contract because plaintiff was forced to refrain from taking on other work during the first stop work order period due to the nature of its previous bankruptcy and personal injury practice. Plaintiff's counsel also stated that plaintiff "was not generating income during the stop work period and was surviving on capital contributed by Mr. Chapman from his personal resources." With respect to Frank Chapman's salary, plaintiff's counsel stated: "I do not see how you can assert that a salary of $350,000 is not reasonable for the Chief Executive Officer managing at least $25 million in contracts per year." In addition, plaintiff's counsel amended plaintiff's request for equitable adjustment relating to the first stop work order period to include an additional claim for "$300,000 in income" that Frank Chapman lost as a result of his divestment from Lakeside Title "at the direction of the Government."[13] The April 19, 2007 letter to the contracting officer also included Frank Chapman's certification of plaintiff's first stop work order claim pursuant to the Contract Disputes Act. See 41 U.S.C. § 605(c)(1) (2006).

The GAO denied the second bid protest on April 4, 2007. See Greenleaf Constr. Co., B–293105.21, B–293105.22, B–293105.23, 07 CPD ¶ 84. The contracting officer sent Frank Chapman an email on April 6, 2007, asking whether he was ready to begin performance, to which Frank Chapman responded: "I am ready on the 16th. Everyone has either started or starts on Wednesday. The key people know their duties and irreparable harm will occur to my reputation if this is not the start date." On April 13, 2007, the contracting officer issued Modification 0006,[14] which established April 16, 2007 as "the day that all new acquisitions, conveyances, custodials, pre-conveyance approvals and pending mortgagee requests will be transferred to Chapman Law Firm from MCB [Michaelson, Connor, and Boul, Inc., the prior contractor]," and June 30, 2007 as "the first day of full performance for Chapman Law Firm." Modification 0006, which was signed by both parties, stated that "HUD and Chapman Law Firm agree to formalize the transition schedule ... at no additional cost to either

---

13. Although plaintiff's Second Amended Complaint included a claim for $3.4 million relating to Frank Chapman's "premature forced sale of Lakeside Title," which plaintiff associated with its claim that defendant failed to exercise the first option year to the parties' contract in bad faith, plaintiff's Third Amended Complaint withdrew this claim after the court questioned plaintiff at a status conference whether it could recover "lost profit" related to Frank Chapman's ownership of a separate entity unrelated to plaintiff.

14. Although Modification 0006 is dated April 13, 2007, it indicates that the second stop work order was lifted on April 12, 2007.

party...." Modification 0006 also noted, however, that "[t]his modification does not effect [sic] the contractor's right to submit a claim pursuant to FAR 52.233(b) due to the stop work order, issued January 3, 2007 and lifted April 12, 2007, or any prior stop work order."

On May 7, 2007, after beginning its performance of the contract, plaintiff sent the contracting officer a request for equitable adjustment in the amount of "$768,898.35" [15] relating to the second stop work order period, which began on January 3, 2007 and ended on April 12, 2007. Plaintiff claimed entitlement to compensation for its rent in the amount of $103,933.84, expenses paid through two checking accounts in the amounts of $2,757.84 and $305,157.84, respectively, and expenses paid through Frank Chapman's credit card, which plaintiff now referred to as a "corporate" card, in the amount of $6,713.87. Plaintiff also claimed entitlement to wages that were not paid "where parties agreed to take less money" in the amounts of $20,000.00 for Mr. Gasiorowski, $10,000.00 for Mr. Smith, $12,500.00 for Mr. Goss, $20,000.00 for William Barrett, who was described as a "CPA," and $109,283.00 for Frank Chapman. In addition, plaintiff claimed entitlement to a "reasonable profit" of fifteen percent of plaintiff's expenses. Plaintiff also referred to a claim, which it "reserved" pending the amendment of the contract, for $1,200,00.00 arising from a loss of incentive fees that plaintiff believed it would suffer given that the second bid protest abbreviated the performance period of the contract.

Although the copy of the request for equitable adjustment related to the second stop work order period that appears in the record, prepared by both parties, the record does not include plaintiff's supporting documentation, a portion of the supporting documentation for the second request for equitable adjustment appears to have been included in a report issued by the Defense Contract Audit Agency (DCAA), which is described below. Plaintiff included invoices for consulting services, as well as included invoices from Mr. Goss' separate technology company, although plaintiff claimed entitlement to Mr. Goss' salary as a separate item in its second request for equitable adjustment and the invoices are billed to "CLF Real Estate Services," rather than to plaintiff. Plaintiff's request for equitable adjustment for the second stop work order period also appears to have included copies of Frank Chapman's credit card billing statements, which were addressed to Frank Chapman of "FRANK H CHAPMAN CO" and which indicated that Frank Chapman's account was shared with his wife Ann Chapman. In addition, plaintiff's request for equitable adjustment for the second stop work order period appears to have included utility payment summaries, checking and electronic account statements and documentation, third-party payroll statements, evidence of 925 Keynote Circle Corporation's ownership of the offices in which plaintiff was located, a copy of plaintiff's lease with 925 Keynote Circle Corporation, charts apparently created to delineate plaintiff's monthly rent for the second stop work order period, and invoices and documentation relating to the services of Mr. Barrett.

The DCAA audited plaintiff's claims relating to the first stop work order period and the second stop work order period and issued reports on plaintiff's claims for each stop work order period on March 3, 2008 and March 19, 2008, respectively. The DCAA's reports concluded that plaintiff's requests for equitable adjustments did not represent "an acceptable basis for negotiation of a fair and reasonable price adjustment" and noted that plaintiff "did not have factual and verifiable cost or pricing data supporting a number of the proposed amounts." The reports questioned a portion of plaintiff's claimed rent, payroll expenses, and check and electronic transfer payments, as well as the entirety of the cost of plaintiff's utilities and the foregone salary of plaintiff's key employees. The March 19, 2008 report for the second stop work order period also questioned rent payments made outside the second stop work order period. The reports also questioned the costs of plaintiff's utilities because the

---

15. Plaintiff appears to have transposed numbers in its total claim. Plaintiff's individual claims amount to $678,898.35, rather than the "$768,898.35" number listed by plaintiff.

supporting documentation submitted to the contracting officer indicated that 925 Keynote Circle Corporation, rather than plaintiff, paid for the cost of plaintiff's utilities. In addition, the reports questioned plaintiff's payroll expenses to the extent that they were incurred outside the stop work order periods, as well as payroll expenses that plaintiff had not minimized "in accordance with the stop work order," highlighting that Mr. Smith received a pay raise during the stop work order periods and that plaintiff had made payments to Mr. Gasiorowski and Jeff A. Swiecicki, a real estate broker for plaintiff, although both were not added to the payroll until after the first stop work order period began. In addition, the reports questioned the salaries owed to plaintiff's key employees based on plaintiff's failure to provide the DCAA with signed employment agreements. The reports further questioned whether a number of charges were allowable, including the lease payments on luxury vehicles and the permanent seat license for the Cleveland Browns sports team. Although the reports recognized that the costs associated with the contract were "properly classified to permit application of the proposed profit percentage to the total proposed costs," the reports noted that plaintiff did not provide a profit rate in the proposals that it submitted in response to the solicitation.

Plaintiff's counsel, and current attorney of record, responded to the DCAA's findings, arguing in part that the DCAA auditor had failed to consider the full amount of space leased by plaintiff, the cost of capital invested into plaintiff's offices, that plaintiff was responsible for reimbursing 925 Keynote Circle Corporation for the cost of utilities, that the services of Mr. Goss and Mr. Barrett were "exclusively related to performing work related to the contract," and that plaintiff's costs only had to be incurred, rather than paid in order to be recoverable under the contract. Plaintiff's counsel included a market survey to support the "reasonableness" of Frank Chapman's salary. Plaintiff's counsel conceded, however, that plaintiff had requested reimbursement for rent obligations outside the second stop work order period. Plaintiff's counsel ultimately sent the contracting officer a letter on December 9, 2008, indicating that plaintiff intended to treat her failure to respond to plaintiff's stop work order claims as a deemed denial of plaintiff's claims under the Contract Disputes Act. The contracting officer issued a final decision denying a portion of plaintiff's stop work order claims on February 3, 2009. Plaintiff filed its original complaint on December 28, 2009. Defendant filed its Answer to the original complaint on April 12, 2010.

**Plaintiff's Performance of the Contract**

Plaintiff performed the contract while simultaneously negotiating its stop work order claims. Although the contract provided that plaintiff would not begin receiving property conveyances until the sixty-first day "after the effective date of the contract," plaintiff and the contracting officer mutually agreed to modify the "Ramp Up" phase of the contract to establish April 16, 2007 as the "day that all new acquisitions, conveyances, custodials, pre-conveyance approvals and pending mortgagee requests will be transferred to Chapman Law Firm" from plaintiff's predecessor. Although plaintiff alleges in its Third Amended Complaint that, "without any prior warning, CLF was instructed to commence performance immediately" on April 15, 2007, plaintiff had been negotiating a performance schedule with HUD and HUD had rejected plaintiff's proposal to allow it to seek an equitable adjustment for the shortened "Ramp Up" phase because, as contemporaneously highlighted by HUD, plaintiff had indicated that it was "ready to go and there would be no need to wait any longer."

Soon after beginning performance of the contract, plaintiff's employees encountered difficulties obtaining access to HUD's Single Family Acquired Asset Management System (SAMS), which was a database that HUD used to track data related to each property in plaintiff's inventory. Under the parties' contract, plaintiff was required to "input property related data into SAMS no later than two (2) business days following the date the information is obtained." The contract also required defendant to provide plaintiff with access to SAMS to facilitate plaintiff's performance under the contract. Although the contract did not provide a timeframe in which defendant was to provide plaintiff with

SAMS access, the contracting officer testified that plaintiff "could not effectively perform the contract" without SAMS access because plaintiff's employees were required to have SAMS access in order to determine whether a property had been assigned to plaintiff. In addition, Frank Chapman testified that SAMS access was required for plaintiff to inform HUD that it had performed the work required by the parties' contract.

In order to obtain SAMS access, plaintiff's employees and subcontractors were required to "undergo a background investigation" and HUD's obligation to provide SAMS access was "[s]ubject to any necessary security clearances." Specifically, the contract provided the following with respect to SAMS access:

> As a condition of obtaining access, Contractor employees requiring access to SAMS and/or other HUD systems shall submit to the GTR [Government Technical Representative] an original and one copy of completed Standard Form 85P, Questionnaire for Public Trust Positions, Option Form 306 and 21–D258 Finger Print Chart. Contractor staff may be required to provide other background information as deemed appropriate for the requested security access level.

The record indicates that, at the end of March 2007, prior to the GAO's decision on the second bid protest, Frank Chapman and Mr. Goss had been working with HUD personnel to ensure that plaintiff's employees would be able to access SAMS at the start of contract performance.[16] Frank Chapman informed the contracting officer that, of "the tasks associated with the 'rampup' period," SAMS access was "thecritical [sic] path." Frank Chapman indicated to the contracting officer, however, that he expected that plaintiff would obtain SAMS access a day prior to the start of its performance.

While simultaneously attempting to obtain SAMS access for its employees by following the procedures described in the parties' contract, plaintiff tried to pursue alternative means of obtaining SAMS access. Plaintiff's

management inquired as to whether a number of individuals who previously had been granted SAMS access could use their previous access to forego the application process. After the contracting officer informed plaintiff's management that the individuals no longer had SAMS access, plaintiff's management inquired as to whether their SAMS access could be reactivated. In addition to attempting to obtain SAMS access for plaintiff's employees, Frank Chapman sought to obtain SAMS access from individuals working for other contractors. On March 29, 2007, Frank Chapman forwarded to the contracting officer a proposal from Cityside Management (Cityside) and indicated that he was seeking proposals from Home Source, both of which were management and marketing contractors. Frank Chapman had previously informed the contracting officer that he was seeking proposals from other contractors to assist plaintiff with obtaining SAMS access and that he "could keep everyone honest and go with the lower bid." Frank Chapman testified that the HUD contracting officer had asked plaintiff to obtain a quote from Cityside. The record indicates, however, that, by February 13, 2007, and prior to the date of contract performance, Frank Chapman already had an agreement with Cityside to contract with at least one Cityside employee for consulting services to assist plaintiff in performing the contract, although Frank Chapman gave conflicting testimony as to whether the employee ever provided plaintiff with consulting services. Additionally, Frank Chapman indicated that he separately negotiated with Cityside for plaintiff's use of the employee's SAMS access. The HUD contracting officer testified that she did not ask Frank Chapman to inquire as to whether plaintiff could obtain SAMS access through other contractors, and that she did not tell Frank Chapman at that time that defendant would pay the costs plaintiff incurred in obtaining SAMS access through other contractors, although she admitted that she knew Frank Chapman was attempting to obtain SAMS access at the time.

16. The HUD contracting officer explained at trial that plaintiff and HUD were conducting "advanced planning" prior to the GAO's decision because "[t]he attorneys had knowledge that the GAO bid protest was coming to an end and that Chapman would have won that protest...."

Upon reviewing Cityside's proposal, the contracting officer informed Frank Chapman that she thought the proposed price for SAMS access was too high. Specifically, the contracting officer told Frank Chapman: "That is a lot of money for simple data entry.... I am having Housing folks take a look at this, but my initial reaction is the proposal is too high." The contracting officer subsequently informed Frank Chapman that she had asked a contract specialist to "check the GSA [Government Services Administration] website for hourly rates for data entry and also to see if we can get the Service Contract Act wage rates from the Department of Labor." In addition, the contracting officer stated:

> If I can get labor rates from similar HUD contracts, I'll provide you with that data, also. The travel costs, per diem, rental car, etc. are really escalating the cost of the proposal also. We don't pay over the Gov't rates for travel, and does everyone need their own rental car? Geez.

In response to the contracting officer's reference to "the GSA website," Frank Chapman stated: "I read the law on GSA rates. What do I need to take advantage of these rates. The regulation spoke of a letter from the CO [contracting officer]. Have you done this in the past?" The record reflects that the contracting officer ultimately provided Frank Chapman with standard rates to compare to Cityside's proposal. Frank Chapman testified that he interpreted his communications with the contracting officer as an indication that the contracting officer approved of his negotiations with Cityside. Frank Chapman also testified that the contracting officer "specifically told me to gain services to get SAMS and that she'd reimburse me for it later," although he subsequently stated that he did not "have an agreement from her to pay it." At trial, the contracting officer confirmed that she "never said don't pay anything," but maintained that the question of whether plaintiff should pay to obtain SAMS access from a third-party contractor "never came up in conversation." The contracting officer testified that she forwarded pricing information in order to "help Frank Chapman in any way that I could."

On April 10, 2007, six days before plaintiff was to begin performance of the contract, Mr. Goss inquired as to whether plaintiff could obtain "emergency access approval to SAMS" and HUD's other databases. On April 13, 2007, Frank Chapman informed Clifford Kellett, the government technical representative and the primary point of contact for plaintiff during contract performance, and defendant's designated government representative at trial, that plaintiff had retained Lionel Hotard, a Cityside employee, to obtain access to SAMS. With the understanding that plaintiff had hired Mr. Hotard as a contractor,[17] Mr. Kellett requested that HUD personnel meet the "urgent requirement" of modifying Mr. Hotard's access to allow him to view Ohio and Michigan properties, which was accomplished on April 16, 2007. The record indicates that plaintiff ultimately hired six consultants with SAMS access, although Frank Chapman testified that plaintiff required eight to fifteen employees with SAMS access to track the status of properties assigned to plaintiff.

On April 23, 2007, while plaintiff continued its efforts to obtain other sources of SAMS access, including contracting with a second employee from Home Source, Mr. Kellett informed Frank Chapman, with apparent reference to applications for access, that "[t]he SAMS/SFIS [Single Family Insurance System] process can not [sic] be sped up any faster than its currently working," and that he was "[a]ssuming workers like Lionel Hotard (with active access to SAMS and SFIS) is an effective method of gaining access...." One week later, on April 30, 2007, Mr. Goss informed Mr. Kellett that HUD had returned to plaintiff applications for SAMS access, apparently as a result of errors in the applications. Although plaintiff had been performing the contract for two weeks, Mr. Goss also informed Mr. Kellett: "No one employee in our office still has SAMS and SFIS access.

---

17. Although plaintiff claimed reimbursement for the full price of contracting with Mr. Hotard, the record demonstrates that Mr. Hotard and other Cityside employees provided other services to plaintiff during its initial performance of the contract, such as training plaintiff's employees in the performance of a management and marketing contract.

We are still relying on consultants for access." In reply, Mr. Kellett stated:

The SAMS/SFIS access is imperative. We had 361 homes in PB [Philadelphia B area which corresponded geographically to Ohio and Michigan] inventory this morning and all in step 1. They need to me [sic] moving on and this can't be done without SAMS as well as SFIS status.

CLF needs to implement contingency measures to cover the lapse of SAMS and SFIS access. In reality, you are operating in Emergency Circumstances.... Let me know what alternative are [sic] being sought and implemented. Otherwise, performance is aversely [sic] affected.

Following this exchange, it appears based on the record before the court, that a number of plaintiff's employees had SAMS access by May 31, 2007, notwithstanding plaintiff's claim that defendant did not provide plaintiff with SAMS access for the first ninety days of contract performance.

While plaintiff's management was attempting to gain SAMS access for plaintiff's employees, a number of disputes arose between the parties. On April 30, 2007, soon after plaintiff began performance of the contract, plaintiff requested that HUD transfer into plaintiff's inventory "35 homes which were transferred out of our inventory and into MCB's [Michaelson Connor and Boul, Inc.'s] inventory after we completed approximately 100k of work." Frank Chapman represented to the contracting officer that plaintiff "cleaned these homes, ordered appraisals, quality control inspections, and lawn care." Frank Chapman also informed the contracting officer that plaintiff performed work on each of the thirty-five homes at the direction of Mr. Kellett. Frank Chapman asked the contracting officer to either: (1) return the transferred homes to plaintiff's inventory, (2) compensate plaintiff for $96,150.00 "representing our contractual fees," or (3) reimburse plaintiff for the costs it had incurred in

providing services to the properties, which Frank Chapman estimated to be $110,250.00. Frank Chapman also stated: "In order to clarify, I do not want these funds, I simply want to rely upon the statements and representations made to me by HUD which in turn would result in placing these homes back into my inventory and allowing me to bill for them on May 1st." On May 1, 2007, the day after Frank Chapman had made his request, HUD transferred the thirty-five properties back into plaintiff's inventory. Mr. Kellett testified that plaintiff was paid a management fee under the contract for each of the properties transferred back to plaintiff, which is consistent with the parties' stipulation that defendant paid all of the invoices that plaintiff submitted to HUD. Mr. Kellett also testified that HUD records did not show that plaintiff had actually conducted any work on the thirty-five properties that had been transferred out of plaintiff's inventory.[18] HUD's contemporaneous records, however, noted that plaintiff's EMS did not contain initial property inspection reports for eleven of the thirty-five properties transferred back to plaintiff, indicating that plaintiff's employees had never visited the properties.

Although occurring later in plaintiff's performance of the contract, a similar dispute arose regarding plaintiff's entitlement to marketing fees. On October 30, 2007, Frank Chapman asserted that plaintiff was entitled to a marketing fee for properties that were in the process of being sold, but, according to Frank Chapman, had been inaccurately labeled as closed when transferred into plaintiff's inventory. Frank Chapman maintained that plaintiff was entitled to a marketing fee if a home was transferred into plaintiff's inventory while it was under contract, but before closing. According to Mr. Kellett, forty-five homes were transferred to plaintiff after they had been closed because the prior contractor had failed to note the properties' closing on SAMS. Although Frank Chap-

---

18. Mr. Kellett testified that, in preparation for trial, he "requested archived case files of the properties in question" and created a summary exhibit demonstrating that plaintiff had not conducted work on any of the thirty-five properties. Mr. Kellett's summary does not include two of the properties that were transferred back to

plaintiff. Although Mr. Kellett was confident in his assertions, both during contract performance and during trial, the record reflects that Mr. Kellett was sometimes quick to jump to conclusions and that the relationship between Frank Chapman and Mr. Kellett had deteriorated badly.

man contemporaneously claimed that plaintiff had settled the forty-five homes, Frank Chapman admitted, under oath, during trial, that at least one of the forty-fives homes was settled by the prior contractor.[19] The record, however, indicates that all but one [20] of the forty-five homes were settled by the prior contractor before the properties were transferred into plaintiff's inventory. Notwithstanding that the prior contractor settled the majority of the properties at issue, Frank Chapman maintained during trial that plaintiff was still entitled to a marketing fee once the properties entered plaintiff's inventory regardless of whether the prior contractor had settled the property. In contrast, Mr. Kellett testified that, "because these properties had not been updated by MCB [Michaelson, Connor & Boul] from step 8, waiting for sale, into step 9, sold, over that one day period, it was my decision that it was not a fair cost for the government and it wasn't a fair cost to pay the Chapman Law Firm for doing nothing." [21]

Aside from fee disputes, from the beginning of the contract there was continual friction between the parties over plaintiff's obligations under the contract. The parties' contract provided that plaintiff was to "obtain and process for payment by HUD all applicable real estate tax bills and special tax assessments on all HUD-owned properties." The contract also provided that plaintiff was responsible for "penalties or interest charges incurred by HUD as a result of late payment of property taxes." Although plaintiff was generally responsible for the costs it incurred in performing the contract, the contract provided that plaintiff was entitled to reimbursement for pass-through expenses, which included expenses such as the cost of evicting "Adverse Occupants," utility costs, the cost of "treatment and repair of infesta-

tion or damage caused by wood destroying organisms," and the cost of demolishing a home.

On May 1, 2007, Mr. Kellett forwarded HUD's Financial Control Manual to plaintiff. HUD's Financial Control Manual described "the minimum documentary evidence required of each type of Payment Request Transmittal" that plaintiff submitted to HUD, which included requests for the payment of taxes and other pass-through expenses. In addition to providing an original tax bill or assessment, which was required by the parties' contract, the Financial Control Manual required plaintiff to submit, with each tax transmittal, a specified form and documentation of any penalties or interest that had been incurred. Consistent with the parties' contract, the Financial Control Manual also directed that all invoices submitted to HUD include a FHA case number "for each property for which payment is being requested." Frank Chapman and Ms. Kajtezovic, plaintiff's Office Co–Manager and Closings Supervisor, testified that they were not aware of the Financial Control Manual's existence until May 1, 2007, the date on which Mr. Kellett forwarded the Financial Control manual to plaintiff. According to Frank Chapman, the Financial Control Manual's requirements "added a whole other level to the number of people that we needed in order to track taxes, utilities, all these items, and get them paid." Frank Chapman testified that the Financial Control Manual required plaintiff to submit additional documentation with each tax bill that plaintiff submitted to HUD. Frank Chapman maintained that plaintiff was required to hire "between four and six" new employees to comply with the Financial Control Manual.

---

**19.** The contracting officer explained that homes that had been closed could still be transferred into plaintiff's inventory if the sale of the homes had not been reconciled.

**20.** Plaintiff's records indicate that the forty-five homes were transferred into plaintiff's inventory on July 2, 2007. After reviewing HUD settlement statements relating to each property, Mr. Kellett confirmed at trial, and testified that he had contemporaneously confirmed, that each settlement statement demonstrated that the forty-

five homes were settled before being transferred to plaintiff. The record indicates, however, despite Mr. Kellett's belief to the contrary, that one settlement occurred after the property had been transferred to plaintiff.

**21.** "Step" numbers in SAMS indicated the status of a particular property. For example, step 8 indicated that a home was under contract, step 9 indicated the closing of a sale, and step 10 indicated the reconciliation of the money received from a sale.

Plaintiff encountered difficulties in the transmittal of tax assessments to HUD, which were reviewed by HUD's payment contractor, The McConnell Group. Under the parties' contract, plaintiff was required to submit, with each tax transmittal, a specific form, as well as the tax bills or special assessments "or evidence of the obligation to the HOC [Home Ownership Center]" fifteen business days before a tax was due. As noted above, plaintiff was responsible for any penalties or interest incurred as a result of late payment. A dispute arose between the parties, however, over whether plaintiff was responsible for writing a "FHA [Federal Housing Administration] case number" on the tax bills submitted to HUD. Carmella Harrigan, a government technical monitor, explained HUD's position to Frank Chapman on September 19, 2007:

All bills and invoices that are paid by the Department must have the address and FHA Case number on them which is the way that we track our properties. Since a FHA case number is an internal identification for HUD, they are not normally reference [sic] on regular bills (subcontractors will place them on their invoice [sic] on request) so they need to be written by your staff. G.4B states "All invoices must include the FHA case number and property address for each property for which payment is being requested." This information is being provided for payment. Therefore, the case number must be included. It is not difficult. All that CLF needs to do is to write the case number on the item.

In response to Frank Chapman's suggestion that a reviewer for The McConnell Group could "have simply written an [sic] FHA number" on plaintiff's submission, Ms. Harrigan stated:

TMG [The McConnell Group] is required to review the transmittal not to complete it. Documents can not [sic] be altered when being reviewed and approved. Therefore, the McConnell Group is not permitted to add information.... It is CLF's responsibility to submit transmittals and the supplemental documentation in an acceptable manner. If it is not, the defi-

ciencies are made known to CLF and will need to be corrected by CLF.

An internal HUD email indicates that HUD personnel interpreted the dispute over tax transmittals to be the result of plaintiff's inexperience. The record indicates that The McConnell Group personnel had complained to HUD that the McConnell Group's compensation, which was contingent on the successful processing of plaintiff's transmittals, had been diminished by a number of delays caused by plaintiff. Plaintiff continued to encounter difficulties with its tax transmittals as late as December 27, 2007, four days before the base period of the contract expired.

Ms. Kajtezovic testified that plaintiff properly prepared the tax transmittals pursuant to the Financial Control Manual. Ms. Kajtezovic also testified that The McConnell Group did not review plaintiff's tax transmittals in the time prescribed by The McConnell Group's contract with HUD and that a number of tax transmittals were lost after plaintiff had submitted them. Plaintiff contemporaneously argued that The McConnell Group was responsible for delays in processing plaintiff's tax transmittals and that the penalties and interest incurred as a result of processing delays was the responsibility of HUD, rather than of the plaintiff. On December 30, 2007, a day before the base period of the contract expired, Ms. Kajtezovic sent the contracting officer a letter continuing to take issue with what plaintiff perceived to be "the continued lack of contractual performance by HUD and/or The McConnell Group."

Plaintiff also contemporaneously asserted that HUD's interpretation of the Financial Control Manual or misunderstanding of facts imposed additional costs on plaintiff other than those associated with tax transmittals. HUD personnel charged plaintiff with refusing to pay penalties assessed as a result of the late payment of utility bills. Plaintiff maintained, however, that the mortgagees, rather than plaintiff, were responsible for utility bills that plaintiff refused to pay. HUD personnel also charged plaintiff with not seeking approval before demanding that lenders pay particular costs, which plaintiff

denied. Plaintiff maintained that HUD required plaintiff to create property condition reports for properties that were transferred from a previous contractor's inventory even though, according to plaintiff, HUD had directed plaintiff not to create property condition reports for such properties. The parties also disagreed over the requirements for appraisals and even disagreed as to whether date stamps were required for particular documents. The relationship between plaintiff's employees and HUD personnel during contract performance is best encapsulated by the following assertion of plaintiff's counsel and current attorney of record to the contracting officer on November 5, 2007:

> I have monitored your technical representative's (Cliff Kellett's) interactions with CLF over the last two months and frankly I am amazed at Mr. Kellett's inability to consistently adhere to the terms of the contract and his failure to properly represent your interests. For example, the brouhaha over payment of local taxes and utilities and Mr. Kellett's failure to correctly comply with the contract and HUD's regulations on that issue is a major case in point.

> The current correspondence from the GTR [government technical representative] is more of the same.... We all want and expect robust interaction between contractor and Government representative(s), but Mr. Kellett is consistently wrong either on the facts or the requirements of the Contract. Additionally, Mr. Kellett immediately goes to DEF CON 5 when he is confused about something, cannot confirm something, or cannot understand how to find the information he needs. For example, just this weekend, Mr. Chapman forwarded me an email trail where Mr. Kellett could not confirm the FHA approved status of an appraiser identified by CLF. His message to Mr. Chapman was in the nature of having identified a man in the harem and we needed to execute the infidel immediately. In actuality it turns out the appraiser was fully approved and the problem was that Mr. Kellett had failed to properly access the HUD database on this point.

Throughout plaintiff's performance of the contract, Mr. Kellett raised deficiencies in plaintiff's Electronic Management System (EMS), which, similar to SAMS, contained data relating to each property in plaintiff's inventory. Under the parties' contract, plaintiff was required to ensure that its EMS was functional within forty-five days of the effective date of the parties' contract, which corresponded to May 31, 2007. Mr. Kellett repeatedly informed plaintiff, however, that deficiencies in plaintiff's EMS did not allow HUD to monitor plaintiff's performance of the contract. As late as November 14, 2007, almost seven months after contract performance began, plaintiff continued to acknowledge, and address, deficiencies in plaintiff's EMS.

In addition, HUD continued to identify other deficiencies in plaintiff's performance of the contract during a number of site visits to plaintiff's offices conducted by various HUD personnel, including Mr. Kellett. Although plaintiff received an adequate review from HUD's May 2007 site visit, HUD's September 2007 site visit concluded that plaintiff's management of the properties in its inventory was "very poor." The September 2007 site visit also concluded that plaintiff was "not securing accurate FHA appraisals" and that plaintiff had submitted requests for reimbursement before paying pass-through expenses. Mr. Kellett also found in September 2007 that plaintiff had not obtained timely appraisals of at least one property. Subsequently, HUD's November 2007 site visit continued to find that plaintiff was not adequately inspecting and cleaning homes in its inventory, that plaintiff's files "were incomplete, lacking crucial information, and did not reflect a well managed effort," and that plaintiff had "again demonstrated a very high risk in property preservation and protection." As a result, plaintiff's formal "scorecards," kept by HUD, consistently indicated that plaintiff had performed at an "unacceptable level," and HUD issued a number of deficient performance letters to plaintiff. Although plaintiff challenged some of the deficiencies identified by defendant, such as that plaintiff was not seeking approval before demanding that lenders pay particular costs, plaintiff received an overall "unacceptable"

score for July, August, September, November, and December 2007, as well as January, February, and March 2008. October 2007 was the only month identified to the court in which plaintiff received an overall score above "unacceptable."

## Inspections

During plaintiff's performance of the contract, HUD also charged that plaintiff was not conducting termite inspections in accordance with Section 5.3.9 of the contract between the parties. Section 5.3.9 of the parties' contract required plaintiff to obtain, prior to listing, a "termite and Wood Destroying Organism (WDO) inspection" on all homes located in a Termite Probability Zone, which included all of Ohio and part of Michigan, except for vacant lots and homes scheduled to be demolished. Section 5.3.9.1 of the parties' contract required plaintiff to obtain at closing a "termite/WDO clearance letter," "if requested by the purchaser" for properties that plaintiff was required to inspect under Section 5.3.9. Section 5.1.8 of the parties' contract also required plaintiff to comply with all federal, state, and local laws and regulations in performing the contract, which included laws and regulations relating to termite inspections. Under Ohio law, a "[w]ood-destroying insect diagnostic inspection" must be conducted by a licensed inspector. Ohio law defines a "wood-destroying insect diagnostic inspection" as "the examination of a structure at the request of any party involved in a contemplated real estate transaction to determine if wood destroying insects are present in the structure, if there is evidence they either are or have been present in the structure, or the presence of any visible damage to the structure caused by wood-destroying insects." *See* Ohio Admin. Code § 901:5–11–01(N)(12).

The record indicates that plaintiff made efforts to try to have its inspectors licensed to conduct termite inspections under Ohio law. Plaintiff's internal correspondence indicates that, before plaintiff began performance of the contract, plaintiff planned to require that its inspectors obtain a termite inspection license within thirty days of employment and that plaintiff planned to use the National Pest Management Association's form (NPMA–33), which is required under Ohio law, to track WDO inspections. On March 20, 2007, Mr. Gasiorowski informed Frank Chapman that plaintiff needed to run advertisements for inspectors in order to ensure that the inspectors had time to obtain licenses before plaintiff began performance of the contract. The record demonstrates that during contract performance plaintiff reduced the salary of any inspector who had not received a termite inspection license and fired at least one inspector because he was unable to obtain a termite inspection license. The record also indicates that plaintiff obtained a company termite inspection license on October 11, 2007.

The proposal that plaintiff submitted in response to the solicitation for the parties' contract indicated that plaintiff budgeted for an inspection prior to listing as well as an inspection within thirty days of closing if the first inspection was no longer valid. Plaintiff's Property Management Plan indicated that its inspectors would "[r]emove bug infestations" during routine inspections of the properties in plaintiff's inventory. In addition, Plaintiff's Property Management Plan indicated that plaintiff would "subcontract with WDO inspectors to provide inspections and abatement in TPZ's [Termite Probability Zones] and will provide clearance letters at closing if requested by the purchaser," which plaintiff reiterated in its Quality Control Plan also submitted in response to the solicitation.

After conducting the September 2007 site visit, Mr. Kellett circulated an internal HUD memorandum indicating that he "confirmed that CLF has not performed any termite inspections as required by [Section] 5.3.9 of the contract" or any form of "termite inspections." Internal HUD correspondence also indicates that Mr. Kellett reached the conclusion that there had "been no Termite and Wood destroying Organism inspections performed on properties under CLF care" after interacting with plaintiff's employees during HUD's September 2007 site visit. On October 11, 2007, Mr. Kellett informed plaintiff of his discovery during the September 2007 site visit that no reports relating to WDO inspections were found on plaintiff's EMS. Mr. Kellett also indicated that plaintiff had not

sought reimbursement for the cost of termite remediation, to which it was entitled under the parties' contract, also indicating that plaintiff had not "performed substantive termite inspections as required by [Section] 5.3.9 of the contract." In response, plaintiff sent Mr. Kellett two letters, the first explaining that its inspectors were licensed, that "CLF inspectors will conduct a termite inspection during each initial Bi–Monthly Inspection,"[22] and the second explaining that "the termite inspections are being added to EMS." Plaintiff also admitted that it had not incurred any costs in termite remediation: "The requests for reimbursement as a pass through expense or termite treatment or repair with [sic] be forthcoming when any such findings occur."

After receiving plaintiff's response, Mr. Kellett informed Mr. Goss, on October 18, 2007, that plaintiff's EMS only contained fourteen termite inspection reports. Mr. Kellett asked Mr. Goss for a timeframe in which "the remaining" inspection reports would be uploaded. In response, Frank Chapman sent the following message to Mr. Goss: "Get this done. We are supposed to be licensed." Mr. Goss then informed Mr. Kellett that plaintiff's "termite specialist" would be uploading termite inspection reports onto plaintiff's EMS and that Mr. Kellett "should start seeing 100's of these being added per day." At the same time, Mr. Smith asked plaintiff's internet and technology subcontractor to confirm whether plaintiff's "listing program" automatically published termite inspections to the public listing associated with each property upon being uploaded to plaintiff's EMS.

Although at trial Mr. Goss often claimed to lack recollection of critical events, and appeared to have other instances of convenient memory, Mr. Goss testified that plaintiff was required to upload a large number of termite inspection reports to its EMS. Mr. Goss testified that plaintiff's inspectors uploaded the results of an inspection to plaintiff's EMS by answering questions on a personal digital assistant (PDA) as they conducted inspections. Mr. Goss testified, however, that data entered into a PDA would not always be uploaded to the EMS. With regard to termite inspection reports in particular, Mr. Goss testified that the data being entered by inspectors during initial and routine inspections, during which plaintiff maintains inspectors conducted WDO inspections under Section 5.3.9 of the parties' contract, was not being "exposed into a separate report" on plaintiff's EMS. Mr. Goss indicated that the data entered by each inspector ultimately had to undergo a "batch process" whereby data "in a raw format" residing on plaintiff's EMS would be entered into relevant fields in a separately generated report. Mr. Goss contemporaneously explained to Mr. Kellett, and likewise testified at trial, that part of the data that was generated on inspectors PDAs was the date on which an inspection was conducted.

On November 1, 2007, after Frank Chapman informed Mr. Goss that "we are jeopardizing our continued HUD existence with items such as BMIs and Termites," Mr. Goss informed Frank Chapman that the data residing on plaintiff's EMS had been used to generate termite inspection reports in a "batch process." The record indicates that plaintiff's technology subcontractor performed the "Mass Deployment" of termite inspection reports. Over the span of a few hours, plaintiff generated 8,900 termite inspection reports, although the automatic generation of reports resulted in some "failed surveys." Similar to Mr. Goss, Alex Papadimoulis,[23] the President of plaintiff's technolo-

---

**22.** The routine inspections that plaintiff performed under the parties' contract were referred to as bi-monthly or bi-weekly inspections, as well as BMIs.

**23.** Mr. Papadimoulis was not an ideal witness. When asked how he could remember the circumstances surrounding plaintiff's generation of termite inspection reports at trial, when he had testified during his deposition that he had no recollection of the event, Mr. Papadimoulis stat-

ed that his testimony could be based on "false memories." The following exchange took place at trial between defendant's counsel and Mr. Papadimoulis:

Q: So you're not sure whether your memories are true or false?

A: It's pretty scary. It happens with all people. All over the place, yeah. False memories is [sic] real.

Q: I'm asking you right now with respect to what happened back in October or November

gy subcontractor, testified that the each report was populated from data on plaintiff's EMS. Specifically, Mr. Papadimoulis testified: "The way it was set up there wasn't 'a' report that we could pull data from. There was [sic] properties associated with vendors which had work orders. We generated the reports from work orders." Mr. Papadimoulis also testified that the data entered into the reports originated from routine inspections. The internal correspondence of plaintiff's technology subcontractor indicates that an electronic folder containing "survey zips that get sent from pda" was associated with the generation of termite inspection reports.

Plaintiff ultimately uploaded the termite inspection reports on its EMS, as well as on a website accessible by the public. As a result, the Ohio Department of Agriculture began an investigation into plaintiff's inspection practices after receiving a call from Robert Richter, an inspector who conducted routine inspections for plaintiff, indicating that plaintiff was not properly conducting termite inspections and that plaintiff was conducting a "physically impossible" number of inspections per day. Ohio Department of Agriculture personnel visited plaintiff's offices on December 11, 2007 and interviewed Frank Chapman, Mr. Smith, and Mr. Goss. The Ohio Department of Agriculture issued a report on January 2, 2008, stating in part:

> The Chapman company officials explained the firms [sic] WDI [wood-destroying insect] inspection procedure as follows:
>
> • Inspectors perform an initial inspection on a property and can inspect a home every six months or so depending upon when the property is sold.
> • The inspection performed is a general inspection per HUD requirements and is not specifically a WDI inspection.
> • The inspectors utilize a PDA to complete HUD inspection forms. When

the inspector completes the form on the PDA, the PDA automatically completes a WDI NPMA–33 form. The inspection information is electronically sent to the firm's office and it is placed on the firm's website. . . .

The firm's representatives were asked if the inspectors are performing a WDI inspection per the departments [sic] laws and regulations, i.e., for a real estate transaction. The representatives stated that to date of the inspection they have not performed a WDI inspection for a real estate transaction. They further explained that the firm thought that they were providing a service to potential buyers by placing the NPMA–33 form on their website.

Frank Chapman also provided a letter to the Ohio Department of Agriculture on December 11, 2007, which stated:

> The termite inspection forms on our website were generated by inspectors during routine bi-monthly inspections of properties in our inventory. . . . Our company inspectors were licensed under Ohio law in order to fulfill possible requests by property buyers using FHA financing who wish to request a free inspection. When and if any such inspections are received they will be performed in accordance with State laws and regulations on Form MPMA–33 [sic].

Ohio Department of Agriculture personnel informed plaintiff that it could not provide NPMA–33 forms to the public for inspections that did not constitute a "WDI inspection" under Ohio law. In response, plaintiff removed the NPMA–33 forms from its website.

On the same day that Frank Chapman provided a letter to the Ohio Department of Agriculture, December 11, 2007, Mr. Kellett received a complaint from Mr. Richter. Mr. Richter confirmed at trial that he informed Mr. Kellett of what he had informed the Ohio Department of Agriculture: "Chapman is in-

---

2007, you don't know whether your memory is true or false?
A: I can look at these emails and put myself in the context of that. But no, if you say that's what I said in the deposition, I now remember this problem as it happened. But if I said that in the deposition, it's probably a false memory.

Mr. Papadimoulis subsequently testified that the discussion of termite inspection reports during his deposition "either helped me remember or created whatever was in the email."

putting termite inspections into EMS without inspectors either visiting homes or performing inspections." Mr. Richter also informed Mr. Kellett that he believed a termite inspection report was generated on plaintiff's EMS when he answered a single question on his PDA relating to whether a termite inspection was required. Mr. Richter also testified that a negative response to the question, or the selection of "N/A," would generate a termite report that indicated there was no evidence of a termite infestation. The record reflects only that a small number of termite inspection reports generated during plaintiff's performance of the contract indicated that there was "visible evidence of wood destroying insects." After plaintiff completed performance of the contract, the successor contractors in Michigan and Ohio also noted the absence of evidence of termite infestations in plaintiff's records, and one of plaintiff's successors requested an equitable adjustment after it felt the need to conduct additional WDO inspections.

**Routine Inspections**

During plaintiff's performance, HUD also charged plaintiff with failing to conduct routine inspections of the properties in plaintiff's inventory, which were required under the parties' contract. Plaintiff's Property Management Plan obligated plaintiff to conduct routine inspections every fifteen days for the majority of properties in plaintiff's inventory. Routine inspectors were to note whether there were any "health and/or safety hazards" present at a property. Under the parties' contract, plaintiff also was responsible for any damage resulting from a "failure to inspect or secure [a] property."

Mr. Kellett raised discrepancies in plaintiff's routine inspection reports in October 2007. On October 15, 2007, Britt Chapman, Frank Chapman's cousin who also worked for plaintiff, requested that HUD pay for an air-conditioning unit and a heating unit that were stolen from a property located at Perkins Street in Saginaw, Michigan while the final approval of the sale of the property was pending. Although he initially approved the payment for a new air-conditioning unit, Mr. Kellett rescinded his approval after discovering that all of the routine inspection reports

associated with the Perkins Street property indicated that the home never contained an air-conditioning unit. Among a number of deficiencies in plaintiff's reporting of inspections, Mr. Kellett noted that, according to plaintiff's EMS, nearly all of the routine inspection reports associated with the Perkins Street property had been replaced. In response, Frank Chapman informed Mr. Kellett that the questions he had raised were "computer training questions" and asserted that HUD personnel had failed to "recognize" the routine inspection reports associated with the property. In reply, Mr. Kellett stated that he did not mean to imply a "failure on CLF's part," but that he was seeking clarification as to why almost every routine inspection report associated with the Perkins Street property was replaced on plaintiff's EMS. Although Frank Chapman answered other questions raised by Mr. Kellett, the record does not indicate that Frank Chapman responded to Mr. Kellett's specific concern regarding routine inspections of the Perkins Street property.

Subsequently, plaintiff's failure to conduct routine inspections became a point of contention between the parties. On October 24, 2007, Mr. Gasiorowski requested that HUD approve the eviction of adverse occupants from a home located at Ferris Street in Detroit, Michigan. After Mr. Kellett approved the eviction, another HUD employee pointed out that plaintiff's EMS only contained routine inspection reports evidencing two routine inspections over a five month period. Although plaintiff committed to conducting routine inspections every fifteen days, the only two documented inspections of the Ferris Street property occurred on May 28, 2007 and October 23, 2007, the day before Mr. Gasiorowski's request to HUD, respectively. Mr. Kellett informed plaintiff's management: "On the surface, this shows that the home has not been inspected on a routine basis and I am concerned that this has led to adverse occupants." Frank Chapman admitted that that plaintiff's inspectors had only conducted two routine inspections. Notwithstanding his admission, Frank Chapman maintained that two "exterior inspections" had been conducted by "the lawn crews." Frank Chapman assured Mr. Kellett that

plaintiff had ordered more inspection trucks and informed Mr. Kellett that plaintiff had been required to "keep replacing inner city Detroit inspectors who quit b/c they fear for their lives." Mr. Kellett informed Frank Chapman that, although he "appreciated the actions being put in place," he was "extremely disappointed that the actions are the direct result of HUD monitoring." Mr. Kellett also once again highlighted his observation that plaintiff had not conducted nine scheduled inspections over the course of over four months. In response, Frank Chapman stated: "I believe that the addition of eight additional inspectors is a positive move to address any of your concerns and frankly there is nothing else that can truly be done to combat this criminal act on our side but for adding more inspectors and accounting for turnover due to work conditions." Mr. Kellett, however, dismissed Frank Chapman's response as attempting to "sway the discussion" away from the fact that "CLF did not demonstrate preservation and protection of this home for over three months, which led to an adverse occupancy."

Six days later, on October 30, 2007, Lana Vacha, a HUD official from the local HUD field office, informed plaintiff that she had received a complaint that the windows and doors of the Ferris Street property had been vandalized, that the property had been "open since June," and that, although maintenance crews had visited the property to mow the lawn, no one had reported the vandalism. Frank Chapman informed Ms. Vacha that "there were not any problems" reported when the property was "last inspected," which was contradicted by Mr. Gasiorowski's October 24, 2007 eviction request. On November 2, 2007, after Ms. Vacha reported additional complaints and indicated that she would "drive by" the Ferris Street property, Frank Chapman represented that plaintiff's employees had inspected the property twice since receiving Ms. Vacha's initial communication and that an employee would return to the property on the morning of November 3, 2007. On November 4, 2007, Ms. Vacha indicated that she had discovered that the Ferris Street property had burned down after visiting the property on the afternoon of November 3, 2007. In response, Frank Chapman

asked Terry Blackley, plaintiff's Vice President of Contract Compliance and Property Maintenance/Preservation during contract performance, to send Ms. Vacha "an email with the inspections and cures" and stated: "THERE WAS NOT A FIRE!" (emphasis in original). Over three months later, on February 12, 2008, Ms. Vacha informed Frank Chapman that she had received a report that "now there really was a fire in this property and it remains unsecured." After visiting the property, Whitney Dutton, one of plaintiff's quality control employees, confirmed: "Definite fire damage."

On November 7, 2007, Britt Chapman informed Mr. Gasiorowski that an inspection of a home located at Trenton Street in Detroit, Michigan, which was conducted on November 6, 2007, indicated that the Trenton Street property was a "total loss" as the result of a fire. Britt Chapman noted that the "last Bi Monthly" had been conducted on August 30, 2007 and asked Mr. Gasiorowski to "obtain the report from the Fire Department and access [sic] the situation so we can inform HUD." Two incident reports in the record indicate that a small fire had occurred at the Trenton Street property on September 19, 2007 and that a second, larger fire had occurred on September 20, 2007. On November 19, 2007, Mr. Gasiorowski requested that HUD approve the demolition of the Trenton Street property. After reviewing plaintiff's request, another HUD employee indicated to Mr. Kellett that plaintiff's EMS did not contain routine inspection reports for the months of July, September, and October 2007. The employee noted that "[s]everal" of the routine inspection reports on plaintiff's system were "duplicates," without explaining whether the reports were identical or merely had some overlapping information. In addition, the employee noted: "There is an inspection for the month of October but it was for [l]awn maintenance." The employee also indicated that plaintiff had uploaded an inspection report corresponding to an inspection for November 19, 2007, the same day as Mr. Gasiorowski's request to HUD, and after Mr. Kellett had told plaintiff that he would not approve the demolition of the Trenton Street property without documentation that

plaintiff had properly maintained the home. Mr. Kellett ultimately approved the demolition, but directed plaintiff's management to submit evidence that plaintiff had properly maintained the Trenton Street property.

On the same day that Mr. Gasiorowski had requested that HUD approve the demolition of the Trenton Street property, Frank Chapman sent the following email to Mr. Goss and Mr. Dutton:

THIS IS IMPORTANT. YOU GO THROUGH AND CREATE THE BI MONTLIES [sic] BASED UPON ALL THE EVENTS THAT OCCURRED. LAWN CARE, APPRAISAL, DEREK'S INSPECTIONS.

JOHN MAKE SURE DEREK COMPLETES PCRS [24] AND JUST DOES NOT STOP IN! HE DOES THIS AND IT SCREWS US.

HUD WILL CONTINUE TO DO THIS AND I ABSOLUTELY WILL NOT PAY FOR THESE HOMES. THE PROGRAM WILL HELP AND THE INCREASED WORKERS WILL HELP.

(capitalization in original). Mr. Goss responded the next day by asking whether Frank Chapman wanted Mr. Goss "to add Bi–Monthlies to this particular case" because HUD had a "thumbprint of all the documents," noting that "adding them at this point might cause more harm than good."

Although HUD personnel had indicated that plaintiff's EMS did not contain routine inspection reports for the months of July, September, and October 2007, plaintiff subsequently uploaded hand-written, routine inspection reports for the Trenton Street property, indicating that routine inspections had occurred on September 14, 2007 and October 13, 2007. Although two fires had occurred at the Trenton Street property on September 19 and September 20, 2007, respectively, the September 28 and October 13, 2007 routine inspection reports were almost identical to the September 14, 2007 routine inspection

report.[25] Notwithstanding the occurrence of two fires, all three routine inspection reports indicated that the roof looked "okay," the windows were secured, the property's interior appearance looked "good," there were no "major cracks in foundation or exterior walls," there was no "major structural damage," there was no evidence of vandalism, and "emergency or preventive maintenance repairs" were not required. In contrast, the November 6, 2007 inspection report, which led Mr. Gasiorowski to make a demolition request, included photographs showing that the entire second story of the Trenton Street property had been destroyed and that the roof was no longer present.

On November 13, 2007, less than two weeks after Ms. Vacha had initially informed Frank Chapman that the Ferris Street property had burned down, Mr. Kellett asked plaintiff to explain why a home located at East Dale Avenue in Muskegon, Michigan had not been listed for sale since May 16, 2007, and that the last time plaintiff's employees had interacted with the property was on September 7, 2007. Frank Chapman asked Mr. Smith to respond to Mr. Kellett's inquiry, indicating that Mr. Smith should first demonstrate to Frank Chapman that there was no "mortgagee neglect," that the lawn was cut, and that plaintiff's inspectors had "been out there twice per month." Upon reviewing the files associated with the East Dale Avenue property, Mr. Smith informed Frank Chapman that a work order was placed for lawn services on June 5, 2013, but was canceled on July 30, 2013, and that there were "only a few irregular BMIs." Mr. Smith asked Mr. Chapman whether plaintiff had "anything to demonstrate we have done BMIs or cut lawns?" After receiving Mr. Smith's response, Frank Chapman directed his employees to look at invoices to determine when the lawn had been cut and to "fill out BMIs and put them in the system for those dates." Frank Chapman directed Car-

---

24. PCRS is short for property condition reports.

25. The September 14, 2007 routine inspection reports indicated that the Trenton Street property was unoccupied, however, the corresponding section in the September 28 and October 13, 2007 inspection reports was blank. In addition,

although the September 28, 2007 inspection report indicated that the garage to the Trenton Street property was secure, the corresponding section in the September 14 and October 13, 2007 routine inspection reports was blank.

rie Sampson, one of plaintiff's property preservation employees, to fill out "BMIs" with the information provided by the lawn care service provider for lawn care visits that occurred in August and September 2007 and to call the lawn care service provider to "make sure a OK."

Ms. Sampson provided plaintiff's management with routine inspection reports containing data that corresponded to lawn care visits. The routine inspection reports indicated that inspections had occurred in August, September, and October 2007, and represented that an interior inspection of the property had occurred. The routine inspection reports also included specific details relating to the East Dale Avenue property, such as an indication that the property contained a heating unit and a water heater, that there was no structural damage to the property, and that no emergency repairs were necessary. The reports were filled out by hand and contained the same signature.[26] On November 14, 2007, Mr. Smith sent an email addressed to Mr. Kellett to another HUD employee representing that lawn care services and routine inspections had occurred on the same relevant days in August, September, and October, 2007. The record indicates that plaintiff conflated lawn care visits with routine inspections, although lawn care personnel were not directed or trained to conduct interior inspections of the properties in plaintiff's inventory.

Following HUD's inquiries with respect to the East Dale Avenue and Trenton Street properties, plaintiff's management evidenced concern throughout December 2007 about requesting HUD approval of any action taken at a number of properties because of the lack of documentation that routine inspections had occurred. On December 6, 2007, Mr. Gasiorowski informed Frank Chapman that plaintiff's EMS contained only three routine inspection reports for a property located at

Chester Street in Detroit, Michigan, which had been transferred into plaintiff's inventory almost four months before, on August 14, 2007. Although the property was adversely occupied, Mr. Gasiorowski stated that he did not want to ask Mr. Kellett to approve an eviction because Mr. Kellett would "want CLF to pay for it due to Lack of Bi-monthlies." On December 11, 2007, Mr. Gasiorowski identified two additional properties in Michigan that were adversely occupied, but subject to "inconsistent BMI's." Also on December 11, 2007, Mr. Smith indicated to plaintiff's management that he wanted to request that HUD authorize a "price drop" for a fourth property, but was concerned that HUD would ask for evidence of routine inspections, which plaintiff had not conducted since October 2007. In response to these concerns, Frank Chapman indicated that a "new system" would change the number of routine inspection reports associated with a property.

On December 17, 2007, one of plaintiff's employees requested that HUD approve the eviction of an adverse occupant living at a home located at Mount Elliott Avenue in Flint, Michigan. In contrast to the East Dale Avenue and Trenton Street properties, Plaintiff's EMS indicated that routine inspections of the Mount Elliott Avenue property had occurred at regular intervals in October, November, and December 2007. After discovering that "[f]our of the alleged BMI's were lacking photo evidence," however, Mr. Kellett reviewed the routine inspection reports associated with the Mount Elliot Avenue property and discovered that, according to the properties of the ".pdf" files associated with each report, the routine inspection reports representing that inspections had been conducted on October 25, November 15, and November 30, 2007 were all created within fifteen minutes of plaintiff's December 17, 2007 eviction request.[27] Mr. Goss had previ-

---

26. Mr. Kellett testified that routine inspection reports uploaded to plaintiff's EMS "were filled out in the same manner electronically with no handwritten details whatsoever" and "had a two letter indicator for Michigan or Ohio, a hyphen and a number," representing a particular inspector, rather than an actual signature. Although Michael Hethcoat, one of plaintiff's inspectors,

testified that he filled out routine inspection reports by hand in addition to using a PDA, he testified that he never signed an inspection report.

27. Although Mr. Kellett confused a.m. and p.m. in his contemporaneous communications, the record supports Mr. Kellett's conclusion that the

ously informed Mr. Kellett that routine inspection reports were generally uploaded to plaintiff's EMS within twenty-four hours of an inspection. Mr. Kellett informed other HUD personnel that his findings, therefore, indicated "that the EMS system was modified to show a more favorable inspection cycle based on the previous denials to pay for the eviction when CLF [Chapman Law Firm, LPA] is not inspecting our homes as required." Specifically, Mr. Kellett stated in part:

My review shows that many of the alleged inspection documents on the EMS were actually created the morning of the Adverse Occupancy request for pass through from CLF. This indicates to me that the EMS system was modified to show a more favorable inspection cycle based on the previous denials to pay for the eviction when CLF is not inspecting our homes as required.

Plaintiff's internal correspondence supported Mr. Kellett's conclusion, indicating that, as late as January 14, 2008, plaintiff's employees recognized that plaintiff had not met its obligation to conduct routine inspections of a number of properties in plaintiff's inventory.

On December 20, 2007, Mr. Kellett informed plaintiff's management that he had spoken to Kelly Few, one of plaintiff's human resources employees, to inquire as to how many inspectors plaintiff had employed. According to Mr. Kellett, Ms. Few represented that plaintiff employed twenty-eight inspectors. Although he admitted that he never verified the number of inspectors that plaintiff employed following his conversation with Ms. Few, Mr. Kellett contemporaneously asserted that, given the size of plaintiff's inventory, there was "no way" that plaintiff could conduct routine inspections of properties at the frequency required by the parties' contract with twenty-eight inspectors. Specifically, Mr. Kellett stated: "The evidence of having only 28 inspectors demonstrates a lack of manpower to support the scope of work required." In response to Mr. Kellett's allegations, Frank Chapman informed Mr.

Kellett that he was "wrong and that was not what Kelly told you." Frank Chapman represented that plaintiff had employed thirty-six inspectors. Mr. Goss had informed Frank Chapman that Ms. Few had represented that plaintiff employed twenty-seven inspectors a day before Frank Chapman made this representation.

On January 17, 2008, HUD personnel asked plaintiff's management to address an "adverse occupancy situation" at the same Chester Street property in Detroit, Michigan that Mr. Gasiorowski had identified as adversely occupied on December 6, 2007. Without indicating that he had known the property was adversely occupied for over a month, Mr. Gasiorowski indicated to HUD personnel that he had "[j]ust visited" the property to confirm that it was adversely occupied, noting that the home "was reported 'occupied' on the last BMI." On January 25, 2008, Mr. Kellett authorized plaintiff to proceed with the eviction of the adverse occupant, but stated that he would not approve the reimbursement of the expenses plaintiff incurred in the eviction process because plaintiff was "liable for damages to all acquired properties due to failure to inspect or secure . . . ." Mr. Kellett explained that the "last valid inspection prior to the adverse occupancy appears to be October 17th," corresponding to the three routine inspections that Mr. Gasiorowski had internally identified on December 6, 2007. Mr. Kellett noted that after October 17, 2007, there were "four questionable inspections that were all created on January 9th, but posted with prior dates resembling a more responsive inspection cycle." Similar to his findings with respect to the Mount Elliott Avenue property in Flint, Michigan, Mr. Kellett noted that, although the routine inspection reports associated with the Chester Street property generally included photographs, the reports corresponding to November and December 2007 did not contain photographic evidence that routine inspections had occurred.

After realizing that Mr. Kellett was reviewing the properties of the ".pdf" files as-

---

routine inspection report files appear to have been created within fifteen minutes of plaintiff's

December 17, 2007 eviction request.

sociated with each routine inspection report to determine when the file was created, Frank Chapman sent the following email to Mr. Goss: "I am working very hard to keep everyone employed and then this happens. This is bad. You told everyone that he could not see that date. What happened?" Mr. Goss informed plaintiff's technology subcontractor that HUD had "figured out that they can look at the Metadata of the documents to get the created time and date," noting that "[t]his is a huge problem," and asking whether the subcontractor had "any ideas of what we can do to suppress that information." Mr. Goss informed Frank Chapman that the subcontractor could alter the creation dates for all of the ".pdf" files associated with plaintiff's routine inspection reports, as well as the creation dates of the ".pdf" files that plaintiff created in the future. In response to Mr. Goss' proposal, Frank Chapman directed Mr. Goss to "[w]ipe them ALL! ASAP." (emphasis in original). Mr. Goss informed plaintiff's technology subcontractor to "[p]roceed with all," to which the subcontractor replied: "we're on it! Won't get to it until Monday though … I assume GTR isn't poking around over the weekend?"

On February 4, 2008, after discovering that plaintiff had altered the creation dates of the ".pdf" files associated with routine inspection reports, Mr. Kellett sent Frank Chapman the following email:

> Frank, HUD requires real-time access to all property related information—per our contract. I've discussed with you and John Goss in the past about the validity of the EMS documents, to include the requirement for date stamping on EMS data. One check and balance method that I have had to employ was the creation/modification date of your EMS documents. I clearly shared that with you on January 25th, on questionable BMI data. Seven days later, I find all documents I review on the EMS (including previously viewed)

have a creation date of 1/1/2000. Has CLF changed the creation dates of documents in the EMS?

Frank Chapman forwarded Mr. Kellett's email to plaintiff's current attorney of record,[28] explaining that "Kellett looked up a [sic] adobe pdf creation date and called us out," and that plaintiff had "wiped all pdf creation dates to stop him from this practice in the future." Frank Chapman informed plaintiff's counsel that he wanted to respond to Mr. Kellett's inquiry by stating: " 'I don't know what you are talking about.' " In a separate email, Frank Chapman proposed informing Mr. Kellett that he was "confused" and that "[t]he dates in EMS are true and accurate dates." In addition, Frank Chapman proposed the following:

> As we have demonstrated on numerous occasions you have previously misrepresented dates and the character of inspections to manipulate the scoring of our contract and we will not tolerate your self serving behavior. In fact, you have without a doubt ignored the GPS [global positioning system] [29] and date stamps and fabricated lies which then manufactured to equate to failing grades. CLF will not tolerate this behavior.

Notwithstanding the tone of Frank Chapman's proposed response, Frank Chapman also informed plaintiff's counsel:

> I don't think elaborating is such a good idea b/c John [Goss] and his people put in inspections which were not in EMS and the creation date of the pdf was opened which did not match our EMS date. John is an idiot! Anyway, getting into the specifics only makes us look bad.

In response, plaintiff's counsel stated:

> OK I did not realize that the substance was problematic. I thought John was keeping things straight. By all means if the specifics are not good do not include them.

---

**28.** In the presence of Frank Chapman, who had also practiced law, and without objection from his client, plaintiff's counsel voluntarily waived the attorney-client privilege with respect to the attorney-client communications produced during this litigation. With respect to the communications at issue, plaintiff's counsel stated during

trial: "I frankly have looked at them. I don't think they're all that startling."

**29.** Plaintiff tracked its inspectors' activities via a global positioning system device, which placed a date stamp on photographs taken by inspectors.

Related to this, I have been making assumptions about the future claims litigation based on the strength of the data in the EMS. Are we going to have a problem with that evidence?

The record does not reflect that Frank Chapman responded to counsel's question. After discussing potential responses with plaintiff's counsel, Frank Chapman ultimately informed Mr. Kellett on February 4, 2008 that the creation dates of the ".pdf" files associated with routine inspections had been changed "in order to avoid any possible confusion on the part of HUD employees" and that the creation dates of the ".pdf" files were "not accurate."

Concern that plaintiff was not adequately performing the contract ultimately led HUD to not exercise the first option year to the parties' contract. On December 28, 2007, soon after Mr. Kellett had informed other HUD personnel of his suspicion that plaintiff had modified its routine inspection reports "to show a more favorable inspection cycle," HUD notified plaintiff of its decision not to exercise the first option year to the parties' contract. After plaintiff's contract expired by its own terms on December 31, 2007, plaintiff performed under the "Transition Out" phase of the parties' contract until May 14, 2008. Internal HUD correspondence indicates that HUD personnel decided not to exercise the option year to the parties' contract on or near December 20, 2007. A memorandum written by Cheryl Walker, the Director of the Real Estate Owned Division at the Philadelphia Homeownership Center, which handled Michigan and Ohio, stated that an exercise of the first option year to the parties' contract "indicates unacceptable levels of risk to the Department due to various aspects of the contract management that the contractor is unable and/or unwilling to successfully perform." Ms. Walker also stated:

> The risks to HUD posed by the non-compliance issues include but are not limited to: financial loss from improperly valued appraisals, financial loss from lower prices for poorly maintained properties, improper payment of property related expenses, exposure to increased expenses from evic-

tions due to non-secured properties, local government concerns over unsightly properties, increased administrative burden to respond to complaints, and potential liens against title for unpaid vendor property maintenance services.

Although Ms. Walker recognized that "other contractors have needed improvement in the past after the first six months of performance," she maintained that "CLF's very extensive performance deficiencies are well documented...."

Ms. Walker also identified four "layers of risk" associated with exercising the option year to the parties' contract: plaintiff's deficient performance in managing the properties in its inventory, plaintiff's "less than responsible business practices" relating to its interaction with outside vendors and its payment of fees and taxes, the size and importance of the area that plaintiff was managing, and "an emerging pattern of CLF false or questionable reporting." With respect to the fourth "layer of risk," Ms. Walker stated, in part:

> HUD suspicions about a CLF report as to a sudden increase of 8900 termite inspections shortly after informing HUD that its staff was in training for inspection certifications, were validated when CLF was only able to produce three staff termite inspection licenses and no signed inspection forms and when 7 of 9 homes visited by HUD did not have an inspector sign in on days CLF reported that inspections occurred.... [A]fter HUD ascertained that a home for which inspection reports had never been filed was being occupied illegally, CLF suddenly found reports of inspections that had not been previously entered.

By letter dated April 8, 2009, following the end of the parties' relationship, plaintiff sent the contracting officer a claim certified under the Contract Disputes Act, 41 U.S.C. § 605(c)(1), alleging that HUD had effected a number of constructive changes to the parties' contract, that HUD had stolen plaintiff's trade secrets in allowing third parties to access plaintiff's EMS,[30] and that HUD had

---

30. As noted above, plaintiff subsequently with- drew its theft of trade secrets claim during the

failed to exercise the first option year to the parties' contract in bad faith. With respect to plaintiff's allegation regarding constructive changes, plaintiff claimed entitlement to compensation for: (1) defendant's failure to provide plaintiff with SAMS access for the first ninety days of contract performance, (2) homes that were assigned to plaintiff but credited to another contractor, (3) homes that were assigned to plaintiff but transferred to another contractor, (4) modifications to HUD's Financial Control Manual, (5) claim preparation costs, (6) a modification to the parties' contract requiring homes to be held off the market for a period of time, (7) unpaid management and marketing incentive fees resulting from HUD's imposition of additional requirements, and (8) reimbursement of recordation fees imposed by local governments. The contracting officer did not issue a final decision on plaintiff's April 8, 2009 claim.

**Litigation**

Plaintiff ultimately filed its complaint in the above-captioned case in this court on December 28, 2009. After adding and subsequently removing additional claims, plaintiff filed its Third Amended Complaint on January 25, 2013. Plaintiff's Third Amended Complaint asserts four claims against defendant, which mirror plaintiff's stop work order claims and plaintiff's April 8, 2009 submission to the contracting officer, although plaintiff did withdraw the claim of the alleged theft of plaintiff's trade secrets claim on July 31, 2013.

While the above-captioned case was pending, HUD notified Frank Chapman on February 23, 2010, that he had been proposed for debarment because he "participated in, had knowledge of, or reason to know of the improper conduct of CLF," and that plaintiff's conduct was imputable to him "pursuant to 2 C.F.R. § 180.630(b)," which allows for the imputation of the "fraudulent, criminal, or other improper conduct of any organization to an individual." *See* 2 C.F.R. § 180.630(b) (2010). The proposed debarment alleged that plaintiff had failed to obtain WDO inspections as required by the parties' contract, noting that deficiencies in plaintiff's

performance of the contract were imputable to Frank Chapman. The proposed debarment also charged that plaintiff had produced over 500 inspection reports that indicated plaintiff had used a licensed inspector to conduct each inspection when the inspections were not conducted by a licensed inspector. In addition, the proposed debarment highlighted that a number of inspectors allegedly conducted over thirty WDO inspections in a single day in multiple towns throughout the state of Ohio. The proposed debarment also highlighted that, although plaintiff received a commission for marketing the properties in its inventory, plaintiff was listed as the inspecting company on the NPMA-33 forms it used to track WDO inspections, which stated that the inspecting company had no financial interest in the property being inspected. The proposed debarment further alleged that plaintiff failed to properly obtain appraisals and that plaintiff failed to maintain the homes in its inventory. In addition, the proposed debarment alleged that plaintiff submitted a request for equitable adjustment relating to the first stop work order period for expenses "that were clearly outside the scope of expenses needed to remain ready to perform the Contract."

On June 24, 2010, after HUD had initiated debarment proceedings against Frank Chapman, defendant amended its Answer to assert a counterclaim in this court against plaintiff under the False Claims Act, as well as an affirmative defense under the Special Plea in Fraud statute. Defendant originally alleged that plaintiff had conducted WDO inspections with unlicensed inspectors and that plaintiff had not conducted WDO inspections as represented to HUD. On January 18, 2012, the court denied defendant's motion for partial summary judgment on the issue of whether Section 5.3.9 of the parties' contract and Ohio law required plaintiff to use licensed inspectors to conduct WDO inspections. The court accepted plaintiff's interpretation of Section 5.3.9 of the contract, which the court noted was consistent with the Ohio Department of Agriculture's apparent interpretation of Ohio law. Based on the

course of litigation.

court's decision, and the lack of persuasive evidence submitted by defendant in support of its motion for partial summary judgment, the court dismissed defendant's allegation that plaintiff had conducted unlicensed inspections and struck the relevant portions of defendant's Answer. At a status conference subsequent to the decision, the court and the parties agreed on a discovery schedule. The court subsequently set a trial date for September 10, 2012.

On August 17, 2012, the court was informed, for the first time, of the numerous difficulties the parties had encountered related to discovery.[31] The difficulties arose when defendant moved to reopen discovery only after a second attorney was assigned to the above-captioned case. Although discovery was scheduled to close on July 11, 2012, defendant represented that plaintiff had produced over five million pages of documents to defendant on July 6, 2012. Defendant maintained that plaintiff's July 6, 2012 production was plaintiff's "first and only document production" in response to a discovery request that defendant had issued on April 10, 2012.

Plaintiff maintained that it had adequately responded to defendant's April 10, 2012 discovery request because it had sent a response to defendant on May 25, 2012, indicating that plaintiff had previously produced responsive documents to defendant in the bid protest proceedings described above. In addition, plaintiff noted that it had informed defendant that "CLF does not have access to the requested information as it is contained on a third party server access to which is controlled by John Goss." Plaintiff represented that "Mr. Goss has been asked to provide access to said database but to date Mr. Goss has not responded to CLF's requests." In addition, plaintiff explained that it had belatedly produced documents to defendant on July 6, 2012 because plaintiff's counsel had determined after the deposition of Frank Chapman on June 7, 2012 "that a number of responsive documents including electronic mails received or generated by Mr. Chapman resided on his personal laptop" and

that Mr. Chapman "had an electronic back up of his companies [sic] Electronic Monitoring [sic] System ('EMS')."

Defendant offered no explanation for its counsel of record's failure to timely raise what defendant perceived to be deficiencies in plaintiff's May 25, 2012 response to defendant's April 10, 2012 discovery request. In addition, during the deposition of Frank Chapman, plaintiff's counsel repeatedly stated that plaintiff would only produce documents in its possession, which did not include internal correspondence that Frank Chapman had not received, plaintiff's employment records, and documents relating to plaintiff's routine inspections. Specifically, plaintiff's counsel directed defendant's counsel to obtain responsive documents from Mr. Goss, who was no longer associated with plaintiff. At his deposition, Mr. Goss informed defendant's counsel that he did not have access to any documents that were responsive to defendant's discovery request because he had overwritten the information contained on hard drives he had retained after ending his employment relationship with plaintiff. Mr. Goss also indicated that he had confirmed with the company that maintained plaintiff's email server that the server had been dismantled. It became clear, however, that defendant's discovery request had not been fully complied with by plaintiff, well in advance of August 17, 2012, the first time the court was made aware of the inadequate production.

Despite defendant's failure to timely challenge plaintiff's nonresponsive conduct during discovery, the court stayed the September 10, 2012 trial date and ordered plaintiff to produce missing documents that defendant had identified. On October 1, 2012, plaintiff produced additional emails from Frank Chapman's personal laptop computer. On October 15, 2012 and November 9, 2012 respectively, plaintiff produced documents relating to vehicle leases and a line of credit that plaintiff had obtained. Plaintiff admitted that its May 25, 2012 response to defen-

---

**31.** The court notes, as indicated in the court's previous opinion in this case, *Chapman Law Firm, LPA v. United States*, 103 Fed.Cl. 28, 31 n. 1 (2012), the parties previously had difficulties putting together the record for review of the motion for partial summary judgment, requiring the court to request the parties refile documents numerous times.

dant's discovery request was "inadequate because the Plaintiff did not consider the possibility of using the extensive electronic mail messages resident on Mr. Chapman's laptop," but plaintiff continued to maintain that it did not have access to additional, responsive documents following its latest production of documents. Plaintiff's counsel revealed during a status conference on November 26, 2012, however, that he possessed emails from Mr. Chapman's personal laptop computer, of which was still in Mr. Chapman's possession, which he had not produced to defendant because he did not believe the emails were responsive to defendant's discovery request.

Plaintiff's counsel subsequently informed the court that he had again reviewed the additional emails and had "determined, in good faith, that some of the electronic mails contain relevant, responsive information," which he produced to defendant. Plaintiff's counsel also inadvertently, without having reviewed them, according to plaintiff's counsel, conveyed to and produced to defendant 500 pages of invoices from plaintiff's subcontractors, three handheld devices and a hard drive from a separate computer that Frank Chapman owned prior to 2007. On December 14, 2012, plaintiff's counsel and Frank Chapman, as representative of plaintiff, once again confirmed in affidavits submitted to the court that, other than the files contained on plaintiff's email server, which plaintiff alleges was destroyed by the server's custodian, neither plaintiff's counsel nor Frank Chapman were "aware of any documents or material in whatever form" in either plaintiff's counsel's or Frank Chapman's possession "that relate to the award or performance of the Contract at issue here that have not been disclosed to the Government."

Notwithstanding the dismantling of plaintiff's email server, and plaintiff's continual, rolling production of documents responsive to defendant's April 10, 2012 discovery request, plaintiff's counsel represented to the court that he had verbally issued a litigation hold to Frank Chapman during a conversation that took place after plaintiff finished performance of the contract and the transition out in the summer or late spring of 2008. At

the court's direction, plaintiff's counsel subsequently elaborated, stating that he "repeatedly discussed with Frank Chapman the need to maintain the Plaintiff's records" in relation to the demands of plaintiff's counsel for information relating to the bid protests discussed above. Plaintiff's counsel asserted that "specific discussions of the need to maintain records concerning CLF's performance would have occurred in April 2007, November 2007, and May 2008" during meetings between Frank Chapman and plaintiff's counsel. In response to the court's inquiry as to whether plaintiff's counsel had issued a litigation hold to any of plaintiff's other employees, plaintiff's counsel stated: "I understood that Mr. Chapman controlled all of that information, so I believed that communicating with him was sufficient." Plaintiff's counsel admitted he had never issued any written litigation hold to plaintiff, Frank Chapman, or any other Chapman Law Firm, LPA employees.

After receiving plaintiff's belated production of documents, defendant filed a motion for reconsideration of the court's January 18, 2012 decision dismissing defendant's allegation that plaintiff conducted unlicensed inspections. Defendant maintained that the documents produced by plaintiff demonstrated that plaintiff's "contemporaneous interpretation of the contract language was consistent with the Government's interpretation, and that both parties interpreted the contract to require Ohio State licensed inspectors to conduct the WDO inspections under Section 5.3.9 of the contract." Defendant also asserted that the court "did not review or consider any extrinsic evidence" regarding plaintiff's contemporaneous interpretation of the contract in applying the doctrine of contra proferentem against defendant. Notwithstanding the fact that "defendant did not present the court with any evidence to contradict plaintiff's articulations of its contemporaneous intent" in support of its earlier motion for partial summary judgment, and that plaintiff had presented evidence of its contemporaneous intent in opposition to defendant's motion for partial summary judgment, the court granted defendant's motion for reconsideration on December 21, 2012 because defendant did not have "a full oppor-

tunity to present evidence of plaintiff's contemporaneous intent" as a result of plaintiff's deficient responses to defendant's requests for production. The court concluded that defendant should be given an opportunity to present evidence relating to plaintiff's contemporaneous intent at trial.

## DISCUSSION

### I. Special Plea in Fraud

Due to the potential forfeiture of plaintiff's claims under the Special Plea in Fraud statute, the court addresses defendant's counterclaim and affirmative defenses before addressing plaintiff's stop work order, constructive change, and lost profits/bad faith claims. Defendant maintains that plaintiff "engaged in a series of fraudulent schemes" to deceive HUD into thinking that plaintiff had performed WDO inspections and routine inspections as required by the parties' contract. Defendant admits that plaintiff performed a number of inspections, but alleges that plaintiff failed to perform "nearly all" of the WDO inspections it was required to conduct or "countless" routine inspections. According to defendant, plaintiff generated a large number of termite inspection reports for homes "that never received a termite inspection, much less a termite inspection on the dates and by the inspectors listed in the reports." Defendant also asserts that plaintiff generated "false" routine inspection reports and modified the creation dates of the ".pdf" files associated with the routine inspection reports after HUD discovered evidence of their falsification.

Although plaintiff was paid a fixed property management fee for providing services to each home in its inventory, defendant maintains that after plaintiff had "falsified" inspection reports, that invoices plaintiff submitted to HUD "contained the implicit representation that CLF had performed the property management work for assigned homes as called for by the contract." Specifically, defendant highlights that the contract provided that defendant would pay plaintiff "full compensation for all work required, performed and accepted under this contract...." Plaintiff received a fixed fee for meeting a number of requirements under the contract, including: (1) obtaining a WDO inspection for properties in Termite Probability Zones prior to listing, (2) providing a "current termite/WDO clearance letter at closing if requested by the purchaser" of a property in a Termite Probability Zone, and (3) conducting routine inspections pursuant to plaintiff's Property Management Plan, in which plaintiff indicated that it would conduct routine inspections of most properties in its inventory every fifteen days. In addition, although HUD was obligated to reimburse plaintiff for approved evictions and demolitions, the contract provided that plaintiff was "liable for damages to all acquired properties due to failure to inspect or secure [a] property." Defendant asserts that, "[c]learly, payment was contingent on performance of the contract work" that plaintiff failed to perform.

 The Special Plea in Fraud statute provides:

A claim against the United States shall be forfeited to the United States by any person who corruptly practices or attempts to practice any fraud against the United States in the proof, statement, establishment, or allowance thereof.

In such cases the United States Court of Federal Claims shall specifically find such fraud or attempt and render judgment of forfeiture.

28 U.S.C. § 2514. Under the statute, "the government must 'establish by clear and convincing evidence that the contractor knew that its submitted claims were false, and that it intended to defraud the government by submitting those claims.'" *Daewoo Eng'g & Constr. Co. v. United States*, 557 F.3d 1332, 1341 (Fed.Cir.) (quoting *Commercial Contractors, Inc. v. United States*, 154 F.3d 1357, 1362 (Fed.Cir.), *reh'g denied* (Fed.Cir.1998)), *reh'g and reh'g en banc denied* (Fed.Cir.), *cert. denied*, 558 U.S. 990, 130 S.Ct. 490, 175 L.Ed.2d 346 (2009); *accord Glendale Fed. Bank, FSB v. United States*, 239 F.3d 1374, 1379 (Fed.Cir.2001). Mere negligence, inconsistency, or discrepancies are not actionable under the Special Plea in Fraud statute. *See Daewoo Eng'g & Constr. Co. v. United States*, 73 Fed.Cl. 547, 584 (2006), *aff'd*, 557

F.3d 1332 (Fed.Cir.), *reh'g and reh'g en banc denied* (Fed.Cir.), *cert. denied*, 558 U.S. 990, 130 S.Ct. 490, 175 L.Ed.2d 346 (2009); *Veridyne Corp. v. United States*, 105 Fed.Cl. 769, 801 (2012); *Grand Acadian, Inc. v. United States*, 105 Fed.Cl. 447, 458 (" 'Proof of negligence or ineptitude does not meet the standard of clear and convincing evidence; rather, "[a]n intent to deceive the Government must be proved." ' " (bracket in original) (quoting *Alcatec, LLC v. United States*, 100 Fed.Cl. 502, 517 (2011) (quoting *Miller v. United States*, 213 Ct.Cl. 59, 68, 550 F.2d 17, 22 (1977)), *aff'd*, 471 Fed.Appx. 899 (Fed.Cir. 2012))), *appeal dismissed* (Fed.Cir.2012). The United States Court of Appeals for the Federal Circuit has described the clear and convincing evidence standard as follows:

> "A requirement of proof by clear and convincing evidence imposes a heavier burden upon a litigant than that imposed by requiring proof by preponderant evidence but a somewhat lighter burden than that imposed by requiring proof beyond a reasonable doubt. Clear and convincing evidence has been described as evidence which produces in the mind of the trier of fact an abiding conviction that the truth of a factual contention is *'highly probable.'* "

*Am–Pro Prot. Agency, Inc. v. United States*, 281 F.3d 1234, 1240 (Fed.Cir.2002) (quoting *Price v. Symsek*, 988 F.2d 1187, 1191 (Fed. Cir.1993)) (emphasis in original); *see also Hernandez, Kroone & Assocs., Inc. v. United States*, 110 Fed.Cl. 496, 525 (2013) (citing *Am–Pro Prot. Agency, Inc. v. United States*, 281 F.3d at 1239–40 (other citation omitted)).

"The court may ... consider circumstantial evidence in making its determination." *Alcatec, LLC v. United States*, 100 Fed.Cl. at 517 (citing *Kamen Soap Prods. Co. v. United States*, 129 Ct.Cl. 619, 642, 124 F.Supp. 608, 620 (1954)). With respect to the court's analysis of circumstantial evidence to demonstrate clear and convincing evidence of fraud, the United States Court of Claims explained:

> About the only way a just conclusion can be reached is by placing the questioned documents and statements alongside well-known and established facts.... One cause produces an effect, and that effect in turn becomes a cause....

It is difficult, therefore, to make up a story that is not part of this one continuous design.... [A] made-up story will not fit into the scheme of events, because it is not a part of it. It will not, therefore, stand close examination. One made-up story calls for another and the last fabrication will not tally with the next fact.

*Kamen Soap Prods. Co. v. United States*, 129 Ct.Cl. at 642, 124 F.Supp. at 620.

Once fraud is established, "the court has no discretion to turn a blind eye to an attempt, whether successful or not, to commit fraud in the statement of a claim against the United States." *Am. Heritage Bancorp v. United States*, 61 Fed.Cl. 376, 385 (2004). Forfeiture under the Special Plea in Fraud statute "carries no monetary penalties other than the forfeiture itself." *Daewoo Eng'g & Constr. Co. v. United States*, 73 Fed.Cl. at 584. Although the Special Plea in Fraud Statute does not require the court to render a judgment of forfeiture when a contractor practices fraud against the government "in some other unrelated transaction," when a contractor commits fraud "in regard to the very contract upon which the suit is brought, this court does not have the right to divide the contract and allow recovery on part of it." *Little v. United States*, 138 Ct. Cl. 773, 778, 152 F.Supp. 84, 88 (1957). The claims that a contractor asserts in court, therefore, may be forfeited as long as the fraudulent conduct that serves as the basis for the forfeiture is related to the contract from which the claims are derived. *See Daff v. United States*, 31 Fed.Cl. 682, 697 (1994) ("Although ... fraud does not have to occur in the court proceeding itself, it plainly has to be relevant to the present assertion of a claim in court, arising out of the same transaction or contract." (citing *Little v. United States*, 138 Ct.Cl. at 778, 152 F.Supp. at 87–88)), *aff'd*, 78 F.3d 1566 (Fed.Cir.1996); *see also Veridyne Corp. v. United States*, 105 Fed.Cl. at 806 ("A plaintiff's claim will be forfeited under 28 U.S.C. § 2514 even if only part of its claims is [sic] false." (citing *Daewoo Eng'g & Constr. Co. v. United States*, 557 F.3d at 1341)); *Barren Island Marina, Inc. v. United States*, 44 Fed.Cl. 252, 256 (1999) ("Based on the *Little* case, there is no

question that all claims arising under the contract are subject to forfeiture."), *appeal dismissed,* 54 Fed.Appx. 329 (Fed.Cir.), *and recons. granted and order vacated by,* 57 Fed.Appx. 427 (Fed.Cir.2003). A fraudulent invoice submitted to a contracting officer during the performance of the same contract that is the subject of a contractor's claims, therefore, may result in the forfeiture of the contractor's claims under the Special Plea in Fraud statute. *See Tyger Constr. Co. v. United States,* 28 Fed.Cl. 35, 61 (1993) ("The statute does not specify where such claims must be presented in order to invoke the statute. Claims for payment before a contracting officer are as subject to 'proof, statement, establishment, or allowance' as are claims before the Court of Federal Claims."); *see also Jerman v. United States,* 96 Ct.Cl. 540, 552 (1942).

Although discussing liability under the False Claims Act, which does not have the intent requirement of the Special Plea in Fraud statute, a number of decisions in the United States Court of Federal Claims have reasoned that "an implied representation on an invoice that work has been completed pursuant to the contract requirements may constitute a false claim for payment." *See BMY Combat Sys. Div. of Harsco Corp. v. United States,* 38 Fed.Cl. 109, 125 (1997) (citing *Ab-Tech Constr., Inc. v. United States,* 31 Fed.Cl. 429, 433–34 (1994) ("The withholding of such information—information critical to the decision to pay—is the essence of a false claim."), *aff'd,* 57 F.3d 1084 (Fed. Cir.1995); *Daff v. United States,* 31 Fed.Cl. at 695). But *see United States ex. rel. Stewart & Stevenson Servs., Inc.,* 305 F.Supp.2d 694, 700 (S.D.Tex.2004) (noting that an invoice must indicate "that the contractor has disclosed deficiencies or nonconformance areas" when, in reality, "the contractor submits the invoice without disclosing a material deficiency or area of nonconformance" in order for an invoice with an implied representation to serve as the basis for liability under the False Claims Act). Similarly, under the Special Plea in Fraud statute, an implied representation on an invoice that work has been completed pursuant to a contract may demonstrate fraud, necessitating the forfeiture of claims arising from the same contract. *Cf.*

*Jerman v. United States,* 96 Ct.Cl. at 552 (holding that the submission of a fraudulent invoice constituted a claim under an earlier version of the Special Plea in Fraud statute); *Daff v. United States,* 31 Fed.Cl. at 697 (finding that the submission of invoices for work that did not comply with the terms of the parties' contract constituted clear and convincing evidence that the "requests for payment were made with an intent to deceive the government"). Because plaintiff submitted invoices to defendant asserting entitlement to payment for work performed in the management of the homes in plaintiff's inventory, which impliedly represented that plaintiff had performed the work required by the parties' contract, the claims that plaintiff asserts before the court, which arise from the same contract, should be forfeited under the Special Plea in Fraud statute if the court finds clear and convincing evidence that plaintiff intended to deceive HUD into thinking that plaintiff had performed the work entitling plaintiff to payment under the parties' contract. *See* 28 U.S.C. § 2514.

### A. WDO Inspections

Of the multiple "fraudulent schemes" that defendant alleges were perpetrated by plaintiff, defendant focuses on its allegation that plaintiff failed to conduct WDO inspections with licensed inspectors, which, according to defendant, was required by the parties' contract and the routine inspections, discussed below. Section 5.3.9 of the parties' contract required plaintiff to obtain a "termite and Wood Destroying Organisms (WDO) inspection" of all properties located in a Termite Probability Zone prior to listing, except for vacant lots and homes scheduled to be demolished. Section 5.3.9.1 of the parties' contract required plaintiff, "if requested by the purchaser," to obtain a "termite/WDO clearance letter" at closing for properties that plaintiff was required to inspect under Section 5.3.9. Although the parties' contract does not state whether plaintiff was required to employ licensed inspectors to conduct WDO inspections, Section 5.1.8 of the parties' contract required plaintiff to comply with all federal, state, and local laws and regulations in its performance of the contract. Under Ohio

law, a "wood-destroying insect diagnostic inspection" must be conducted by a licensed inspector. *See* Ohio Rev.Code § 921.01(F), (K) (2007); Ohio Rev.Code § 921.06(A)(1)(e); Ohio Rev.Code § 921.24(B) (2007); Ohio Admin. Code 901:5–11–08 (2007)(A)(4). A "wood-destroying insect diagnostic inspection" is defined as "the examination of a structure at the request of any party involved in a contemplated real estate transaction to determine if wood destroying insects are present in the structure, if there is evidence they either are or have been present in the structure, or the presence of any visible damage to the structure caused by wood-destroying insects and the generation of a written report of the findings of the examination." *See* Ohio Admin. Code § 901:5–11–01(N)(12) (2007).

▮ Defendant contends that plaintiff was required to employ licensed inspectors to conduct WDO inspections because "[t]he termite inspections required under CLF's management and marketing contract were requested by a party (HUD) involved in a 'contemplated real estate transaction.'" Defendant highlights that the purpose of the parties' contract was to "sell the homes that CLF was assigned, with HUD as the 'seller' of each assigned property and CLF acting as HUD's agent. . . ." Defendant also emphasizes that Ohio law required plaintiff to employ licensed inspectors to conduct "'contemplated real estate transactions,' not only real estate transactions in which there is an identified buyer," indicating that plaintiff was required to employ licensed inspectors to conduct WDO inspections before a home was listed for sale. (emphasis in original). In addition, defendant contends that plaintiff's management contemporaneously interpreted the contract to require plaintiff to employ licensed inspectors. Defendant notes that Marla Webb, who defendant characterizes as "the primary author of the CLF proposal accepted by HUD,"[32] testified that she intended for plaintiff to use licensed inspectors to conduct WDO inspections. Defendant also points out that plaintiff's internal correspon-

dence indicates that plaintiff made efforts to ensure that its inspectors were licensed.

In response, plaintiff contends that it was not required to employ licensed inspectors to conduct WDO inspections of the Ohio properties under Section 5.3.9 of the parties' contract, which occurred prior to listing a property for sale, because "there is no real estate transaction in Ohio until there is a buyer and a seller." Plaintiff concedes that it was required to employ licensed inspectors to conduct inspections under Section 5.3.9.1 of the parties' contract, which were performed at the request of a buyer or lender, but maintains that WDO inspections conducted under Section 5.3.9.1 were distinct from WDO inspections conducted under Section 5.3.9. Plaintiff maintains that its obligation under Section 5.3.9 of the parties' contract was satisfied when plaintiff's inspectors looked "for the presence of WDOs" during the initial and routine inspections of each property, as well as when each property was appraised. According to plaintiff, a general inspection or appraisal of a property qualified as a "termite and WDO inspection" under Section 5.3.9 of the parties' contract. Plaintiff argues that "[t]he Government's contentions are based on its misinterpretation of the Contract and its reading into the Contract requirements that are not there."

▮ As indicated above, the court already has determined that the phrase a "party involved in a contemplated real estate transaction" is ambiguous. *See Chapman Law Firm, LPA v. United States*, 103 Fed.Cl. at 43–44. The court previously resolved this ambiguity in favor of plaintiff's interpretation of the contract after noting that plaintiff presented its contemporaneous interpretation of the contract to the Ohio Department of Agriculture in December 2007. *See id.* at 46. Subsequently, after plaintiff belatedly produced a large number of responsive documents in close proximity to trial, the court reconsidered its earlier decision to the extent that defendant would be allowed to introduce

---

**32.** Defendant also characterizes Ms. Webb as "a former partner with Frank Chapman during the proposal process," "who ended up working for the follow-on contractor in Ohio." Ms. Webb testified that she met with Frank Chapman "to revise his initial proposal to the government in response to a request for revised final proposal."

evidence to demonstrate that plaintiff did not contemporaneously interpret the parties' contract to require plaintiff to employ licensed inspectors only when conducting inspections under Section 5.3.9.1.[33]

Based in part on defendant's failure during trial to account for ambiguity in the terms "WDO inspection" and "termite inspection," and counter plaintiff's intent, defendant has failed to successfully challenge the evidence that originally led the court to conclude that plaintiff contemporaneously interpreted the contract in a manner consistent with the court's prior opinion or introduce new evidence to undermine plaintiff's previous position. Defendant highlights that plaintiff made efforts to ensure that its inspectors were licensed to conduct termite inspections before it began performance of the contract and continued to promote its inspectors to obtain termite inspection licenses. Defendant also notes that plaintiff's internal correspondence indicates that it sought to hire licensed inspectors, implemented a salary structure that encouraged inspectors to become licensed, and even made efforts to ensure that its key employees were licensed to conduct termite inspections. In addition, defendant argues that evidence that plaintiff intended to use the NPMA–33 form before beginning performance of the contract indicates that plaintiff understood that its inspectors were required to complete the NPMA–33 form prescribed by Ohio law when conducting WDO inspections. *See* Ohio Admin. Code. § 901:5–11–13(B) (2013).

Although plaintiff made some efforts to ensure that its inspectors were licensed may suggest to some that plaintiff did not interpret the parties' contract to provide for two types of WDO inspections, the record indicates that plaintiff's efforts also could be consistent with plaintiff's interpretation of the contract. Frank Chapman explained that plaintiff required its inspections to be licensed because plaintiff intended to use the same inspectors that were conducting WDO inspections under Section 5.3.9 of the parties' contract to conduct WDO inspections under Section 5.3.9.1 when a WDO inspection was requested by a buyer or a lender. At trial, Frank Chapman distinguished between inspections conducted under Sections 5.3.9 and 5.3.9.1:

> My understanding of how the two paragraphs interact is that we've got to determine just generally whether or not there's termites [sic] in the home. We did that with our initial clean out crews by looking for insects and everything else; we did that by hiring outside people to do appraisals who are responsible for doing this; and we also did it through our bi-monthly inspectors.
>
> 5.3.9.1 requires because of, and only because of Ohio law, that if a mortgagee asks for—through the buyer, if the buyer's representative, a mortgagee, agent, whatever, asks for a termite inspection that would trigger Ohio law and then we have to have somebody who is licensed to go out and conduct the inspection.[34]

---

**33.** The court's prior opinion did not address the properties that plaintiff managed in Michigan because "[n]either party briefed Michigan law nor discussed the Michigan properties in their pleadings." *See Chapman Law Firm, LPA v. United States*, 103 Fed.Cl. at 31 n.3. Although not raised in its Amended Answer to plaintiff's Third Amended Complaint, defendant belatedly argued in its post-trial brief that plaintiff also was required to employ licensed inspectors when inspecting Michigan properties. Michigan law requires "applicators *who use pesticides* in, on, or around structures for the management of wood-destroying pests, such as ... [t]ermites" to obtain a state certification. *See* Mich. Admin Code. r.285.636.3(7)(b) (2007) (emphasis added); *see also* Mich. Comp. Laws §§ 324.8312, 324.8313, 324.8325(1)(d) (2007); Mich. Admin Code. r.285.636.4 (2007). The record does not

indicate that plaintiff's inspectors applied pesticides. In addition, defendant did not adequately address, unlike defendant's position regarding plaintiff's obligations with respect to properties located in the State of Ohio, whether plaintiff was not required to conduct a WDO inspection of all properties in the State of Michigan. Therefore, this opinion does not address if plaintiff was required to employ licensed inspectors when inspecting Michigan properties.

**34.** Although Frank Chapman's distinction between inspections conducted under Sections 5.3.9 and 5.3.9.1 is supported by the record, the court notes that Frank Chapman is a trained lawyer who gave very carefully worded and deliberate testimony at trial, repeatedly pausing at times before completing an answer.

Similarly, Mr. Gasiorowski testified for plaintiff that, although plaintiff initially hired unlicensed inspectors to conduct routine inspections, which, according to plaintiff, included a WDO inspection under Section 5.3.9 of the parties' contract, plaintiff ultimately required its inspectors to be licensed in order to perform a WDO inspection at the request of a buyer or lender. Specifically, Mr. Gasiorowski testified:

They had to be licensed to stay onboard with us. If they didn't pass the exam, they weren't going to become an inspector for us. They wouldn't continue, but we needed inspectors, again, to start out of the gate just to inspect the homes as routine inspections, you know. And then depending on when the sales hit, you know, they've got these requests from the lenders to do the inspections, whoever was licensed we could send out and get those on time.

Although plaintiff's Property Management Plan, which plaintiff was required to follow under the contract, indicated that plaintiff intended to use subcontractors to perform WDO inspections, Mr. Gasiorowski explained that plaintiff ultimately made efforts to ensure that its own inspectors were licensed in order to minimize the time required to "outsource" an inspection to a third party when a WDO inspection was requested by a buyer or lender. Mr. Gasiorowski also testified that his understanding was that HUD only required management and marketing contractors to conduct a WDO inspection when an inspection was "requested by the broker or the buyer," which is consistent with plaintiff's interpretation of the parties' contract, and previous representations to the court.

Similarly, Mr. Blackley explained that plaintiff made efforts to ensure that its inspectors were licensed because he believed that plaintiff's contract required plaintiff to employ licensed inspectors and because plaintiff "might as well get everybody—everybody licensed." Although Mr. Blackley believed that an inspector was required to be licensed to complete a termite inspection report in Ohio, Mr. Blackley also stated that he did not believe inspectors were required to be licensed to perform a "visual inspection" for termites during the initial inspection of a property. Mr. Blackley, on redirect at trial, distinguished between a "visual inspection" for termites and a "licensed termite inspection," noting that inspectors were required to be licensed to "write a report," which was not the same as "visualizing what they see and reporting it back on the report:"

Q: Mr. Blackley, Ms. Moore [defendant's counsel] was discussing with you about termite inspections and she asked you if it was your understanding that a license was required for termite inspections. Do you recall that?

A: Yes.

Q: Now what are you referring to in that context as a termite inspection?

A: As in termite inspection or a licensed termite inspection?

Q: Well, that is what I'm trying to understand. She asked you is it your understanding that a license was required for a termite inspection. My question is in that context whether you think a termite inspection requires a license.

A: I hope I'm saying this right. You could do a visual termite inspection without being licensed, but to write a report, you must be licensed in the state of Ohio.

. . .

Q: Okay. Now you discussed the work of the initial property inspectors and you indicated that part of their job related to termites. Did they require a license to do what they were doing?

A: No.

Q: Why not?

A: Because it was just a visual inspection. They're not required to have a license. They're visualizing what they see and reporting it back on the report.

Mr. Blackley subsequently elaborated on the distinction between what defendant's counsel referred to a "visual inspection versus a report inspection:"

Q: Now, Mr. Blackley, you stated earlier that the contract required a license for termite inspections, but you also differentiated between a visual inspection versus a report inspection. Do you remember that?

A: Right. Uh-huh.

Q: What is the difference between as far as you understand it a visual inspection and a report inspection? Can you tell me?

A: A visual inspection is when we're out there doing the beginning of the initial cleanout, okay? We're there, we're visualizing. We're not there doing a termite inspection report. We have no clue there's going to be termites in that home when we arrive. So we go out, we clean it out, we do a visual inspection. It's on the question form. What they see, that's what they put down as visual.

Now I don't know for the State of Michigan, but for the State of Ohio there is an actual form you must fill out for termites.

. . .

Q: So, to fill out the form, you have to be a licensed inspector, is that correct?

A: Far as I recall, the answer is yes.

Q: Okay. Now you said—Okay. So a visual inspection that's done at the initial cleanup is not an inspection under the Ohio law definition, is that correct?

A: That's correct. Yes.

Mr. Gasiorowski similarly testified that inspectors could "still look for termites" without being licensed. In addition, Mr. Gasiorowski suggested that an inspector was required to be licensed to fill out an inspection report only when conducting "an actual termite inspection." Mr. Gasiorowski also distinguished between the WDO inspections conducted during routine inspections and the WDO inspections conducted at the request of a buyer or a seller:

Q: Now you said that during the initial inspection and the routine home inspection an inspector would look for bugs, insects, vermin. Do you recall that testimony?

A: Yes.

Q: Would an inspector for an initial property inspection or a routine home inspection actively search for termites by going into crawl spaces, attics, prying away baseboards, looking under floor boards with flashlights?

A: Would they pry away stuff? No. No, they wouldn't. But they would look in attics. Part of the routine inspection is to look in attics for roof leaks and vermin, and that's part of their routine inspection.

Although Mr. Gasiorowski at one point indicated that plaintiff's inspectors were not "doing inspections for termites," he also indicated that plaintiff's inspectors were looking for evidence of "infestation."

Plaintiff's former inspectors testified that they only conducted a small number of WDO inspections for plaintiff, but definitional ambiguities that pervaded questioning by defendant's counsel made the meaning of the inspectors' testimony unclear. When prompted by defendant's counsel, Mr. Richter, the Chapman Law Firm, LPA inspector who had complained to both the Ohio Department of Agriculture and Mr. Kellett, distinguished between a "wood-destroying organism inspection and a bimonthly inspection," but gave testimony that was generally consistent with Mr. Gasiorowski's testimony. Mr. Richter testified:

A bimonthly inspection, just, you know, let's take a typical house in Ohio, a two-story home with a basement. For a bimonthly inspection, if I was going to go in the basement, there were questions that asked is the electricity on, is the water heater present, is the water on, is there debris in the home?

So from the bottom of the basement stairs, without really venturing into the basement at all, I could answer the questions on the BMI. However, for a termite inspection or a wood-destroying organism inspection, you need to actually physically go into the basement to every corner, walk completely around the basement. . . . Take that same house, it's got an attic. I can answer these questions on the BMI. I can climb to the top of the attic and I can see is there debris? It's pretty easy. Look around. Okay. Have maybe a quick look at the ceiling, you know, the roof, the under side of the roof. Is there any evidence that it's leaking? . . . Are there termites? Okay. Now I need to get the screwdriver out, now I need to get into the corner of the attic, and now I'm tapping and I'm probing and I'm doing that for all of these rafters, all of these supports for the ceiling. There's a huge difference.

Doug Bullman, another former Chapman Law Firm, LPA inspector, similarly distinguished between the scope of a WDO inspections and a routine inspection, and noted that in a routine inspection, which he characterized as a "vermin inspection," he would look for what was "visible because you're doing a general walkthrough." Mr. Bullman admitted that he answered a question relating to termites while conducting routine inspections. Charles Toczdlowski, an additional former Chapman Law Firm, LPA inspector, testified that he did not conduct a termite inspection or look for termites in response to the following questioning by defendant's counsel: "Now, when you were doing the bi-monthly inspections, were you looking for termites at that time? I mean, did you consider yourself to be doing a termite inspection at that time?" The compound form of defendant's questioning makes it impossible to determine whether Mr. Toczdlowski's testimony indicates that he did not look for termites during a routine inspection or that he did not conduct what he considered to be a "termite inspection" during a routine inspection. This definitional dilemma is highlighted elsewhere in Mr. Toczdlowski's testimony when he indicated that he defined the term "termite inspection" as something other than a routine inspection:

Q: During your bi-monthly or routine inspections, what, if anything, were you told to do regarding a termite inspection?

A: They were two different inspections.

Q: Were you told to conduct a termite inspection during a bi-monthly inspection?

A: No.

Mr. Hethcoat, yet another former Chapman Law Firm, LPA inspector, who testified for plaintiff, stated that he never conducted a WDO inspection or a "termite inspection" for plaintiff, but also noted, in apparent contradiction, that he had he had completed at least one termite inspection report for plaintiff. Mr. Hethcoat maintained that that he was never given any instructions from plaintiff's management on how to conduct a termite inspection. Mr. Hethcoat also indicated, however, that he may have looked for "visible" insect infestations while conducting routine inspections. In addition, after testifying that a distinguishing feature of a WDO inspection was an examination for "a tube up the side of your house," and indicating that he did not look for evidence of "a tube" during routine inspections, Mr. Hethcoat gave the following contradictory testimony:

Q: Now you were asked by [plaintiff's counsel] about the termite inspections, and you stated that you looked for mud tubes then around the foundation of a home. Do you recall that testimony?

A: Yes.

. . .

Q: Did you look for mud tubes around the foundation on the inside and outside of a home when you did the bi-monthly inspections?

A: Yes.

Q: [Plaintiff's counsel] asked you about, were you looking for termites in conjunction with that inspection, any bi-monthly inspection?

A: No, I wasn't looking for termites.

Although Mr. Hethcoat's vacillating testimony ended with the assertion that he did not look for evidence of termites during a routine inspection, the record indicates, at least with respect to one property, that Mr. Hethcoat had been "reporting and sending in photos of the termites" that he had discovered while conducting routine inspections.

The record indicates that at the time that the inspectors were conducting routine inspections, individual plaintiff's inspectors may not have been aware that a termite inspection report was generated on plaintiff's EMS each time that they answered a single question relating to termites on their PDAs. After examining the termite inspection reports uploaded to plaintiff's EMS, however, three of the four inspectors who testified at trial confirmed that the termite inspection reports corresponded to properties on which they had conducted routine inspections. The record also indicates that, upon discovering his name on termite inspection reports, Mr. Richter contemporaneously indicated to HUD that he believed the termite inspection reports were being generated during routine inspections as a result of his answer to the question relating to termites, doubting that

"someone at CLF just made the reports up and put my name on them." Therefore, although not condoning how plaintiff conducted, or failed to conduct, its inspection properly or at all, plaintiff's inspectors generally testified that they did not conduct WDO inspections or termite inspections for plaintiff, and, therefore, their testimony does not contradict plaintiff's purported interpretation of the contract of when a licensed Ohio WDO inspection was required under the contract, because the inspectors appear to have been testifying with regard to formal WDO inspections conducted under Ohio law.

In addition to referring to the testimony of plaintiff's inspectors, defendant highlights that plaintiff's initial property inspection report and plaintiff's routine inspection report, did not "identify termites or other WDOs." Defendant also asserts that "[t]he record contains no evidence that inspectors conducted a termite inspection during an initial property inspection" and that plaintiff's "training manual for initial inspections says nothing about termites and WDOs." The January 2, 2008 report issued by the Ohio Department of Agriculture regarding plaintiff's inspection practices, however, indicated that plaintiff's inspectors conducted an "an initial inspection on a property," which was "a general inspection per HUD requirements ... not specifically a WDI inspection." In addition, the initial property inspection report, which is included in plaintiff's training manual for initial inspections, and which was provided by HUD, refers to an inspection for "Infestation—Rats/Mice/Vermin/Insects," which Mr. Gasiorowski interpreted as including "termites, you know, rats, bats, cats, bees, you know, fleas, everything under the sun." As Frank Chapman recognized during his testimony, the HUD manual for appraisers also directed appraisers to look for evidence of pest infestation and included specific directions regarding an inspection for evidence

of a "termite infestation." In addition, plaintiff's Property Management Plan indicated that its inspectors would "[r]emove bug infestations" during routine inspections. Defendant asserts that there is a difference between "a question about vermin or insect infestation and a WDO inspection," but defendant's assertion assumes that a visual inspection for termites did not qualify as a WDO inspection under Section 5.3.9 of the parties' contract.

Although insects are not referenced on plaintiff's routine inspection report, a form which was also provided by HUD, the record indicates that an unsigned NPMA–33 form indicating that there was "[n]o visible evidence of wood destroying insects was observed" was generated on plaintiff's EMS when an inspector conducting a routine inspection answered "no" or "N/A" to a question on their PDAs relating to whether a termite inspection was required.[35] Frank Chapman confirmed that the questions plaintiff provided to inspectors on their PDAs included questions that did not precisely overlap with the questions on the routine inspection report provided by HUD.[36] Frank Chapman explained that the data generated by an inspector's response to the questions that did not overlap with the questions on the routine inspection report was entered into a termite inspection report separately generated on plaintiff's EMS.

The court recognizes that there are a number of unexplained and obvious inconsistencies in the record regarding plaintiff's contemporaneous interpretation of the parties' contract. At one point during trial, Mr. Gasiorowski testified that inspectors looked for evidence of an "infestation," which he defined as including an inspection for termites. Immediately afterward, however, Mr. Gasiorowski defined an inspection for evidence of an infestation as an inspection for "[a]nything

---

**35.** The record also suggests that plaintiff's EMS generated a work order relating to a WDO inspection when plaintiff's inspectors answered "yes" to the question of whether a termite inspection was required.

**36.** Although Mr. Richter indicated that a question specifically relating to termites did not appear on the PDA until November 2007, he indi-

cated that he was required to answer a question relating to "infestation, rats/mice/vermin/insects" while conducting routine inspections. Frank Chapman testified that plaintiff had "always" asked inspectors about "evidence of infestation in the home which would include termites" before plaintiff included a specific question relating to termites on its inspectors' PDAs.

other than termites," unless "it was obvious where you could see the crumbling of a pillar . . . ." Subsequently, Mr. Gasiorowski testified that a routine inspection did not involve a "termite inspection" and stated that he had "never heard" of a termite inspection being conducted prior to a closing. Plaintiff's management also did not contemporaneously inform HUD of their understanding of the parties' contract when Mr. Kellett notified them on October 11, 2007 that plaintiff's EMS contained few if any termite inspection reports and that plaintiff was not in compliance with Sections 5.3.9 and 5.3.9.1 of the parties' contract. On November 29, 2007, plaintiff's management asserted that plaintiff's inspectors had been conducting inspections "on their first BMI visit to the properties" in response to Mr. Kellett's allegation that the termite inspection reports that were subsequently uploaded to plaintiff's EMS were "generally false." Plaintiff's management, however, failed to inform Mr. Kellett that plaintiff's inspectors also were performing what they interpreted to be WDO inspections during the initial inspection and appraisal of each property. It is unclear from the record how plaintiff differentiated between termite inspection reports, associated with Section 5.3.9 inspections, and termite inspection reports associated with Section 5.3.9.1 inspections, when the reports generated from either inspection indicated that the inspector's signature was on file and did not provide an inspector's individual license number.

Although not brought to the court's attention by plaintiff, the record contains at least a partial explanation for some of these inconsistencies. The context in which Mr. Gasiorowski indicated that inspectors did not look for termites during a routine inspection suggests that Mr. Gasiorowski, like plaintiff's inspectors, may have understood references to an examination or inspection for termites to refer to a WDO inspection conducted under state law, rather than a visual examination for termites. In addition, as noted above, plaintiff contemporaneously informed the Ohio Department of Agriculture that its inspectors were conducting a general termite inspection at the "initial inspection on a property." Mr. Blackley also suggested that

plaintiff's inspectors conducted a WDO inspection "with the initial inspection" and indicated that plaintiff's inspectors would have also conducted a WDO inspection after "consult[ing] with our appraisal department."

During his testimony, Frank Chapman indicated that the HUD manual for the appraisers, who were subcontracted by plaintiff from a HUD-approved list of appraisers, referenced a termite inspection. Frank Chapman tried to explain multiple times at trial that the record does not contain many references to WDO inspections being conducted during initial inspections and appraisals because he did not think it was "necessary," as plaintiff was conducting what it interpreted to be three WDO inspections under Section 5.3.9, rather than the single inspection required by the contract. Frank Chapman also testified that "HUD certainly knows that the appraisers do it as well." In addition, although the record does not indicate how plaintiff differentiated between termite inspection reports completed for inspections conducted under Section 5.3.9 and termite inspection reports completed for inspections conducted under Section 5.3.9.1, Frank Chapman explained that plaintiff used the same form for each inspection as a result of "ease of access." Although Frank Chapman admitted that the use of the NPMA–33 form to track Section 5.3.9 inspections conducted during routine inspections may have been misleading, he testified that plaintiff did not intend to convey that Section 5.3.9 inspections had been conducted pursuant to state law by generating an incomplete NPMA–33.

The new evidence that defendant presented to the court regarding plaintiff's contemporaneous interpretation of the parties' contract is consistent with the evidence previously before the court when it concluded in its prior opinion that plaintiff was not required to employ licensed inspectors to conduct WDO inspections under Section 5.3.9 of the parties' contract. When the court issued its previous decision, the principle evidence before the court of plaintiff's contemporaneous interpretation of the contract was the report issued by the Ohio Department of Agriculture on January 2, 2008. According to the

report and a contemporaneous statement issued by Frank Chapman on December 11, 2007, plaintiff's management contemporaneously represented to Ohio Department of Agriculture personnel that a termite inspection report was automatically generated when plaintiff's inspectors answered a question during a routine inspection or "an initial inspection on a property," which was "a general inspection per HUD requirements ... not specifically a WDI [Wood Destroying Insect] inspection," and that the routine inspection and "initial inspection" performed by plaintiff's inspectors were not conducted for a contemplated real estate transaction under Ohio law. The evidence introduced at trial is generally consistent with plaintiff's contemporaneous statements to the Ohio Department of Agriculture. The court, therefore, does not depart from its earlier conclusion that plaintiff was not required to employ licensed inspectors to conduct WDO inspections under Section 5.3.9 of the parties' contract.[37] *See Chapman Law Firm, LPA v. United States*, 103 Fed.Cl. at 46–47. Although the court does not condone the manner in which plaintiff performed the Section 5.3.9 inspections or maintained records of inspections under the contract, plaintiff was not required by the parties' contract to employ licensed inspectors to conduct WDO inspections under Section 5.3.9. Accordingly, the court cannot find that plaintiff committed fraud "in the proof, statement, establishment, or allowance" of a claim when it invoiced defendant for work performed under the contract to the limited extent that plaintiff employed unlicensed inspectors to conduct WDO inspections under Section 5.3.9 of the parties' contract. *See* 28 U.S.C. § 2514. The defendant has not demonstrated by clear and convincing evidence the Chapman

Law Firm, LPA "knew that its submitted claims were false, and that it intended to defraud the government by submitting those claims." *Daewoo Eng'g & Constr. Co. v. United States*, 557 F.3d at 1341.

### B. Routine Inspections

■ A separate issue arose during trial as to whether plaintiff had conducted routine inspections that it claimed to have conducted in accordance with the parties' contract. Defendant presented the court with four, selected examples of instances in which, according to defendant, plaintiff fraudulently "create[d] the appearance that BMIs were being done." Defendant offered evidence that Frank Chapman "directed that six BMIs be created for days when the lawn was mowed" at the home located at East Dale Avenue in Muskegon, Michigan.[38] Defendant also introduced evidence that plaintiff falsified routine inspection reports associated with the property that was destroyed by a fire at Trenton Street in Detroit, Michigan in order to avoid paying for the cost of the property's demolition. Similarly, defendant offered evidence that the routine inspection reports associated with the properties located at Mount Elliott Avenue in Flint, Michigan and Chester Street in Detroit, Michigan, were falsified in order to avoid paying for the cost of evictions.

Although the circumstances related to some of the properties identified by defendant may not be overwhelming, the record demonstrates a pattern of conduct relating to each property to constitute clear and convincing evidence that plaintiff falsified routine inspection reports with the intent to deceive HUD into thinking that plaintiff was conducting routine inspections as required by

---

37. The court notes that, although not before the court when it made its previous decision, the testimony of plaintiff's expert, Donald McFadden, also supports plaintiff's interpretation of the contract in the absence of an application of the doctrine of *contra proferentem*. *See Fisher v. Halliburton*, Nos. H–05–1731, H–06–1971, H–06–1168, 2009 WL 5216949, at *4 (S.D. Tex. Dec. 21 2009) (citations omitted) (indicating that a court may rely on expert testimony "regarding the meaning of contract terms when the meaning depends on trade practice").

38. The court notes that, although Michigan properties were not initially a part of defendant's allegations relating to WDO inspections, the court permitted evidence relating to Michigan properties at issue under the contract on which plaintiff based its claims to demonstrate general "fraud on the contract" during a March 18, 2013 status conference with the parties. The court reiterated that it would permit defendant to present evidence of fraud relating to Michigan properties at the May 29, 2013 pretrial conference for the second phase of trial.

the parties' contract, including attempts to avoid any obligation to pay for the cost of demolishing the Trenton Street property and evicting adverse occupants from the Mount Elliot Avenue and Chester Street properties, as well as attempt to create BMIs for the East Dale Avenue property when only the lawn was mowed.[39]

When Mr. Kellett alleged, on October 24, 2007, that plaintiff had not conducted routine inspections warranting HUD's reimbursement of the cost of evicting an adverse occupant from the Ferris Street property in Detroit, Michigan, Frank Chapman admitted that plaintiff's inspectors had conducted only two routine inspections there over the course of approximately five months. Although Mr. Gasiorowski had requested that HUD approve plaintiff's eviction request for the Ferris street property based on an October 23, 2007 routine inspection report, Frank Chapman informed Ms. Vacha of the local HUD field office that "there were not any problems" reported by the October 23, 2007 routine inspection after Ms. Vacha notified Frank Chapman of the presence of adverse occupants at the Ferris Street property on October 30, 2007. After representing to Ms. Vacha that plaintiff's employees had visited the Ferris Street property on October 30, 2007 and November 2, 2007, as well as indicating that plaintiff's inspectors would visit the Ferris Street property on the morning of November 3, 2007, Ms. Vacha informed Frank Chapman that she had learned that the Ferris Street property had burned down after she visited the property on the afternoon of November 3, 2007. Frank Chapman denied that a fire had occurred, stating "THERE WAS NOT A FIRE!," Mr. Dutton, however, subsequently confirmed that there was "[d]efinite fire damage" to the property. (emphasis in original). The record indicates, therefore, that, as early as October 2007, plaintiff's management was engaging in questionable conduct regarding routine inspections.

On November 13, 2007, less than two weeks after Frank Chapman was initially informed that the Ferris Street property had burned down, Mr. Kellett asked Frank Chapman to demonstrate that plaintiff had not neglected the East Dale Avenue property after Mr. Kellett discovered, upon reviewing a routine inspection report dated November 2, 2007, that stated the "last time anyone signed in was 9/7/2007." Frank Chapman directed Mr. Smith to demonstrate that plaintiff's inspectors had conducted routine inspections of the East Dale Avenue property and that the property's lawn had been cut. After Mr. Smith informed Mr. Chapman that plaintiff's EMS indicated that plaintiff's inspectors had issued a work order for a single "lawn cut" and "a few irregular BMIs," Frank Chapman directed Ms. Sampson to use dates from invoices associated with "lawncare" and "fill out BMIs and put them in the system for those dates." When Ms. Sampson asked what Frank Chapman wanted her to "put on the BMIs," Frank Chapman informed her that she should note that any issues that "they saw were clear," directing her to call the lawn care company to "make sure a OK." Although the record indicates that Frank Chapman could have been requesting that Ms. Sampson create lawn care reports, which plaintiff appears to have named "bi-monthly inspection L" in its EMS,[40] Ms. Sampson ultimately created routine inspection reports indicating that routine

---

**39.** The court notes that even if defendant failed to adequately raise plaintiff's failure to conduct routine inspections in its Amended Answer to plaintiff's Third Amended Complaint, and even if plaintiff did not impliedly consent to try issues relating to its routine inspections, the court may *sua sponte* render a judgment of forfeiture under the Special Plea in Fraud statute. *See DeRochemont v. United States*, 23 Cl.Ct. 87, 90 (1991) ("[T]here is no requirement in the statute or in logic which would preclude a *sua sponte* rendering of a judgment of forfeiture where ... a court is faced with clear and convincing evidence of a fraudulent statement of a claim.").

**40.** The record indicates that plaintiff generally contracted for bi-monthly lawn services for the properties in its inventory. On August 20, 2007, Frank Chapman asked Mr. Goss to rename all "lawn care reports" on plaintiff's EMS to "bi-monthly Inspection L." Frank Chapman subsequently indicated to Mr. Kellett, however, that "one of the purposes of the BMI–L" was to "add value for HUD" by ensuring that inspectors were actually conducting inspections, potentially indicating that "bi-monthly Inspection L" files were somehow associated with routine inspections. Mr. Goss testified "probably that L stood for bimonthly inspection lawn."

inspections had occurred on each of the dates associated with a lawn care visit at the East Dale Avenue property, and Mr. Smith represented to Mr. Kellett that both lawn care visits and routine "Bi–Monthly inspections" had been conducted at the East Dale Avenue property on the dates associated with lawn care visits. The record indicates, however, that plaintiff did not train lawn care personnel to conduct interior and exterior home inspections and that lawn care personnel did not enter the interior of the homes. As Mr. Kellett contemporaneously recognized, " '[v]isiting' a HUD home does not constitute a routine inspection." The creation of the routine inspection reports, which made representations as to the condition of the interior of the East Dale Avenue property, the submission of the reports to Mr. Kellett, and plaintiff's submission of invoices to defendant indicating that it had earned a management fee for conducting routine inspections of the East Dale Property constitute clear and convincing evidence that plaintiff knew that it was not entitled to a management fee for conducting routine inspections of the East Dale Avenue property and that plaintiff's management intended to defraud defendant by invoicing HUD for work plaintiff had not performed. *See Glendale Fed. Bank, FSB v. United States*, 239 F.3d at 1379.

Similarly, the conduct of plaintiff's employees after Mr. Kellett questioned plaintiff's November 19, 2007 request that HUD approve the demolition of the Trenton Street property in Detroit, Michigan, which had been destroyed by two consecutive fires, constitutes clear and convincing evidence of fraud. Mr. Kellett had discovered that, according to the data on plaintiff's EMS, plaintiff had not conducted routine inspections of the Trenton Street property for the months of July, September, and October 2007. Mr. Kellett requested that plaintiff demonstrate that it had not neglected the Trenton Street property. Frank Chapman directed Mr. Goss and Mr. Dutton to create routine inspection reports based on all interactions with the Trenton Street property. In apparent frustration with HUD's investigations

into whether plaintiff had completed inspections justifying its requests for reimbursement, Frank Chapman stated: "HUD WILL CONTINUE TO DO THIS AND I ABSOLUTELY WILL NOT PAY FOR THESE HOMES." (capitalization in original). As indicated above, plaintiff was responsible under the parties' contract for any damage resulting from a "failure to inspect or secure [a] property." Notwithstanding Mr. Goss' warning that HUD had a "thumbprint" of plaintiff's documents, plaintiff created routine inspection reports representing that routine inspections had occurred at the Trenton Street property on September 14, 2007, September 28, 2007 and October 13, 2007. Although the record indicates that the Trenton Street property was severely damaged by the two fires that occurred on September 19 and September 20, 2007, respectively, and Mr. Gasiorowski characterized the property as a "total loss" in his November 6, 2007 demolition request, the September 28, 2007 and October 13, 2007 routine inspection reports did not report any major issues with the Trenton Street property.

■ Plaintiff's counsel suggested during closing arguments that the events surrounding the creation of routine inspection reports for the Trenton Street property, at most, indicated evidence of "reckless reporting," in that plaintiff's management may not have been aware of the inconsistency in the September 28, 2007 and October 13, 2007 routine inspection reports. Although the court agrees that, by focusing on its allegation that plaintiff failed to properly conduct WDO inspections, defendant did not fully explore the principles of agency [41] that may have been implicated in the misrepresentations that plaintiff made to HUD, the court concludes that the events surrounding the Trenton Street property constitute clear and convincing evidence of fraud by plaintiff, when viewed in conjunction with the evidence relating to the East Dale Avenue property. Plaintiff's management understood that the creation of routine inspection reports based on other interactions with a property, such as

---

41. Whether an employee was acting as an agent for an entity may be relevant under the Special Plea in Fraud statute as to whether the employ-

ee's actions or knowledge may be imputed to the entity. *See Alcatec, LLC v. United States,* 100 Fed.Cl. at 521.

lawn care, misrepresented that a routine inspection of the property had occurred when, based on the available evidence, it had not. Even stretching to include the possibility that plaintiff's management did not realize that they had indicated to HUD that there were no issues relating to a property that had been destroyed by two fires, an unlikely event at best, plaintiff's management knew that the September 28, 2007 and October 13, 2007 routine inspection reports were associated with events that did not constitute routine inspections when they invoiced HUD for a management fee associated with the Trenton Street property, and that plaintiff's management intended to defraud defendant by invoicing HUD for work the plaintiff had not performed. *See Glendale Fed. Bank, FSB v. United States*, 239 F.3d at 1379. Although the evidence that plaintiff created the routine inspection reports from data unrelated to routine inspections is less direct than the evidence relating to the East Dale Avenue property, the court finds the circumstantial evidence, considered in conjunction with the evidence relating to the East Dale Avenue property, to be clear and convincing evidence of fraud. *See Alcatec, LLC v. United States*, 100 Fed.Cl. at 517 (citing *Kamen Soap Prods. Co. v. United States*, 129 Ct.Cl. at 642, 124 F.Supp. at 620 ("One made-up story calls for another and the last fabrication will not tally with the next fact."))[42]

While discussing routine inspection reports associated with the Chester Street property, Frank Chapman indirectly indicated that plaintiff may have had a general practice of associating events that did not constitute routine inspections with routine inspection reports. When asked to identify files with suspicious ".pdf" creation dates that were labeled "BMI," Frank Chapman testified:

> I don't know that they are inspections. I don't know what they are. I didn't have

anything to do with the creation of those dates. But I believe what they tried to do, John [Goss], was to replicate events that had occurred at the house on those particular days. Maybe the appraiser went, maybe Derek [Gasiorowski] was out there. I don't know what they are.

After receiving HUD's inquiries into the Ferris Street, East Dale Avenue, and Trenton Street properties, Mr. Gasiorowski expressed concern in early December 2007 that HUD would not reimburse plaintiff for the cost of evictions of three properties with adverse occupants because plaintiff had conducted "inconsistent BMI's." In response to Mr. Gasiorowski's concern regarding the lack of routine inspections of the Chester Street property in particular, Frank Chapman cryptically told Mr. Gasiorowski to "see how many inspections" after "[t]he new system goes up." Less than two weeks later, on December 17, 2007, Mr. Kellett discovered that the ".pdf" files associated with three routine inspection reports from the Mount Elliot Avenue property were created within fifteen minutes of plaintiff's eviction request. Two days later, on December 19, 2007, Mr. Goss indicated to Mr. Chapman with respect to Ms. Few's representation to Mr. Kellett of the number of inspectors that plaintiff had employed:

> This has to be stopped now. Cliff [Kellett] called Kelly [Few] and asked her how many inspectors we have at the present time. For the record she said 27. He is obviously building case.

The record indicates, therefore, that plaintiff's management was cognizant, concerned, and wary that HUD personnel were observing plaintiff's deficient routine inspection practices and that plaintiff's management took action with respect to the Mount Elliott Avenue property.[43]

---

**42.** The court notes that even if plaintiff engaged in "reckless reporting," rather than intentional misrepresentation with respect to the Trenton Street property, the court's holding would not change because, as explained below, plaintiff's intentional misrepresentation with respect to the East Dale Avenue property is sufficient to forfeit plaintiff's claims under the Special Plea in Fraud statute, *see Daff v. United States*, 31 Fed.Cl. at 697 (citing *Little v. United States*, 138 Ct.Cl. at

778, 152 F.Supp. at 87–88), and, based on the facts established at trial in this case, reckless disregard for the truth or falsity of a claim is sufficient to find liability under the False Claims Act.

**43.** The issues HUD personnel raised regarding routine inspections were independent from plaintiff's generating 8,900 termite inspection reports in the span of a few hours in November 2007.

Before plaintiff had an opportunity to submit an eviction request relating to the Chester Street property, HUD personnel asked plaintiff to address the "adverse occupancy situation" reported at the property. Upon discovering that plaintiff's EMS contained four ".pdf" files associated with routine inspections that were created in close proximity to each other, similar to the Mount Elliott Avenue property, Mr. Kellett asked plaintiff's management to explain the discrepancy. At trial, Mr. Kellett testified that the inspection reports he "was looking at were created in a series during one day, a very quick series, and then it led me to conclude that the EMS data had been populated with inspection reports that were falsified." Frank Chapman promptly forwarded Mr. Kellett's contemporaneous communication to Mr. Goss and stated: "I am working very hard to keep everyone employed and then this happens.... You told everyone that he could not see the date. What happened?" Frank Chapman and Mr. Goss ultimately decided to set the creation date of all ".pdf" files on plaintiff's EMS that were associated with a "routine inspection" to an arbitrary value.

Subsequently, on February 1, 2008, Mr. Kellett asked plaintiff's management whether the creation dates of ".pdf" files on plaintiff's system had been altered. After plaintiff's management failed to respond to Mr. Kellett's inquiry, on February 4, 2008, Mr. Kellett once again asked plaintiff's management to explain why plaintiff had altered the creation dates of ".pdf" files on plaintiff's EMS after Mr. Kellett had brought "questionable BMI data" to the attention of plaintiff's management. Plaintiff's management came up with the explanation that plaintiff had altered the creation dates of the ".pdf" files associated with routine inspection reports in order "to avoid any possible confusion on the part of HUD employees as they have shown a pattern and practice of becoming easily confused by our outstanding advanced system." Frank Chapman informed Mr. Kellett that the routine inspection reports were "date

stamped in EMS by the system when received," that photographs included in plaintiff's routine inspection reports had a date stamp created by the inspectors' PDAs, and that the creation dates of the ".pdf" files associated with the routine inspection reports were "not accurate." Frank Chapman made this assertion after first proposing that he respond to Mr. Kellett by stating that he was "confused" by Mr. Kellett's comments and informing plaintiff's counsel that he did not "think elaborating is such a good idea b/c John [Goss] and his people put in inspections which were not in EMS and the creation date of the pdf was opened which did not match our EMS date," noting that "getting into the specifics only makes us look bad." Frank Chapman directed Mr. Kellett to look at the date stamps contained on photographs uploaded from inspectors' PDAs, but, as Mr. Kellett had informed him, the majority of the questionable routine inspection reports associated with the Mount Elliott Avenue and Chester Street properties were suspicious in part because they did not include photographs like other, apparently legitimate routine inspection reports.[44] In addition, Mr. Kellett testified at trial that he was forced to rely on the creation dates of ".pdf" files because plaintiff often gave HUD "incorrect information" on reports, such as dates entered into a report not matching dates appearing on a photograph.

The contemporaneous, and trial, attempted explanations and admissions offered by Frank Chapman as to why plaintiff had altered the creation dates of ".pdf" files associated with routine inspection reports do not alter the facts before the court. The contemporaneous recognition by plaintiff's employees that they had not been conducting routine inspections in a timely fashion, the concern of plaintiff's employees that HUD would not approve the reimbursement of expenses based on a lack of routine inspections, the close proximity in which the questionable routine inspection reports were created, the missing photographs in the majority of the

---

**44.** Although Frank Chapman tried to explain that routine inspection reports of properties for which plaintiff had submitted an eviction request did not include photographs because an inspector was not permitted to enter an occupied

home, the suspicious reports associated with the Mount Elliot Avenue and Chester Street properties, which did not include photographs, indicated that the properties were not occupied.

questionable reports, the close proximity between the creation date of the Mount Elliot Avenue routine inspection reports and the eviction request relating to the property, and the clear and convincing evidence of fraud with respect to the routine inspection of the East Dale Avenue and Trenton Street properties together with the exhibits introduced at trial including the voluminous emails, leads the court to conclude that the record contains clear and convincing evidence that plaintiff falsified routine inspection reports for the Mount Elliott Avenue and Chester Street properties. The record before the court also leads the court to conclude that plaintiff attempted to prevent Mr. Kellett from discovering the frauds committed with respect to the Mount Elliott Avenue and Chester Street properties, as well as the potential fraud committed with respect to many other properties, by altering the creation date of the ".pdf" files associated with routine inspection reports. The court cannot ignore the urgency of Frank Chapman's direction to Mr. Goss, with reference to the ".pdf" creation dates, to "[w]ipe them ALL! ASAP." Although primarily circumstantial, *see Alcatec, LLC v. United States,* 100 Fed. Cl. at 517 (citing *Kame Soap Prods. Co. v. United States,* 129 Ct.Cl. at 642, 124 F.Supp. at 620), the court is left with " 'an abiding conviction' " that plaintiff's falsification of routine inspection reports with respect to the Mount Elliot Avenue and Chester Street properties is " '*highly probable,*' " *see Am–Pro Prot. Agency, Inc. v. United States,* 281 F.3d at 1240 (quoting *Price v. Symsek,* 988 F.2d at 1191) (emphasis in original), that plaintiff's management committed fraud with respect to the Mount Elliott Avenue and Chester Street properties when they invoiced HUD for a management fee associated with the properties, and that plaintiff's management intended to defraud defendant by invoicing HUD for work plaintiff had not performed. *See Glendale Fed. Bank, FSB v. United States,* 239 F.3d at 1379.

In *Alcatec, LLC v. United States,* the court found that the plaintiff had committed fraud in performing an indefinite-delivery, indefinite quantity, fixed-rate contract, which compensated the plaintiff for performing services that included a monthly inspection of mobile homes. *See generally Alcatec, LLC v. United States,* 100 Fed.Cl. 502. The plaintiff was a small business contractor that had no experience providing similar services to the government. *See id.* at 505. The plaintiff admitted that it invoiced for "duplicate inspections," but asserted that its overbilling of defendant "was a product of mistake and confusion and not the result of a scheme to intentionally defraud the Government." *Id.* at 517. In addition, the *Alcatec* plaintiff argued that even if the invoices submitted to the defendant were fraudulently created, plaintiff's management could not be held responsible for the intent "manifested solely by field-office employees." *Id.*[45] The *Alcatec* court found that the plaintiff had "created a chaotic billing scheme that made it difficult for FEMA [Federal Emergency Management Agency] to detect inaccuracies in Alcatec's billing," made the "history of an individual trailer's inspections ... difficult to track" by associating inspections with months in which they did not occur, in violation of the contract's requirement that the plaintiff conduct monthly inspections, and directed its inspectors to leave reports undated. *See id.* at 518. Noting that the "routine nature" of the monthly inspections "was at the heart of the performance that FEMA contracted for," *see id.* at 521, the *Alcatec* court concluded that the case "exemplifies a situation in which '[c]ircumstances altogether inconclusive, if separately considered, may, by their number and joint operation, be sufficient to constitute conclusive proof' " that the plaintiff had manipulated its billing system in a way that "distorted the contractual requirements," and that the plaintiff committed fraud by intentionally falsifying the dates that appeared on inspection reports. *See id.* at 518 (alteration in original) (quoting *N.Y. Mkt. Gardeners' Assoc. v. United States,* 43 Ct.Cl. 114, 137–38 (1908)). Given that " 'the falsification of the underlying documents upon which [a] claim is based, voids each of

---

**45.** The *Alcatec* court did not address the *Alcatec* plaintiff's agency argument because it concluded that the plaintiff's Chief Operating Officer was implicated in the fraud, which bound the plaintiff to the actions of its officer. *See id.* at 521–25.

the claims associated with the contract,'" the *Alcatec* court held that the claims that the plaintiff asserted, which arose out of the contract under which the plaintiff had falsified "backup documentation" for its invoices, were forfeited. *See id.* at 525–26 (quoting *Kellogg Brown & Root Servs, Inc. v. United States*, 99 Fed.Cl. 488, 498 (2011), *aff'd*, 728 F.3d 1348 (Fed.Cir.2013)).

The facts in the case before the court are similar to the facts of *Alcatec.* The record in the above captioned case demonstrates that plaintiff falsified inspection reports for the East Dale Avenue, Trenton Street, Mount Elliott Avenue, and Chester Street properties, which served as supporting documentation for its claim to the management fee provided for conducting routine inspections under the parties' contract. Plaintiff in the case currently before the court went even further than the contractor in *Alcatec*, which misreported the date on which inspections had occurred. In the current case, plaintiff represented that routine inspections had occurred on the East Dale Avenue property on dates that lawn care services were provided, by creating routine inspection reports for the Trenton Street property which represented that an inspector had visited the property, which was contradicted by the post-hoc creation of the reports, the failure of the post-hoc reports to recognize that a fire had destroyed the property, and Frank Chapman's direction to use any interaction with the Trenton Street property as evidence of a routine inspection, and by uploading questionable routine inspection reports for the Mount Elliott Avenue and Chester Street

properties, actions which were further magnified by subsequently altering the creation dates of the questionable ".pdf" files after learning that defendant was aware that a number of routine inspection reports were not generated in close proximity to their associated inspections. Under the parties' contract, plaintiff was paid a management fee, in part, for conducting routine inspections, which indicates that the routine inspections reports were "backup documentation" for plaintiff's invoices. *See Alcatec, LLC v. United States*, 100 Fed.Cl. at 525–26 (citing 28 U.S.C. § 2514) (concluding that "backup documentation for Alcatec's invoices that were paid by the Government" constituted "the 'proof' of a claim against the Government"). Because plaintiff created fraudulent routine inspection reports for the East Dale Avenue, Trenton Street, Mount Elliott Avenue, and Chester Street properties, and more generally caused inaccurate information to be retroactively created into its reporting system, plaintiff's claims, which also arise out of the same contract that obligated plaintiff to conduct routine inspection reports of these four properties, are forfeited.[46] *See Daff v. United States*, 31 Fed.Cl. at 697 (citing *Little v. United States*, 138 Ct.Cl. at 778, 152 F.Supp. at 87–88); *Tyger Constr. Co. v. United States*, 28 Fed.Cl. at 61.

## II. False Claims Act

In addition to the forfeiture of plaintiff's claims under the Special Plea in Fraud statute, defendant maintains that plaintiff is liable under the False Claims Act for its falsifi-

---

**46.** Given that plaintiff's claims are forfeited under the Special Plea in Fraud statute, and given defendant's admitted "oversight" at trial in failing to seriously pursue any affirmative defenses other than the Special Plea in Fraud statute, the court does not address the validity of defendant's other affirmative defenses, but does consider the False Claims Act counterclaims. In addition, because plaintiff has not alleged, and the trial record does not demonstrate, that plaintiff is entitled to recover in *quantum meruit* for services that it provided, notwithstanding the forfeiture of plaintiff's claims, which one judge of the Court of Federal Claims has found to be permissible, the court does not address alternative methods by which plaintiff arguably could recover on its claims. *Compare Veridyne Corp. v. United States,*

105 Fed.Cl. at 807 (suggesting that a contractor may recover for services performed without compensation even when plaintiff's claims under a related contract are forfeited), with *Mervin Contracting Corp. v. United States*, 94 Ct.Cl. 81, 86 (1941) (holding under a previous version of the Special Plea in Fraud statute that the plaintiff had forfeited both its claims arising out of express contracts as well as its *quantum meruit* claims when it committed fraud in the statement of a claim); *and Globe Indem. Co. v. United States*, 84 Ct.Cl. 587, 595 (1937) (holding that a suit could not be maintained "on any theory of an implied contract" once forfeiture indicated that the subject matter of an express contract had been "destroyed by operation of law").

cation of routine inspection reports.[47] The False Claims Act, 31 U.S.C. § 3729 (2006),[48] provides that any person who—

(1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval;

(2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government;

(3) conspires to defraud the Government by getting a false or fraudulent claim allowed or paid;

(4) has possession, custody, or control of property or money used, or to be used, by the Government and, intending to defraud the Government or willfully to conceal the property, delivers, or causes to be delivered, less property than the amount for which the person receives a certificate or receipt;

(5) authorized to make or deliver a document certifying receipt of property used, or to be used, by the Government and, intending to defraud the Government, makes or delivers the receipt without completely knowing that the information on the receipt is true;

(6) knowingly buys, or receives as a pledge of an obligation or debt, public property from an officer or employee of the Government, or a member of the Armed Forces, who lawfully may not sell or pledge the property; or

(7) knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or trans-

---

**47.** Defendant also asserted that plaintiff is liable under the False Claims Act for penalties and damages that defendant incurred as a result of plaintiff's failure to "properly conduct approximately 8,900 WDO/termite inspections." As defendant's counsel recognized during closing arguments, plaintiff's use of unlicensed inspectors to conduct Section 5.3.9 inspections does not implicate liability under the False Claims Act as a result of this court's reaffirmed the conclusion at trial that plaintiff was not required to employ licensed inspectors to conduct WDO inspections under Section 5.3.9 of the parties' contract. During closing argument, defendant's counsel stated:

> [I]f the Court finds that, for example, the contractor complied with the requirement to do a WDO inspection—complied with that requirement through doing the initial—like the plaintiff says—by doing the initial inspection, or by doing an appraisal, that somehow that requirement was met, the Court would be saying that then the contractor was allowed to invoice the Government for that work, right? So we would say that then that would mean that those invoices were not false claims.

Moreover, even if the court were to conclude that plaintiff was required to use licensed inspectors to conduct WDO inspections under Section 5.3.9 of the parties' contract, the record does not demonstrate that plaintiff knowingly submitted false invoices for WDO inspections, as plaintiff has consistently maintained the belief that the contract did not require licensed inspectors under Section 5.3.9 of the contract. *See Hernandez, Kroone & Assocs., Inc. v. United States*, 110 Fed.

Cl. 496, 525 (2013) (concluding that a contractor did not "knowingly present a false or fraudulent claim" when the contractor sincerely maintained a different interpretation of the contract).

**48.** The False Claims Act was amended in 2009. *See* Fraud Enforcement and Recovery Act of 2009, Pub.L. No. 111–21, § 4(a), 123 Stat. 1617, 1621. The amendments are treated "as if enacted on June 7, 2008, and apply to all claims under the False Claims Act (31 U.S.C. 3729 et seq.) that are pending on or after that date." § 4(f), 123 Stat. at 1625. Courts that have interpreted the retroactivity of the 2009 amendments have concluded that the 2009 amendments apply only if a contractor's claim, rather than a judicial proceeding, was pending on or after June 7, 2008. *See United States ex rel. Bennett v. Medtronic, Inc.*, 747 F.Supp.2d 745, 763 (S.D.Tex.2010) (concluding that the retroactivity provision of the 2009 amendments does not refer to "*cases or causes of action*" (emphasis in original)); *United States ex. rel. Baker v. Cmty. Health Sys., Inc.*, 709 F.Supp.2d 1084, 1108 (D.N.M.2010) (same); *United States ex rel. Bender v. N. Am. Telecomms., Inc.*, 686 F.Supp.2d 46, 49 n. 4 (D.D.C.2010) (same). But *see United States ex rel. King v. Solvay S.A.*, 823 F.Supp.2d 472 (S.D.Tex.2011), *vacated on recons. on other grounds*, 2012 WL 1067228 (S.D. Tex. Mar 28, 2012); *United States ex rel. Drake v. NSI, Inc.*, 736 F.Supp.2d 489 (D.Conn.), leave to appeal denied (D.Conn. 2010). Plaintiff invoiced HUD and was paid for the work it performed on the East Dale Avenue, Trenton Street, Mount Elliott Avenue, and Chester Street properties prior to June 7, 2008.

mit money or property to the Government,

is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000 [49] plus 3 times the amount of damages which the Government sustains because of the act of that person. . . .

31 U.S.C. § 3729(a) (emphasis in original). The term "claim" is defined in the False Claims Act as:

Includ[ing] any request or demand, whether under a contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient if the United States Government provides any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded.

31 U.S.C. § 3729(c). The False Claims Act also states:

the terms "knowing" and "knowingly" mean that a person, with respect to information—

(1) has actual knowledge of the information;

(2) acts in deliberate ignorance of the truth or falsity of the information; or

(3) acts in reckless disregard of the truth or falsity of the information,

and no proof of specific intent to defraud is required.

31 U.S.C. § 3729(b).

■■■ The government is required to show the knowing presentation by the contractor of information known to be "false or fraudulent." *Wang ex rel. United States v. FMC Corp.,* 975 F.2d 1412, 1420 (9th Cir. 1992); *see also Young–Montenay, Inc. v. United States,* 15 F.3d 1040, 1043 (Fed.Cir.

1994). The government has "the burden to allege and prove that the statements were false under any reasonable interpretation." *United States v. Adler,* 623 F.2d 1287, 1289 (8th Cir.1980). The burden of proof on the government in this regard is by a preponderance of the evidence. *See Daewoo Eng'g & Constr. Co. v. United States,* 557 F.3d at 1340 (citing 31 U.S.C. § 3731(c) and *Commercial Contractors, Inc. v. United States,* 154 F.3d at 1362).

■■■ "To bring [a] FCA [False Claims Act] claim, the Government is not tasked to show that it incurred damages, although a showing of damages as a result of the fraudulent claim is required if the Government seeks to recover damages." *Veridyne Corp. v. United States,* 105 Fed.Cl. 769, 808 (alteration added), *modified by* 107 Fed.Cl. 762 (2012); *see also Daewoo Eng'g & Constr. Co. v. United States,* 557 F.3d at 1341 ("The Court of Federal Claims did not err in concluding that Daewoo violated the False Claims Act. Because the court did not find that the government incurred damages from Daewoo's false claim, the court properly assessed only the statutory penalty."); *see also Commercial Contractors, Inc. v. United States,* 154 F.3d at 1371–72 ("[A] contractor can be held liable for submitting a false claim even if the goods it delivered are of the same quality as the goods specified in the contract, provided that the contractor acted with the requisite knowledge that the corresponding claim was false. But while the contractor may be liable in that situation, it is liable only for FCA penalties, not damages. . . . In order to recover FCA damages, the government must prove that it sustained an actual loss as a result of the contractor's false or fraudulent claim." (citations omitted)); *Alcatec, LLC v. United States,* 100 Fed.Cl. at 526 ("To bring an FCA claim, the Government does not have to show that it incurred damages, although a showing of damages as a

---

**49.** "The Department of Justice, by regulation, has increased the penalties for FCA [False Claims Act] violations to a minimum of $5,500.00 and a maximum of $11,000.00." *Alcatec, LLC v. United States,* 100 Fed.Cl. 502, 526 n. 13 (2011) (citing 28 C.F.R. § 85.3(a)(9)), *aff'd,* 471 Fed.Appx. 899 (2012); *see also* Federal Civil Penalties Inflation Adjustment Act of 1990,

Pub.L. No. 101–410, 104 Stat. 890; Civil Monetary Penalties Inflation Adjustment, 64 Fed.Reg. 47,099–01, 47,104 (Aug. 30, 1999). The court has discretion to impose penalties within the statutory range. *See Morse Diesel Int'l, Inc. v. United States,* 79 Fed.Cl. 116, 125 (2007), *recons. denied,* 81 Fed.Cl. 311 (2008).

result of the fraudulent claim is required if the Government seeks to recover damages." (citing *Daewoo Eng'g & Constr. Co. v. United States*, 557 F.3d at 1341; *Young–Montenay, Inc. v. United States*, 15 F.3d at 1043 (noting that absent proof of harm, the government can recover penalties, but not damages))).

In *Rex Trailer Co. v. United States*, the United States Supreme Court stated, "there is no requirement, statutory or judicial, that specific damages be shown, and this was recognized by the Court in *Marcus*." *Rex Trailer Co. v. United States*, 350 U.S. 148, 152–53, 76 S.Ct. 219, 100 L.Ed. 149 (1956). In *Rex Trailer*, the United States Supreme Court summarized *United States ex rel. Marcus v. Hess*, 41 F.Supp. 197, 218 (W.D.Pa.1941), *rev'd on other grounds*, 127 F.2d 233 (3d Cir.), *cert. granted*, 317 U.S. 613, 63 S.Ct. 40, 87 L.Ed. 498 (1942), *and rev'd on other grounds*, 317 U.S. 537, 63 S.Ct. 379, 87 L.Ed. 443, *and reh'g denied*, 318 U.S. 799, 63 S.Ct. 756, 87 L.Ed. 1163 (1943), *superseded by statute on other grounds as recognized in Graham Cnty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 559 U.S. 280, 130 S.Ct. 1396, 176 L.Ed.2d 225, *reh'g denied*, 560 U.S. 936, 130 S.Ct. 3351, 176 L.Ed.2d 1241 (2010), by noting that, in the 1940s, the United States District Court for the Western District of Pennsylvania concluded that plaintiff was liable for the statutory penalty for submission of a false claim, but not damages, as damages were not proven. *See Rex Trailer Co. v. United States*, 350 U.S. at 152–53, 76 S.Ct. 219. Although the Supreme Court's discussion in *Rex Trailer* focused on the Surplus Property Act, the Supreme Court referred to *Marcus*, which involved the False Claims Act, in determining that proof of damages was not necessarily required in the assessment of a civil remedy or statutory penalty. *See id.* at 153, 76 S.Ct. 219 n.5 ("On several of the projects involved in the *Marcus* case, fraud was discovered by the Government in time for payments to be withheld. At trial [on the False Claims Act] in the District Court defendants urged that there could be

no recovery of a penalty or forfeiture in these instances in which no actual damages could be shown. The District Court held that failure to show actual damages in these instances would not preclude recovery under the statute. *See United States ex rel. Marcus v. Hess*, 41 F.Supp. at 218. The judgment of the District Court [in *Marcus* ] was affirmed here. *See United States v. Rohleder*, 157 F.2d 126, 129 [ (3d Cir.1946) ].").

 The Federal Circuit has indicated that "[i]t is well established that a baseless certified claim is a fraudulent claim." *Daewoo Eng'g & Constr. Co. v. United States*, 557 F.3d at 1339. " '[T]he statute attaches liability, not to the underlying fraudulent activity or to the government's wrongful payment, but to the "claim for payment." ' " *See Ulysses, Inc. v. United States*, 110 Fed.Cl. at 642 (quoting *United States v. Rivera*, 55 F.3d 703, 709 (1st Cir.1995)) (alteration in original). "[I]n deciding whether a given false statement is a claim or demand for payment, a court should look to see if, within the payment scheme, the statement has the practical purpose and effect, and poses the attendant risk, of inducing wrongful payment." *See United States v. Rivera*, 55 F.3d at 709. In order to determine the number of false claims a contractor submitted to the government, the United States Supreme Court has stated: "A correct application of the statutory language requires ... that the focus in each case be upon the specific conduct of the person from whom the Government seeks to collect the statutory forfeitures." *See United States v. Bornstein*, 423 U.S. 303, 312, 96 S.Ct. 523, 46 L.Ed.2d 514 (1976).[50] The Supreme Court's guidance in *United States v. Bornstein* has been interpreted to require courts to ask: " 'With what act did the defendant submit his [or her] demand or request and how many such acts were there?' " *United States v. Krizek*, 111 F.3d at 939. When a fraudulent claim consists of multiple components, the submission of an aggregate claim, rather than its individual components, is the act that creates liabili-

**50.** *United States v. Bornstein* analyzed an earlier version of the False Claims Act, but the guidance of the United State Supreme Court remains relevant to the court's interpretation of amended versions of the False Claims Act. *See United States v. Krizek*, 111 F.3d 934, 939 n. 1 (D.C.Cir. 1997).

ty under the False Claims Act. *See Miller v. United States*, 213 Ct.Cl. at 71–72, 550 F.2d at 23–24 (rejecting an argument that a contractor had asserted sixteen false claims under an earlier version of the False Claims Act, "eleven based on invoices used in calculating the monthly billings plus five, one for each of the monthly consolidated billings," because "the invoices are like tally sheets used in calculating a final figure to present to the Government; they are not the claim itself"); *see also United States v. Woodbury*, 359 F.2d 370, 378 (9th Cir.1966) (rejecting the argument that a penalty could be assessed under an earlier version of the False Claims Act for each document that was attached to fraudulent applications for payment).

■ Without differentiating between its allegations regarding WDO inspections and its allegations regarding routine inspections, defendant asserts that plaintiff is liable for fourteen false claims, consisting of thirteen invoices that plaintiff submitted to defendant during the course of performing the contract and for the April 8, 2009 claim that plaintiff submitted to the contracting officer. Defendant maintains that each invoice that plaintiff submitted "implicitly represented that CLF [Chapman Law Firm, LPA] had performed the contract work, to include the WDO and BMIs required by the contract," and that plaintiff's April 8, 2009 claim to the contracting officer sought payment for "computer services that enabled CLF to mass-generate the fraudulent termite/WDO reports, mass-generate the fraudulent BMI reports, and alter the electronic document creation dates of its reports in order to deceive HUD contracting officials."

Although not explained by plaintiff at trial, in the post-trial briefs, or explained in plaintiff's April 8, 2009 claim, the invoices relating to the generation of termite and routine inspection reports appears in a collection of invoices from technology subcontractors that amount to the total of plaintiff's theft of trade secrets claim, which plaintiff asserted in its April 8, 2009 claim to the contracting officer and originally asserted in its claim before the court. Plaintiff claimed that HUD had enabled a third party to access allegedly

proprietary information contained on plaintiff's EMS, which included the termite and routine inspection reports generated by plaintiff's subcontractor. Although entirely unclear, plaintiff may have included the invoices relating to the subcontractor's generation of termite and routine inspection reports in its April 8, 2009 claim to the contracting officer as evidence of the cost of the information which plaintiff believed had been misappropriated. Defendant did not address at trial this possibility, and given the lack of evidence in the record relating to plaintiff's intent for including the invoices in its April 8, 2009 claim to the contracting officer, defendant has not demonstrated that the April 8, 2009 claim constituted a false or fraudulent claim. Moreover, although the plaintiff subsequently dismissed the theft of trade secrets claim in this count.

■ In addition, defendant has not demonstrated that all thirteen invoices that plaintiff submitted to defendant were false. As discussed above, the record supports the conclusion that plaintiff fraudulently claimed entitlement to a management fee related to work its inspectors failed to perform on the East Dale Avenue, Trenton Street, Mount Elliott Avenue, and Chester Street properties. Under the parties' contract, plaintiff was entitled to "a single fixed fee" for managing the properties in its inventory. Plaintiff was to "invoice one fourth of the Property Management fee each month for four months beginning with the month the property is assigned." Although plaintiff claimed entitlement to property management fees to which it was not entitled in multiple invoices, the multiple invoices that plaintiff submitted with respect to each property asserted entitlement to only a portion of a single fee. Plaintiff claimed entitlement to property management fees for the East Dale Avenue and Trenton Street properties on the same four invoices, but the "specific conduct" that implicates plaintiff's liability under the False Claims Act arises from four, distinct sets of factual circumstances. *See United States v. Bornstein*, 423 U.S. at 312, 96 S.Ct. 523; *see also United States v. Krizek*, 111 F.3d at 939 (explaining that the *Bornstein* court assessed three penalties under an earlier version of

the False Claims Act for "three separate causative acts"). The court concludes that plaintiff's misrepresentation that its inspectors had performed routine inspections of the East Dale Avenue, Trenton Street, Mount Elliott Avenue, and Chester Street properties implicates liability under the False Claims Act for four false claims.[51]

The clear and convincing evidence that plaintiff intentionally misrepresented that it had conducted routine inspections of the East Dale Avenue, Trenton Street, Mount Elliott Avenue, and Chester Street properties, and that plaintiff intended to deceive defendant into thinking plaintiff was entitled to a management fee for its inspection of those properties, is sufficient to demonstrate by preponderant evidence that plaintiff had actual knowledge that the invoices it submitted to defendant were false. *See Alcatec, LLC v. United States*, 100 Fed.Cl. at 528 (concluding that the "lower standards of proof of knowledge under the FCA" were met upon finding clear and convincing evidence that the plaintiff had made intentional misrepresentations on inspection reports that the plaintiff submitted to the government "for compensation"). Frank Chapman, plaintiff's Chief Executive Officer, directed plaintiff's employees to use dates associated with lawn care visits to falsify routine inspection reports for the East Dale Avenue property. Mr. Smith, of many titles, misrepresented to Mr. Kellett that routine inspections of the East Dale Avenue property had been conducted on particular dates pursuant to Frank Chapman's directions. Frank Chapman also directed plaintiff's employees to create fraudulent routine inspection reports for the Trenton Street property, and others, stating: "YOU GO THROUGH AND CREATE THE BI MONTLIES [sic] BASED UPON ALL THE EVENTS THAT OCCURRED. LAWN CARE, APPRAISAL, DEREK's INSPECTIONS.... HUD WILL CONTINUE TO DO THIS AND I ABSOLUTELY WILL NOT PAY FOR THESE HOMES." (emphasis in original). Specifically, defendant demonstrated at trial that plaintiff's employees created two routine inspection reports indicating that the Trenton Street property was not damaged after two fires had occurred at the property, after Mr. Kellett had raised the lack of routine inspections in response to plaintiff's request to demolish the property, and after Mr. Goss expressed concern that HUD personnel had "a thumbprint of all the documents and communications for this property." Following repeated contact with HUD personnel, plaintiff's employees created routine inspection reports within fifteen minutes of making an eviction request for the Mount Elliott Avenue property and in apparent preparation for an eviction request for the Chester Street property. Upon being questioned about the falsified reports, Frank Chapman immediately directed Mr. Goss, with respect to the ".pdf" creation dates that served as evidence of plaintiff's fraudulent conduct: "Wipe them ALL! ASAP." Frank Chapman informed plaintiff's counsel that "John and his people put in inspections which were not in EMS," to which plaintiff's counsel responded: "OK I did not realize that the substance was problematic. I thought John was keeping things straight." Plaintiff's employees knew the importance that HUD placed on plaintiff's routine inspections, yet invoiced defendant for inspections it never conducted. The court concludes, therefore, that plaintiff violated the False Claims Act in knowingly making four implied representations that plaintiff had performed the work required by the parties' contract and by knowingly using falsified routine inspection reports to induce defendant to pay plaintiff's' fraudulent claims. *See* 31 U.S.C. § 3729(a)(1), (a)(2).

Plaintiff argues that it could not have submitted false claims because any misrepresentations it made "did not affect the amount of

---

51. The court notes that the facts of the above-captioned case are distinguishable from the facts of *Miller v. United States*, 213 Ct.Cl. 59, 550 F.2d at 17. The Court of Claims in *Miller* rejected the argument that a separate penalty could be assessed for the submission of invoices that served as the basis for consolidated billing statements. *See id.*, 213 Ct.Cl. at 71–72, 550 F.2d at 23–24.

Although plaintiff's claims of entitlement to management fees for the East Dale Avenue and Trenton Street properties were both included in the total amount claimed on four invoices, the assessment of two separate penalties for the East Dale Avenue and Trenton Street properties does not assess liability for the individual components of an aggregate claim.

funds that the Government was obligated to pay." (citing *United States ex rel. Watson v. Conn. Gen. Life Ins. Co.*, No. CIV.A.98–6698, 2003 WL 303142, at *10 (E.D.Pa.2003), *aff'd*, 87 Fed.Appx. 257 (3d Cir.2004)); *United States v. Southland Mgmt. Corp.*, 95 F.Supp.2d 629 (S.D.Miss.2000), *rev'd*, 288 F.3d 665, 679 (5th Cir.) (holding that the false certifications were material as a matter of law), *and reh'g en banc granted*, 307 F.3d 352 (5th Cir.2002), *and on reh'g en banc*, 326 F.3d 669 (5th Cir.2003). Although the 2009 amendments to the False Claims Act provide for liability when a contractor "knowingly makes, uses, or causes to be made or used, a false record or statement *material to* a false or fraudulent claim," 31 U.S.C. § 3729(a)(1)(B) (Supp. III 2009) (emphasis added), the earlier version of the False Claims Act, which is applicable to the above-captioned case, provides for liability when a contractor "knowingly makes, uses, or causes to be made or used, a false record or statement *to get* a false or fraudulent claim paid or approved by the Government." 31 U.S.C. § 3729(a)(2) (2006) (emphasis added); *see also United States ex rel. Hill v. Univ. of Med. & Dentistry of N.J.*, 448 Fed.Appx. 314, 317 n.4 (3d Cir.2011). A number of courts read an implied materiality requirement into the False Claims Act prior to the 2009 amendments. *See, e.g., United States ex rel. Longhi v. United States*, 575 F.3d 458, 468–69 (5th Cir.2009), *cert. denied sub nom. Lithium Power Techs., Inc. v. United States ex rel. Longhi*, 559 U.S. 1067, 130 S.Ct. 2092, 176 L.Ed.2d 722 (2010); *United States v. Bourseau*, 531 F.3d 1159, 1170–71 (9th Cir.

2008); *United States ex rel. Costner v. United States*, 317 F.3d 883, 886–78 (8th Cir. 2003); *United States ex rel. Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 785 (4th Cir.1999); *cf. United States ex rel. Loughren v. Unum Grp.*, 613 F.3d 300, 307 (1st Cir.2010). The United States Supreme Court also held that materiality was required, at least under Subsection 3729(a)(2) and Subsection 3729(a)(3). *See Allison Engine Co. v. United States ex rel. Sanders*, 553 U.S. 662, 672–73, 128 S.Ct. 2123, 170 L.Ed.2d 1030 (2008), *superseded by statute*, Fraud Enforcement and Recovery Act of 2009, Pub.L. No. 111–21, § 4, 123 Stat. 1617, 1621;[52] *see also United States ex rel. Loughren v. Unum Grp.*, 613 F.3d at 307. Various definitions of materiality have been proposed, including " 'outcome materiality,' " which holds that " 'a falsehood or misrepresentations must affect the government's ultimate decision,' " " 'claim materiality,' " which holds that " 'a falsehood or misrepresentation must be material to the defendant's claim of right in order to be considered 'material' for the purposes of the FCA,' " and the " 'natural tendency test,' " which requires only that "the false of fraudulent statements have the potential to influence the government's decisions." *See United States ex rel. Longhi v. United States*, 575 F.3d at 468–70 (quoting *United States v. Southland Mgmt. Corp.*, 288 F.3d at 676). At least one decision in the Court of Federal Claims has addressed the materiality requirement, holding that a claim is material if it is "an essential, important, or pertinent part of the claim." *See Tyger Constr. Co. v. United States*, 28 Fed.Cl. at 55.

---

**52.** Previous decisions imposed a materiality requirement on 31 U.S.C. § 3729(a)(1) as well as 31 U.S.C. § 3729(a)(2). *See United States ex rel. Loughren v. Unum Grp.*, 613 F.3d at 307. Although the 2009 amendments imposed a clear materiality requirement on the recodified version of Section 3729(a)(2), the express mention of materiality in the recodified version of Section 3729(a)(2) creates uncertainty as to whether materiality applies to the recodified version of Section 3729(a)(1). *See Allison Engine Co. v. United States ex rel. Sanders*, 553 U.S. at 671, 128 S.Ct. 2123 ("The inclusion of an express presentment requirement in subsection (a)(1), combined with the absence of anything similar in subsection (a)(2), suggests that Congress did not intend to include a presentment requirement in subsection (a)(2)."); *compare* 31 U.S.C. § 3729(a)(1)(A)

(Supp. III 2009), *with* 31 U.S.C. § 3729(a)(1)(B) (Supp. III 2009). Congress passed the 2009 amendments to " 'legislatively overrule[ ]' " the Supreme Court's holding in *Allison Engine*, reflecting Congress's original intent. *See United States v. Sci. Applications Int'l Corp.*, 653 F.Supp.2d 87, 106 (D.D.C.2009), *aff'd in part, vacated in part*, 626 F.3d 1257 (D.C.Cir.2010). Congress, therefore, rejected the normal principle of *expressio unius est exclusio alterius* in passing the 2009 amendments. Simultaneously, however, Congress, in passing the 2009 amendments, made that statute susceptible to the same principle of interpretation by expressly recognizing a materiality requirement in only one subsection of the amended version of the False Claims Act.

Plaintiff is correct that under the pre–2009 version of the False Claims Act, its knowing use of a false routine inspection reports "to get a false or fraudulent claim paid or approved by the Government," and its knowing presentation of a claim with a false, implied representation that it had performed the work that entitled plaintiff to be paid under the parties' contract, had to be material to plaintiff's claim. *See Allison Engine Co. v. United States ex rel. Sanders*, 553 U.S. at 672–73, 128 S.Ct. 2123; *see also United States ex rel. Loughren v. Unum Grp.*, 613 F.3d at 307. The court concludes, however, under any definition of materiality that plaintiff's misrepresentations were material to plaintiff's claims. Plaintiff's employees understood the importance that HUD placed on the routine inspections of the homes in plaintiff's inventory. As Mr. Kellett contemporaneously stated in response to Frank Chapman's attempt to avoid responsibility for the presence of an adverse occupant in the Ferris Street home: "HUD paid CLF to preserve and protect the home. . . . CLF did not inspect as required. Simply put, we paid you to do a job and it was not performed." Throughout plaintiff's performance of the contract, HUD continually objected to plaintiff's failure to conduct routine inspections.

As defendant recognizes, "the contract expressly tied payment to performance" and plaintiff was entitled to a management fee for each property only if it timely conducted routine inspections. Plaintiff's representation that it had conducted routine inspections, therefore, was material to defendant's obligation to pay plaintiff, material to plaintiff's claim of entitlement to a management fee, and was an "essential, important, or pertinent part" of plaintiff's claim. *See Tyger Constr. Co. v. United States*, 28 Fed.Cl. at 55; *see also United States ex rel. Longhi v. United States*, 575 F.3d at 468–70. Because defendant presented clear evidence only on limited examples and because plaintiff's alteration of the evidence of its fraudulent conduct prevents the court from determining whether there were additional instances in which plaintiff falsified routine inspection reports,[53] the court assesses the maximum statutory penalty of $11,000.00 per claim for the knowing submission of fraudulent claims and use of falsified inspection reports in support of fraudulent claims, resulting in a total penalty of $44,000.00. *See* 31 U.S.C. § 3729(a).[54] Plaintiff also is liable for the costs that defendant incurred in seeking penalties under the False Claims Act.[55] *See id.*

**53.** The record before the court raises concerns that numerous additional instances of fraud may have occurred in the above-captioned case. There is insufficient evidence in the record before the court, however, to find additional instances of fraud under either the Special Plea in Fraud statute or the False Claims Act, in part because of how defendant prosecuted its case.

**54.** Although the parties stipulated to the cost of a WDO inspection, defendant did not present evidence of what, if any, damages defendant suffered as a result of plaintiff's failure to conduct routine inspections. Defendant has the burden of proving that it sustained damages as a result of plaintiff's failure to conduct routine inspections. *See Commercial Contractors, Inc. v. United States*, 154 F.3d at 1371–72 ("In order to recover FCA damages, the government must prove that it sustained an actual loss as a result of the contractor's false or fraudulent claim."); *see also Alcatec, LLC v. United States*, 100 Fed.Cl. at 529 ("The evidence does not give the court confidence in the total amount of overpayments alleged, and, as such, the court declines to award other damages."); *Lamb Eng'g & Constr. Co. v. United States*, 58 Fed.Cl. 106, 109 (2003) (noting that defendant has the burden "of establishing actual damages in order to recover treble damages under the FCA"); *Ab–Tech Constr., Inc. v.*

*United States*, 31 Fed.Cl. 429, 434 (1994); *cf. United States v. Sci. Applications Int'l Corp.*, No. 04–1543 (RWR), 2013 WL 3791423, at *20 (D.D.C. July 22, 2013) (applying the principle that "[d]amages must be proven with reasonable certainty'" to treble damages under the False Claims Act. (citation omitted)). During closing arguments, defendant's counsel admitted that, based on the record before the court, plaintiff would not be liable for anything "[o]ther than statutory penalties" if the court were to conclude that plaintiff did not conduct routine inspections.

**55.** The court notes that the False Claims Act does not provide for the recovery of prejudgment interest on either damages or penalties assessed under the statute. Defendant's Amended Answer to plaintiff's Third Amended Complaint sought "a penalty of between $5,500 and $11,000 for each violation of the False Claims Act, plus interest as provided by law." At closing argument, when asked why defendant sought interest on its counterclaim, defendant's counsel requested permission to file a supplemental brief. Defendant subsequently withdrew its request for interest without acknowledging its original request. A number of courts have held that prejudgment interest is not recoverable on the damages and penalties available under the False Claims Act.

To the extent that the lack of government reliance, or the presence of government knowledge of the falsities of plaintiff's claims, constitutes a defense to liability under the False Claims Act, plaintiff has not proven that HUD personnel did not rely on plaintiff's misrepresentations. *See Ulysses, Inc. v. United States,* 110 Fed.Cl. at 645; *Veridyne Corp. v. United States,* 105 Fed.Cl. at 813; *Chemray Coatings Corp. v. United States,* 29 Fed.Cl. 278, 284 (1993). Moreover, that HUD was suspicious that plaintiff was not conducting routine inspections does not alter the court's conclusion. HUD paid plaintiff's invoices in reliance on the representation that plaintiff had conducted routine inspections pursuant to the parties' contract. The court also rejects plaintiff's other defenses to liability under the False Claims Act. The assessment of statutory penalties under the False Claims Act is not contingent on whether defendant breached the parties' contract. *See* 31 U.S.C. § 3729. In addition, the doctrines of estoppel, *Mabus v. Gen. Dynamics C4 Sys., Inc.,* 633 F.3d 1356, 1359 (Fed.Cir.), *reh'g and reh'g en banc denied* (Fed.Cir.2011), and accord and satisfaction, *Holland v. United States,* 621 F.3d 1366, 1377 (Fed.Cir.2010), *cert. denied,* — U.S. —, 132 S.Ct. 365, 181 L.Ed.2d 232 (2011), are inapplicable to the facts before the court. The record does not demonstrate, nor does the court find, that defendant in any way misled plaintiff or accepted plaintiff's deficient performance in lieu of the performance required under the contract.

## III. Spoliation

 Spoliation " 'is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation.' " *Micron Tech., Inc. v. Rambus Inc.,* 645 F.3d 1311, 1320 (Fed.Cir.) (quoting *Silvestri v. Gen. Motors Corp.,* 271 F.3d 583, 590 (4th Cir.2001)), *reh'g and reh'g en banc denied* (Fed.Cir.2011); *see also K-*

*Con Bldg. Sys., Inc. v. United States,* 106 Fed.Cl. 652, 663 (2012). The duty to preserve, therefore, "attaches not just when a suit is filed, but whenever a party knows or should know that evidence may be relevant to anticipated litigation." *See AAB Joint Venture v. United States,* 75 Fed.Cl. 432, 440 (2007) (quoting *Silvestri v. Gen. Motors Corp.,* 271 F.3d at 591). " '[T]he duty to preserve means what it says and ... a failure to preserve records—paper or electronic—and to search in the right places for those records, will inevitably result in the spoliation of evidence.' " *See Pitney Bowes Gov't Solutions, Inc. v. United States,* 94 Fed.Cl. 1, 7 (2010) (quoting *Pension Comm. Of Univ. of Montreal Pension Plan v. Banc of Am. Sec.,* 685 F.Supp.2d 456, 462 (S.D.N.Y.2010), *abrogated on other grounds, Chin v. Port Authority of New York & New Jersey,* 685 F.3d 135, 162 (2d Cir.2012), *cert. denied sub. nom Eng v. Port Authority of New York and New Jersey,* — U.S. —, 133 S.Ct. 1724, 185 L.Ed.2d 785 (2013)). A party, therefore, has an obligation to preserve relevant electronic records, including email correspondence and back-up media, when anticipating litigation. *See AAB Joint Venture v. United States,* 75 Fed.Cl. at 441 (citations omitted).

 Sanctions for spoliation arise out of the court's inherent power " 'governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.' " *Chambers v. NASCO, Inc.,* 501 U.S. 32, 43, 111 S.Ct. 2123, 115 L.Ed.2d 27 (quoting *Link v. Wabash R.R. Co.,* 370 U.S. 626, 630–31, 82 S.Ct. 1386, 8 L.Ed.2d 734 (1962)), *reh'g denied,* 501 U.S. 1269, 112 S.Ct. 12, 115 L.Ed.2d 1097 (1991); *see also United Med. Supply Co. v. United States,* 77 Fed.Cl. 257, 263–64 (2007); *Pueblo of Laguna v. United States,* 60 Fed.Cl. 133, 135–39 (2004). The inherent power of courts is broad, but must be exercised by judges cautiously, based on the specific facts of the

---

*See e.g., United States v. McLeod,* 721 F.2d 282, 286 (9th Cir.1983) (citing *United States v. Foster Wheeler Corp.,* 447 F.2d 100, 102 (2d Cir.1971)); *United States ex rel. Bunk v. Birkart Globistics GmbH & Co.,* Nos. 1:02CV1168(AJT/TRJ), 1:07CV1198(AJT/TRJ), 2011 WL 5005313, at *17

n. 24 (E.D.Va. Oct. 19, 2011); *United States ex rel. Maxwell v. Kerr–McGee Oil & Gas Corp.,* No. 04–cv–01224–MSK–CBS, 2010 WL 3730894, at *6 (E.D.Wis. Sept. 16, 2010); *United States v. Uzzell,* 648 F.Supp. 1362, 1368 n. 6 (D.D.C. 1986).

case presented. According to the United States Supreme Court, because of their very potency, inherent powers "must be exercised with restraint and discretion." *Roadway Express, Inc. v. Piper,* 447 U.S. 752, 764, 100 S.Ct. 2455, 65 L.Ed.2d 488 (1980). "In invoking the inherent power to punish conduct which abuses the judicial process, a court must exercise discretion in fashioning an appropriate sanction." *Chambers v. NASCO, Inc.,* 501 U.S. at 44–45, 111 S.Ct. 2123 (citing *Roadway Express, Inc. v. Piper,* 447 U.S. at 764, 100 S.Ct. 2455). Sanctions for spoliation are designed "to punish the spoliator, so as to ensure that it does not benefit from its misdeeds; to deter future misconduct; to remedy, or at least minimize, the evidentiary or financial damages caused by the spoliation; and last, but not least, to preserve the integrity of the judicial process and its truth-seeking function." *See United Med. Supply Co. v. United States,* 77 Fed.Cl. at 264 (citations omitted).

■■■■ The Federal Circuit has recognized:

> The general rules of evidence law create an adverse inference when evidence has been destroyed and "(1) . . . the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) . . . the records were destroyed with a culpable state of mind; and (3) . . . the destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense."

*See Jandreau v. Nicholson,* 492 F.3d 1372, 1375 (Fed.Cir.2007) (quoting *Residential Funding Corp. v. DeGeorge Fin. Corp.,* 306 F.3d 99, 107 (2d Cir.2002)) (omissions in original). The party seeking an adverse inference has the burden of establishing that spoliation has occurred. *See K–Con Bldg. Sys., Inc. v. United States,* 106 Fed.Cl. at 664 (citation omitted); *Morse Diesel Int'l, Inc. v. United States,* 81 Fed.Cl. 220, 222 (2008). In addition, the party seeking an adverse inference must " ' "come forward with plausible, concrete suggestions as to what [the discarded] evidence might have been." ' " *See K–Con Bldg. Sys., Inc. v. United States,* 106 Fed.Cl. at 666 (alteration in original; empha-

sis removed) (quoting *Micron Tech., Inc. v. Rambus Inc.,* 645 F.3d at 1328 (quoting *Schmid v. Milwaukee Elec. Tool Corp.,* 13 F.3d 76, 80 (3d Cir.1994))).

> In determining whether a party bears responsibility for spoliation of evidence, the key inquiry is identifying who had control over the evidence. If a party having control over evidence allows that evidence to be discarded, then the disposal of that evidence is attributable to that party, regardless of who actually discarded the evidence.

*Id.* at 664 (citations omitted). Physical possession is not necessary for a party to have control over evidence, and a " 'legal right to control or obtain' " is sufficient. *See id.* (quoting *United Cent. Bank v. Kanan Fashions, Inc.,* No. 10 C 331, 2011 WL 4396856, at *3 (N.D.Ill. Sept. 21, 2011)).

■■■■ The Federal Circuit has not clarified on the level of culpability required for a finding of spoliation. *See Cencast Servs., L.P. v. United States,* 94 Fed.Cl. 425, 444 (2010) (citing *United Med. Supply Co. v. United States,* 77 Fed.Cl. at 266, 266 n.20); *see also Lab. Corp. of Am. v. United States,* 108 Fed.Cl. 549, 560 (2012). Although judges of the Court of Federal Claims have disagreed over whether spoliation requires a finding of bad faith, *compare United Med. Supply Co. v. United States,* 77 Fed.Cl. at 268, *with Columbia First Bank, FSB v. United States,* 54 Fed.Cl. 693, 704 (2002), *and Slattery v. United States,* 46 Fed.Cl. 402, 405 (2000), *and Hardwick Bros. Co., II v. United States,* 36 Fed.Cl. 347, 416 (1996), a number of recent decisions have advanced persuasive arguments that the court is no required to find bad faith in order to impose a sanction for spoliation. *See United Med. Supply Co. v. United States,* 77 Fed.Cl. at 268; *see also K–Con Bldg. Sys., Inc. v. United States,* 106 Fed.Cl. at 661 n. 16, 664 n. 19. In the absence of a requirement to show bad faith, the court may impose sanctions if the destruction of evidence was "blameworthy." *See K–Con Bldg. Sys., Inc. v. United States,* 106 Fed.Cl. at 665 (citation omitted). The intent of the party who destroyed the evidence is relevant only in that it informs to the court's analysis of what, if any, sanctions

should be imposed. *See Lab. Corp. of Am. v. United States,* 108 Fed.Cl. at 560 (citations omitted) ("[T]he degree of culpability ... impacts not only whether a sanction should be imposed, but also which sanction is appropriate."); *K–Con Bldg. Sys., Inc. v. United States,* 106 Fed.Cl. at 666 ("[A]lthough the choice of sanction is within the court's discretion ... it must select a sanction that is proportionate to the conduct being punished and the harm that conduct caused.") (citations omitted); *Cencast Servs., L.P. v. United States,* 94 Fed.Cl. at 444 ("Under any applicable test, the level of culpability is relevant to the propriety of a sanction.").

■ When deciding whether to impose sanctions based on spoliation in a particular case, given the potential harshness of negative inferences, the discretion of the court must be exercised in a common sense manner, individually, with respect to the facts of each case. As stated in *Fujitsu Limited v. Federal Express Corp.:*

> Once a court has concluded that a party was under an obligation to preserve the evidence that it destroyed, it must then consider whether the evidence was intentionally destroyed, and the likely contents of that evidence.... The determination of an appropriate sanction for spoliation, if any, is confined to the sound discretion of the trial judge, *see West v. Goodyear Tire & Rubber Co.,* 167 F.3d 776, 779 (2d Cir. 1999), and is assessed on a case-by-case basis. *See United States v. Grammatikos,* 633 F.2d 1013, 1019–20 (2d Cir.1980).

*Fujitsu Ltd. v. Fed. Express Corp.,* 247 F.3d 423, 436 (2d Cir.), *cert. denied,* 534 U.S. 891, 122 S.Ct. 206, 151 L.Ed.2d 146 (2001).

■ The record indicates that plaintiff failed to preserve email correspondence of employees other than Frank Chapman, as well as office computers and hard drives that

may have contained relevant information.[56] After plaintiff transitioned out of the contract on May 14, 2008, Frank Chapman testified that plaintiff's email server was "left sitting" at HMon, LLC (HMon), the third party that maintained plaintiff's email server. Although Frank Chapman testified that he did not create a copy of plaintiff's email server, Mr. Goss testified that he conducted an "Ex-Merge" in the summer of 2008 at Frank Chapman's request, taking the emails of "certain employees" from plaintiff's email server and placing them on an external hard drive, which he then forwarded to Frank Chapman. Mr. Goss also testified that he "repurposed" hard drives that contained backups of plaintiff's files because he "wasn't instructed to keep them." During discovery, plaintiff maintained that Mr. Goss, who had not spoken to Frank Chapman since December 2008 or January 2009, was in possession of plaintiff's email server, although it now appears that the server was in the control of HMon. The record indicates that plaintiff's employees, including Frank Chapman, did not receive instructions from counsel to preserve evidence in anticipation of litigation, although plaintiff's counsel vaguely asserted that verbal discussions with Frank Chapman about the "need to maintain CLF's records" "would have" occurred in April 2007, November 2007, and May 2008. Plaintiff's counsel acknowledged to the court that he did not issue any written document preservation directions in this case. Although Frank Chapman testified that he directed HMon to preserve the email server, and that the owner of HMon knew "we were in litigation," no written evidence of such a direction was introduced into the record and the email that purportedly contains Frank Chapman's directive, which plaintiff's counsel submitted to the court after trial, indicates only that the owner of HMon asked Frank Chapman what

**56.** Although defendant charges plaintiff with also failing to preserve its "ordinary office files," the record developed by defendant for the court, both in its filings and at trial, does not contain sufficient evidence of what other documents plaintiff maintained, other than those contained on its email server, on its EMS, which contained the files associated with each property, and in personnel files, which plaintiff has consistently maintained were given to the United States Department of Labor. Although Mr. Goss testified that plaintiff stored physical files in file cabinets located at plaintiff's offices, he explained that at least some of the cabinets contained property files, which were duplicative of the electronic files on plaintiff's EMS. It is unclear whether the other "file cabinets" that Mr. Goss identified included documents other than plaintiff's personnel files.

to do with the server on July 8, 2009. Mr. Goss contradicted Frank Chapman's representation at trial, indicating that the email server was "put out of function, and the hosting company was allowed to reuse it for whatever they wanted," with Frank Chapman's permission. Frank Chapman also confirmed that, although the computers used during contract performance may have contained relevant files, "[a]ll the computers in the office were given to a local high school." Moreover, Mr. Goss testified that plaintiff's employees shared documents on a server that was apparently never produced.

The record also indicates that plaintiff's management anticipated litigation well before the end of contract performance. On February 4, 2008, after the end of the base year of the contract, but over three months before plaintiff transitioned out of the contract, plaintiff's counsel advised Frank Chapman to respond to Mr. Kellett's inquiries relating to plaintiff's alteration of ".pdf" creation dates, noting: "They know you are going to sue them." On the same day, plaintiff's counsel stated that he had "been making assumptions about the future claims litigation based on the strength of the data in the EMS" after Frank Chapman informed him that "John and his people put in inspections which were not in EMS." Throughout February and March 2008, plaintiff's counsel disputed the DCAA's findings with respect to its audit of the two stop work order claims that plaintiff had submitted on January 3, 2007 and May 7, 2007, respectively. By letter dated April 3, 2008, plaintiff's counsel informed the contracting officer that HUD's

> disparate treatment of CLF continues and will be noted for future use in any claim presented by CLF for such disparate treatment, overzealous inspection, the Government's failure to cooperate in the performance of the Contract, the Government's bad faith failure to exercise the first option year of the Contract, and the Government's constructive changes to the manner and method of performance of the Contract.

By letter dated June 2, 2008, noting that he had not received a response to his April 3, 2008 letter, plaintiff's counsel foreshadowed

plaintiff's theft of trade secrets claim, which plaintiff abandoned during litigation, by setting forth the value of damages plaintiff had allegedly sustained by HUD's purported grant of access to plaintiff's EMS to a third party, and assuring the contracting officer that "CLF will take any and all steps to enforce its rights and recover its damages arising from your agency's actions."

Although Frank Chapman maintained at trial that HMon, rather than plaintiff, was responsible for the failure to preserve plaintiff's email server, Frank Chapman allowed the email server to be used for other purposes, either by express direction or a failure to respond to the owner of HMon's inquiry, while having a right to control the server's disposition. *See K–Con Bldg. Sys., Inc. v. United States*, 106 Fed.Cl. at 666. Frank Chapman even recognized his rights to control the email server when he testified with respect to the owner of HMon's use of the email server for another purpose: "He converted my property to his use." The record, therefore, supports a finding of spoliation with respect to plaintiff's electronic files because plaintiff failed to preserve its email server, computers, and general office server while anticipating future litigation. *See AAB Joint Venture v. United States*, 75 Fed.Cl. at 441 (citations omitted).

In addition, the court agrees with defendant that plaintiff's alteration of ".pdf" creation dates constituted an additional demonstrable instance of spoliation. Less than two weeks before plaintiff's counsel stated to Frank Chapman that HUD personnel knew he was "going to sue them," Frank Chapman directed Mr. Goss to alter the creation dates of ".pdf" documents following Mr. Kellett's notification to Frank Chapman that he had discovered the suspicious files associated with routine inspections of the Chester Street property. The record does not indicate that plaintiff's counsel took any action upon being informed that Frank Chapman had directed that the ".pdf" creation dates be altered, other than asking with respect to the usefulness in future litigation of the data on plaintiff's EMS: "Are we going to have a problem with that evidence?" There is no evidence in the record of Frank Chapman

responding to plaintiff's counsel. Plaintiff's alteration of ".pdf" creation dates violated its duty to preserve relevant information at a time when litigation was reasonably foreseeable. *See Victor Stanley, Inc. v. Creative Pipe, Inc.,* 269 F.R.D. 497, 516 (D.Md.2010) (noting that spoliation can include the destruction of metadata); *Rimkus Consulting Grp., Inc. v. Cammarata,* 688 F.Supp.2d 598, 612 (S.D.Tex.2010) (same).

Once litigation had commenced, plaintiff also failed to adequately, and within an appropriate timeframe, respond to defendant's discovery requests. Although defendant failed to raise plaintiff's failure to timely respond to defendant's April 10, 2012 discovery request in plaintiff's May 25, 2012 response to defendant's April 10, 2012 discovery request until August 17, 2012, after the scheduled end of discovery, plaintiff's counsel failed to realize that Frank Chapman retained responsive documents, including on his laptop computer, until July 6, 2012, despite multiple representations to defendant and to the court. The court subsequently had to order plaintiff's counsel to produce to defendant all responsive emails after the court discovered that plaintiff's counsel had limited plaintiff's production of documents to a specific timeframe. In addition, although the court faults defendant's counsel for initially acquiescing to plaintiff's nonresponsiveness, the late production of Frank Chapman's laptop computer to defendant, and plaintiff's counsel's failure to realize that Frank Chapman had included additional sources of information with his laptop computer, which plaintiff's counsel did not even review before simply forwarding it to defendant's counsel, indicates a disregard for the discovery process.

▪ Although the court concludes that plaintiff engaged in the spoliation of evidence with "a culpable state of mind," *Jandreau v. Nicholson,* 492 F.3d at 1375, by engaging in what was, at the least, reckless conduct, the court does not believe that an adverse inference is warranted in the above-captioned case. *See K–Con Bldg. Sys., Inc. v. United*

*States,* 106 Fed.Cl. at 665 ("To be culpable merely means to be blameworthy or responsible for the conduct at issue." (citation omitted)). While keeping the purposes of imposing a sanction for spoliation in mind, *see United Med. Supply Co. v. United States,* 77 Fed.Cl. at 264, the court should " 'impose the least harsh sanction that can provide an adequate remedy.' " *See Lab. Corp. of Am. v. United States,* 108 Fed.Cl. at 562 (quoting *Pension Comm. Of Univ. of Montreal Pension Plan v. Banc of Am. Sec. LLC,* 685 F.Supp.2d at 469). Considering the overall disposition of the above-captioned case, the court concludes that the harsh sanction of a negative inference is not necessary to ensure that plaintiff does not "benefit from its misdeeds," to deter similar conduct, or to preserve the integrity of the judicial process.[57] *See United Med. Supply Co. v. United States,* 77 Fed.Cl. at 264 (citations omitted). The court has already concluded that plaintiff's claims are forfeited under the Special Plea in Fraud statute. Moreover, it is not clear that defendant has " ' "come forward with plausible, concrete suggestions as to what [the discarded] evidence might have been." ' " *See K–Con Bldg. Sys., Inc. v. United States,* 106 Fed.Cl. at 666 (quoting *Micron Tech., Inc. v. Rambus,* Inc., 645 F.3d at 1328 (quoting *Scmid v. Milwaukee Elec. Tool Corp.,* 13 F.3d at 80)) (alteration in original; emphasis removed).

Given Frank Chapman's prominence in the company, as well as his prominence in plaintiff's fraudulent conduct, the court agrees with the statement of plaintiff's counsel that it is likely that "any misdeeds by the Plaintiff would have been generated out of or blessed by Mr. Chapman's office." The court has a relatively clear picture of the fraud that occurred based on the contents of what defendant describes as *"a single laptop computer."* (emphasis in original). In addition, although an adverse inference that plaintiff made additional misrepresentations about routine inspections it did not conduct would allow the court to assess additional penalties, or even damages, under the False Claims Act, based

---

57. As discussed with the parties prior to trial, however, the court indicated it would award defendant costs for the litigation, based on the plaintiff's continually nonresponsive conduct during discovery.

on the record before the court, the court would have no basis by which to approximate the number of routine inspection reports that plaintiff falsified. *See United Med. Supply Co. v. United States*, 77 Fed.Cl. at 274–75 (describing complications that arise when an adverse inference relates to "determinations of liability and damages"). Moreover, defendant acknowledged during closing argument that "all of the specific instances" in which plaintiff falsified routine inspections reports were included in defendant's post-trial brief, which did not refer the court to additional instances in which defendant alleged plaintiff had falsified routine inspection reports. Similarly, although the court could possibly infer that plaintiff's email correspondence indicates that plaintiff did not contemporaneously interpret the parties' contract to allow plaintiff to use unlicensed inspectors to conduct WDO inspections under Section 5.3.9 of parties' contract, the record before the court rebuts this inference. *See Cencast Servs., L.P. v. United States*, 94 Fed.Cl. at 445 (noting that a proposed adverse inference would "likely be rebutted" by relevant evidence in the record because "[a]ny adverse inference 'completely vanishes upon the introduction of evidence sufficient to support a finding of the nonexistence of the presumed fact.'" (quoting *A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1037 (Fed.Cir.)), (citing Fed.R.Evid. 301), *reh'g denied* (Fed.Cir.1992)).

Although by no means condoning the behavior of plaintiff and plaintiff's counsel during discovery, in fact to the contrary, the court does not believe that additional sanctions are necessary or warranted in this case, given the court's rulings. In addition to statutory penalties under the False Claims Act, plaintiff is liable for "the costs of a civil action brought to recover any such penalty." 31 U.S.C. § 3729(a). Although defendant may have incurred additional costs during discovery that do not directly overlap with costs related to plaintiff's spoliation of evidence, defendant was not an innocent bystander in the breakdown of the discovery process. Defendant failed to timely raise objections to plaintiff's deficient responses to defendant's discovery requests or more aggressively pursue discovery, and initially acquiesced to plaintiff's improper conduct, which is represented by defendant's failure to object to the deficiencies in plaintiff's May 25, 2012 response to defendant's April 10, 2012 discovery request, defendant failed to object to the assertion of plaintiff's counsel during Frank Chapman's June 7, 2012 deposition that plaintiff would only produce documents in its possession, which did not include: internal correspondence that Frank Chapman had not received, plaintiff's employment records, and documents relating to plaintiff's routine inspections, both prior to the addition of defendant's co-counsel. In addition, defendant did not engage in third-party discovery, or seek relief from the court, when Mr. Goss informed defendant's counsel at his June 25, 2012 deposition that he did not have access to any documents that were responsive to defendant's discovery request, and that he had overwritten the information contained on hard drives containing relevant information. Although defendant would not be at fault for failing to conduct third-party discovery had plaintiff been in possession of the email server during discovery, *see K–Con Bldg. Sys., Inc. v. United States*, 106 Fed.Cl. at 665, defendant did not seek to confirm that HMon had dismantled the email server after plaintiff's counsel informed defendant that Mr. Goss had access to the email server and Mr. Goss informed defendant that the email server "host provider" had informed him that the server was no longer in existence. In addition, although an adverse inference may be warranted in the absence of bad faith, the court is hesitant to further assess defendant with an award of attorney's fees without further evidence. *Cf. Chambers v. NASCO, Inc.*, 501 U.S. at 59, 111 S.Ct. 2123 (Scalia, J. dissenting) ("[A] 'bad-faith' limitation upon the particular sanction of attorney's fees derives from our jurisprudence regarding the so-called American Rule, which provides that the prevailing party must bear his own attorney's fees and cannot have them assessed against the loser.... [F]ee shifting as a sanction can only be imposed for litigation conduct characterized by bad faith." (citation omitted)); *see also Roadway Express., Inc. v. Piper*, 447 U.S. at 765, 100 S.Ct. 2455. The court, therefore, chooses not to impose sanctions for the spoliation that occurred in

the above-captioned case. *See Morse Diesel Int'l, Inc. v. United States,* 81 Fed.Cl. at 222 ("[I]t is well established that the trial court 'has broad discretion in fashioning an appropriate sanction....' " (quoting *Residential Funding Corp. v. DeGeorge Fin. Corp.,* 306 F.3d at 107)).

Although the record only supports a finding that plaintiff submitted four, specific false claims, defendant maintains that "[a]n evidentiary sanction for spoliation is justified in this case." Defendant asserts that plaintiff has never produced "relevant, responsive emails" from employees other than Frank Chapman or plaintiff's "office files kept in the ordinary course of business." Defendant also argues that the alteration of the creation dates of ".pdf" files, "at a time when CLF and its counsel were planning for litigation, demonstrates that counsel was not concerned with preserving documents for litigation." Although the evidence in the above-captioned case may well be incomplete as a result of the actions of Frank Chapman and his employees during plaintiff's performance of the contract and discovery, as well as the failure of plaintiff's counsel to ensure that Frank Chapman preserved documents in anticipation of litigation and failure to timely produce documents once litigation had begun, the court ultimately must conclude, based, in part, on the conduct of defendant's counsel, including the failure early in the case to challenge the information received, that an adverse evidentiary inference is not warranted in the above-captioned case. In sum, this case was a model of how not to engage in discovery, with failures to produce, rolling production and the failure to follow-up on discovery request by both sides until way late in the development of the case.

## CONCLUSION

As a result of plaintiff's commission of fraud, plaintiff's claims are forfeited under the Special Plea in Fraud statute. Plaintiff

also is subject to a penalty under the False Claims Act in the amount of $44,000.00, for four specific, separate violations of the False Claims Act in the submission of four false claims. Defendant chose to present limited evidence on a limited number of specific properties. The Clerk of the Court shall enter **JUDGMENT** consistent with this opinion. Costs for the litigation are awarded to the defendant.

**IT IS SO ORDERED.**